WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Abraham L. Zylberberg
Evan C. Hollander
Richard A. Graham

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 15 |
| JSC Alliance Bank, | Case No. 10-_____ ( ) |
| Debtor in a Foreign Proceeding. | |

## VERIFIED PETITION FOR RECOGNITION OF FOREIGN MAIN PROCEEDING AND REQUEST FOR RELATED RELIEF

Petitioner, Maxat Rakhimzhanovich Kabashev (the "Petitioner"), as the authorized foreign representative of JSC Alliance Bank (the "Bank," or "Debtor"), the debtor in a voluntary restructuring proceeding currently pending in the Republic of Kazakhstan (the "Kazakh Proceeding"), by and through his undersigned counsel, respectfully submits this verified petition in furtherance of the Official Form of Voluntary Petition filed concurrently herewith (collectively, the "Petition") for entry of an order (i) recognizing the Kazakh Proceeding as a foreign main proceeding pursuant to sections 1515 and 1517 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and (ii) granting related relief pursuant to section 1520 of the Bankruptcy Code. In support of the Petition, the Petitioner has filed concurrently herewith and incorporated herein by reference (a) the Declaration of Maxat Rakhimzhanovich Kabashev pursuant to 28 U.S.C. § 1746 (the "Kabashev Declaration") and (b)

the Declaration of Yuriy Vladimirovich Maltsev pursuant to 28 U.S.C. § 1746 (the "Maltsev Declaration"), and respectfully represents as follows:

## BACKGROUND

### A. The Bank and the Foreign Representative

2. The Bank was incorporated under the laws of the Republic of Kazakhstan on 14 May 1993 as an open joint stock company under the name IrtyshBusinessBank OJSC. Since then, it has operated as a bank, accepting deposits and making loans. In 1999, IrtyshBusinessBank OJSC merged with Semipalatinsk City Bank, another regional bank which was based in Eastern Kazakhstan. The combined bank primarily served large industrial enterprises in the Eastern Kazakhstan and Pavlodar regions.

3. In October 2001 a consortium of Kazakhstan companies led by Seimar Alliance Financial Corporation acquired 64% of the issued shares in the Bank. Following the completion of this transaction, the Bank changed its name to JSC Alliance Bank.

4. The Bank's banking license number is 250, dated 26 December 2007, and its registration number with the Ministry of Justice is 4241-1900-AO, dated 13 March 2004. The registered office of the Bank and its principal place of business, in the sense of decision-making and other head office functions, are located at 50, Furmanov Street, Almaty 050004, Republic of Kazakhstan.

5. The Bank, together with its subsidiary companies, is known as the "Alliance Bank Group."[1]

6. The Petitioner is the Chairman of the Bank's Management Board. He was duly appointed as foreign representative of the Bank pursuant to a 18 September 2009 decision (the

---

[1] The Bank's (wholly-owned) subsidiaries are ALB Finance B.V., which operates in the Netherlands, and Alliance Finance LLC, which operates in the Russian Federation. Both were established primarily to raise funds for the group in international capital markets. Neither is a debtor in the Kazakh Proceeding or seeks chapter 15 relief.

"Kazakh Decision") of the Specialized Financial Court of Almaty City (the "Financial Court") and specifically authorized to act in restructuring-related proceedings concerning the Bank outside Kazakhstan, including proceedings concerning the recognition of the Kazakh Proceeding and of his appointment in it.[2]

**B.     The Bank's Business**

7. The Bank has no branch or agency in the United States. The Bank's only assets in the United States are certain correspondent accounts with US banks.

8. Substantially all the Bank's operations are in the Republic of Kazakhstan, where, as of 30 June 2009, it maintained 137 branches (including cash offices) and 1084 ATMs. As of 5 November 2009, the Bank was the sixth largest bank in Kazakhstan, as measured by total net loans. As of 30 June 2009 the Bank's net assets constituted 4.9 % of the total assets of the banking system in Kazakhstan. As of 30 June 2009, the Bank had 3,907 employees, all within Kazakhstan. Most of the Bank's directors and executive officers reside in Kazakhstan.

9. Most of the Bank's assets are concentrated in Kazakhstan (approx. 68% by value as of 31 December 2009).

**C.     Recent Financial Difficulties**

10. During the period 2004–2007 the Bank expanded rapidly, primarily funded by short- and medium-term bank borrowings and debt securities issued in the international capital markets. The Bank experienced severe liquidity difficulties as a result of the world-wide financial crisis which began in the middle of 2007 and also faced a serious deterioration in the quality of its loan portfolio as the Republic of Kazakhstan's economic growth slowed.

---

[2] A true and correct copy of the Kazakh Decision is attached as Exhibit "A" to the Kabashev Declaration. An English translation of the Kazakh Decision is attached as Exhibit "B" to the Kabashev Declaration.

11. On 19 March 2007 the Bank and Calyon Bank, as investment agent, entered into an Islamic financing agreement (the "<u>Master Murabaha Agreement</u>"), which provided the Bank with financing of US$150 million.

12. Following a recapitalization backed by the government of the Republic of Kazakhstan in late 2008 and early 2009, as well as a due diligence process initiated by a new management team in 2009, additional provisions against guarantees and loan losses were put in place by the Bank.

13. Due to a lack of funds, the Bank was unable to settle a payment demand under the Master Murabaha Agreement within 7 days of 19 March 2009, and a payment default occurred thereunder. Subsequently, the Bank was also unable to fulfill its obligations to repay creditors under other agreements. This inability to pay its debts as they fell due formed the basis for the Bank's application to the Financial Court for restructuring (as described in more detail below).

14. In April 2009 the Bank suspended the repayment of all outstanding principal amounts under its obligations but continued servicing interest. Around the same time, the Bank breached the capital adequacy and liquidity requirements of one of its principal regulators, the Agency of the Republic of Kazakhstan for Regulation and Supervision of Financial Markets and Financial Organizations (the "<u>FMSA</u>").

15. In light of the foregoing, the Bank agreed with the FMSA to initiate negotiations with its creditors and entered into an agreement with the FMSA in April 2009 (as amended, the "<u>FMSA Agreement</u>") concerning the restructuring of the Bank (the "<u>Restructuring</u>"). The FMSA Agreement imposed certain restrictions on the Bank, and the Bank agreed to develop and present to the FMSA an indicative restructuring and recapitalization plan (the "<u>Indicative Restructuring Plan</u>") by 15 July 2009.

16. Following negotiations with a steering committee comprised of certain financial creditors of the Bank (the "Steering Committee")[3] in April and May 2009, the Bank and the Steering Committee signed a Memorandum of Understanding with respect to the Restructuring on 6 July 2009.

17. On 14 July 2009, the Bank submitted the Indicative Restructuring Plan to the FMSA in accordance with the FMSA Agreement. The FMSA approved the Indicative Restructuring Plan on 21 July 2009.

### D. The Restructuring Law of the Republic of Kazakhstan

18. As in the United States, distressed banks in Kazakhstan are restructured under a specialized body of banking law rather than under the general provisions of Kazakh law dealing with the insolvency of ordinary companies. On 30 August 2009 the Law of the Republic of Kazakhstan "*On amendments and additions to certain legislative acts of the Republic of Kazakhstan on improvements in the Republic of Kazakhstan laws on money payments and transfers, accounting and financial reporting of financial organizations, banking activities and the activities of the National Bank of the Republic of Kazakhstan*" (the "Amending Law") came into force. The Amending Law put into place, among other things, an insolvency regime to deal with the restructuring of financial institutions in the Republic of Kazakhstan. As such, it made amendments to the Civil Procedural Code of the Republic of Kazakhstan (the "Civil Procedural Code") and the Law of the Republic of Kazakhstan "*On*

---

[3] The Steering Committee members are Asian Development Bank, Calyon, Commerzbank Aktiengesellschaft, DEG – Deutsche Investitutions- und Entwicklungsgesellschaft mbH, HSBC Bank plc, ING Asia Private Bank Limited, JPMorgan Chase Bank, N.A., Sumitomo Mitsui Banking Corporation Europe Limited and Wachovia Bank N.A.

*banks and banking activity in the Republic of Kazakhstan*" (the "Banking Law") among other laws.[4]

19. The Amending Law created a new Chapter 6-1 in the Banking Law which deals with the restructuring of insolvent financial institutions. Chapter 6-1 comprises Articles 59-1 to 59-3. Article 59-1 of the Banking Law sets out the concept of bank restructuring in voluntary cases in the Republic of Kazakhstan as follows: "Bank restructuring shall mean a package of administrative, legal, financial, organizational and technical, and other measures and procedures, to be applied to by a bank on the basis of a bank restructuring plan (the "restructuring plan") with the aim of improving its financial position and quality of operations."

20. Article 59-2 provides that a bank may be subject to restructuring if it cannot discharge its debts as they fall due. Inability to pay debts as they fall due in accordance with Article 59-2 is the only ground for restructuring pursuant to the Chapter 6-1 restructuring regime.

21. In essence, Chapter 6-1 of the Banking Law provides for a bank wishing to restructure to submit a restructuring plan to the Financial Court. Once the decision of the Financial Court to conduct bank restructuring takes effect, the bank is required to convene a meeting of its creditors whose liabilities are to be restructured for the purpose of negotiating and approving the restructuring plan. Approval of the restructuring plan requires the consent of creditors holding at least two-thirds by value of the bank's liabilities to the creditors whose claims are to be restructured. Following approval by creditors, the bank is required to submit the restructuring plan for final approval by the Financial Court. From the time of the court's

---

[4] Excerpts of the pertinent provisions (in English translation) are attached to the Maltsev Declaration as Exhibit "A."

initial decision to allow the restructuring proceedings to proceed, the bank may suspend performance of its outstanding obligations to be restructured and, under the Civil Procedural Code, both creditors' claims and executions upon the property of the bank are suspended.

22. In this case it was necessary for the Bank to invoke Article 2 of the Amending Law, designed for instances in which a restructuring was underway when the amendments came into force, according to which a bank "is entitled to apply to the specialized financial court for restructuring on the basis of documents confirming the conduct of restructuring actions."

### E. The Kazakh Proceeding

23. The Bank made an application for restructuring under the Civil Procedural Code, the Banking Law and the Amending Law on 10 September 2009, which was docketed on 11 September 2009. Pursuant to the Kazakh Decision, the application was granted by the Financial Court on 18 September 2009. This decision resulted in an automatic stay of all relevant claims of the Bank's creditors and protection of the Bank's property from execution and attachment until completion of the Restructuring.

24. On 19 November 2009 the Bank obtained an order of the Financial Court (the "November Order"), which slightly modified the terms of the Kazakh Decision by extending certain deadlines in relation to the Restructuring. A copy of the November Order is annexed to the Kabashev Declaration as Exhibit C, and an English translation thereof is attached to the Kabashev Declaration as Exhibit D.

25. As part of the Kazakh Decision (as modified by the November Order), the Financial Court ordered that:

a) the restructuring of the Bank must be completed by no later than 15 March 2010;

b) the Petitioner should be responsible for conducting the Restructuring;

c) the proceeding should be recognized as a judicial proceeding conducted in accordance with the insolvency legislation of the Republic of Kazakhstan in which the Bank's activity is subject to supervision by the FMSA;

d) the Bank should undertake various actions to notify and inform its creditors in relation to steps to be taken pursuant to the Restructuring, including publishing an information memorandum; and

e) previous court decisions regarding claims against the Bank should be suspended.

26. On 5 October 2009 the Bank and the Steering Committee signed a term sheet setting out key commercial terms of the Restructuring and of the Bank's corporate governance and other aspects of its operations and business following the Restructuring.

27. Pursuant to the order of the Financial Court, the Bank distributed by publishing on its web site an information memorandum dated 5 November 2009, a copy of which is annexed as Exhibit E to the Kabashev Declaration, as supplemented by a supplemental information memorandum dated 24 November 2009, a copy of which is annexed as Exhibit F to the Kabashev Declaration (together, the "Information Memorandum"). The Information Memorandum contains the definitive restructuring plan (the "Restructuring Plan").

28. The Restructuring Plan was approved at a meeting held on 15 December 2009 by creditors holding over 94% in amount of the claims against the Bank that are being restructured.

29. A brief description of the Restructuring Plan can be found at pages 7-11 of the Information Memorandum with the actual Restructuring Plan contained at pages 222-241 of the Information Memorandum. In summary, the Restructuring Plan will be effected through the restructuring of the existing claims of all financial and other creditors of the Bank, save for

certain categories of excluded creditors (such as depositors and day to day trade creditors). Pursuant to the Restructuring Plan, cash will be paid and/or shares and/or notes will be allocated to those creditors whose claims are being restructured. The Restructuring Plan is expected to come into effect in March 2010.

30. Depending on the nature of their claims, creditors may choose and/or be eligible for one of several options to participate in the Restructuring. For example, Option 1, available to holders of unsubordinated claims, involves the payment of 22.5% the face amount of such claims (payable in the relevant currency). Option 2 involves the issuance by the Bank of seven-year notes with a principal amount equal to 50% of the amount of a creditor's unsubordinated claims, and "Recovery Notes" in a principal amount representing approximately the remaining 50% of such claims. Recovery notes will be paid from recoveries on assets in the Bank's corporate and SME (Small and Medium-Sized Enterprise) portfolios, litigation recoveries and certain tax assets.

31. On 20 December 2009 the Restructuring Plan approved at the creditors' meeting was delivered to the FMSA for its review.

32. Pursuant to Resolution No. 268 adopted on 30 December 2009 by the FMSA, the entire issued share capital of the Bank was compulsorily acquired by the FMSA and transferred to the JSC National Welfare Fund Samruk-Kazyna ("Samruk-Kazyna"), which is wholly-owned by the Republic of Kazakhstan. Accordingly, the Bank is now wholly-owned by Samruk-Kazyna. The FMSA undertook this action pursuant to the Banking Law primarily as a result of the Bank's negative equity capital position and its failure to comply with prudential requirements, which were not cured within the time period allowed under Kazakhstan legislation.

33. On 1 February 2010 the FMSA approved the Restructuring Plan. The Restructuring Plan was submitted to the Financial Court for its approval on 3 February 2010. A hearing before the Financial Court is expected to occur on 26 February 2010. All claimants are entitled to appear at that hearing.

34. The Restructuring Plan covers over US$ 5 billion of the Bank's financial indebtedness.

### F. Connections to the United States

35. The Bank's principal assets in the United States are balances in its accounts at correspondent banks located in New York City used to facilitate its wire transfer and credit operations. Its major American creditors are a diverse group of banks, mutual funds, hedge funds and government agencies, such as the Export-Import Bank of the United States.

36. Recognition at this time is considered necessary to prevent the risk of parties taking action against the Bank or seeking attachments over the Bank's assets that are located in the United States, which would disrupt its operations and the implementation of the Restructuring Plan. It is also anticipated that the Bank will use the balances in its accounts with US correspondent banks to make restructuring payments that are to be made with US dollars.

### JURISDICTION AND VENUE

37. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.

38. Venue is proper in this district. Section 1410 of title 28 of the United States Code provides as follows:

> A case under chapter 15 of title 11 may be commenced in the district court of the United States for the district —

(1) in which the debtor has its principal place of business or principal assets in the United States;

(2) if the debtor does not have a place of business or assets in the United States, in which there is pending against the debtor an action or proceeding in a Federal or State court; or

(3) in a case other than those specified in paragraph (1) or (2), in which venue will be consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative.

39. Although the Bank does not have a place of business in the United States, its principal assets in the United States are located in New York City.

## RELIEF REQUESTED

40. Petitioner seeks entry of an order pursuant to section 1517 of the Bankruptcy Code recognizing the Kazakh Proceeding as a foreign main proceeding (as defined in section 1502 of the Bankruptcy Code) and granting the Debtor all of the relief afforded to such proceedings pursuant to section 1520 of the Bankruptcy Code.

## BASIS FOR RELIEF

### A. The Petition Satisfies the Requirements of Chapter 15

41. Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing, the Court shall enter an order recognizing a foreign proceeding as a foreign main proceeding if (1) such foreign proceeding is a foreign main proceeding within the meaning of section 1502 of the Bankruptcy Code, (2) the foreign representative applying for recognition is a person or body and (3) the petition meets the requirements of section 1515 of the Bankruptcy Code. As set forth below, the Kazakh Proceeding, the Petitioner and this Petition satisfy all of the foregoing requirements.

### (i) The Kazakh Proceeding is a Foreign Main Proceeding

42. The Kazakh Proceeding is a foreign main proceeding and, as such, satisfies the first condition for the entry of an order recognizing such proceeding under section 1517(a) of the Bankruptcy Code.

43. As an initial matter, the Kazakh Proceeding plainly comes within the general definition of "foreign proceeding" set forth in section 101(23) of the Bankruptcy Code, which states as follows:

> The term "foreign proceeding" means a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

44. Section 101(23) requires that a "foreign proceeding" (1) be a collective judicial or administrative proceeding relating to insolvency or adjustment of debt, (2) pending in a foreign country, (3) under the supervision of a foreign court and (4) for the purpose of reorganizing or liquidating the assets and affairs of the debtor. See 11 U.S.C. § 101(23). The statute defines "foreign court" as "a judicial or other authority competent to control or supervise a foreign proceeding." See 11 U.S.C. § 1502(3).

45. There should be little doubt that the Kazakh Proceeding qualifies as a "foreign proceeding" under section 101(23) of the Bankruptcy Code. Section 1516(a) of the Bankruptcy Code entitles the court to presume that a foreign proceeding is a "foreign proceeding," if the decision commencing the foreign proceeding so states. See 11 U.S.C. §§ 1516(a), 1515(b)(1). Here, the Kazakh Decision recognizes the Kazakh Proceeding "as a judicial proceeding conducted with the insolvency legislation of the Republic of Kazakhstan in

NEWYORK 7461293 (2K)

12

### (i) The Kazakh Proceeding is a Foreign Main Proceeding

42. The Kazakh Proceeding is a foreign main proceeding and, as such, satisfies the first condition for the entry of an order recognizing such proceeding under section 1517(a) of the Bankruptcy Code.

43. As an initial matter, the Kazakh Proceeding plainly comes within the general definition of "foreign proceeding" set forth in section 101(23) of the Bankruptcy Code, which states as follows:

> The term "foreign proceeding" means a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

44. Section 101(23) requires that a "foreign proceeding" (1) be a collective judicial or administrative proceeding relating to insolvency or adjustment of debt, (2) pending in a foreign country, (3) under the supervision of a foreign court and (4) for the purpose of reorganizing or liquidating the assets and affairs of the debtor. See 11 U.S.C. § 101(23). The statute defines "foreign court" as "a judicial or other authority competent to control or supervise a foreign proceeding." See 11 U.S.C. § 1502(3).

45. There should be little doubt that the Kazakh Proceeding qualifies as a "foreign proceeding" under section 101(23) of the Bankruptcy Code. Section 1516(a) of the Bankruptcy Code entitles the court to presume that a foreign proceeding is a "foreign proceeding," if the decision commencing the foreign proceeding so states. See 11 U.S.C. §§ 1516(a), 1515(b)(1). Here, the Kazakh Decision recognizes the Kazakh Proceeding "as a judicial proceeding conducted with the insolvency legislation of the Republic of Kazakhstan in

which the activity of [the Bank] is subject to the supervision by the [FMSA]." Kazakh Decision, p. 6.

46. The Kazakh Proceeding is "collective" in the sense that it involves all creditors collectively (apart from certain excluded categories of creditors) and requires that at least two-thirds (by way of value) of the Debtor's creditors whose claims are the subject matter of the proceeding consent to the Restructuring in order for the Restructuring to proceed. See Articles 59-3(6), (7), (8) and (11) of the Banking Law and Articles 312-4(2) and 312-5 of the Civil Procedural Code, as well as the terms of the Kazakh Decision itself.

47. The Kazakh Proceeding is a judicial proceeding in that the opening of the restructuring proceedings and the approval of the Restructuring Plan each requires an order of the Financial Court, a judicial body of Kazakhstan. See Articles 59-3(5) and (10) of the Banking Law and Articles 312-3 to 312-5 of the Civil Procedural Code. It also qualifies as a "foreign proceeding" because it is an administrative proceeding in which the restructuring is also controlled or supervised by "the authorized agency," namely the FMSA.[5] See Articles 59-3(2), (3), (4), (9), (14) and (15) of the Banking Law.

48. The Kazakh Proceeding is pending in a foreign country (Kazakhstan) under a law relating to insolvency, particularly Articles 59-2 and 59-3 of the Banking Law, in which the assets and affairs of the Bank[6] are subject to control or supervision by a "foreign court" (the Financial Court and the FMSA) for the purpose of reorganization, in particular, the restructuring of the Bank's debts in return for cash payments, the issuance of bonds and/or the issuance of equity. See, e.g., Article 59-1 of the Banking Law ("Bank restructuring shall mean

---

[5] The Financial Court's supervisory role in the Restructuring is shared with FMSA. To that extent, the FMSA is acting as a "foreign court" within the definition of that term in section 1502(3) of the Bankruptcy Code.
[6] Note that the Bank is an eligible "debtor" under section 1501(c)(1) of the Bankruptcy Code, because it maintains no branches or agencies in the United States. See 11 U.S.C. § 109(b)(3)(B).

a package of administrative, legal, financial, organizational and technical and other measures and procedures to be applied to by a bank on the basis of a bank restructuring plan (the "restructuring plan") with the aim of improving its financial position and quality of operations."); Kabashev Declaration ¶¶ 26-27.

49. In addition to qualifying as a "foreign proceeding" under section 101(23), the Kazakh Proceeding qualifies as a "foreign main proceeding," which is defined in section 1502(4) of the Bankruptcy Code as "a foreign proceeding pending in the country where the debtor has the center of its main interests." See 11 U.S.C. § 1502(4).

50. Although the Bankruptcy Code does not provide a conclusive test for determining a debtor's "center of main interests," it does provide that the debtor's "registered office" is presumed to be the center of its main interests. See 11 U.S.C. § 1516(c); see also 8 Collier on Bankruptcy ¶ 1516.03 (noting that the term "registered office" refers to the place of incorporation or the equivalent for an entity that is not a natural person); In re Artimm, S.r.l., 335 B.R. 149, 159 (Bankr. C.D. Cal. 2005) (holding that debtor's center of main interests was Rome, the location of its registered office).

51. The Bank's registered office is located in Almaty, Kazakhstan, which is thus presumed to be the center of its main interests. This conclusion is further supported by the fact that the Bank maintains its head-office and administrative functions at its corporate headquarters in Almaty, Kazakhstan, making Almaty its principal place of business. See In re Tri-Continental Exch. Ltd., 349 B.R. 627, 634 (Bankr. E.D. Cal. 2006) (equating center of main interests with principal place of business). Moreover, substantially all of the Bank's operations, all of its branches and employees and almost all of its customers are located in Kazakhstan.

52. For all of the reasons set forth above, the Kazakh Proceeding is, and should be recognized as, a foreign main proceeding.

    (ii)    <u>The Petitioner is a Foreign Representative Who is a Person</u>

53. The second requirement for recognition of a foreign proceeding under section 1517(a) of the Bankruptcy Code is that the foreign representative applying for recognition be a person or body. See 11 U.S.C. § 1517(a)(2).

54. The term "foreign representative" is defined in section 101(24) of the Bankruptcy Code as follows:

> [A] person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

55. Under section 101(41) of the Bankruptcy Code, the "term 'person' includes [an] individual . . . ." 11 U.S.C. § 101(41).

56. The Petitioner in this case is an individual who serves as Chairman of the Bank's Management Board and who has been duly appointed by the Financial Court as (1) the person "responsible for conducting the restructuring of JSC Alliance Bank . . ." and (2) specifically authorized to serve as the Bank's "foreign representative" pursuant to the Kazakh Decision. See the Kabashev Declaration and Kazakh Decision, p. 6. As such, he is both "authorized to administer the reorganization" of the debtor and "to act as a representative" of the Kazakh Proceeding, thus satisfying the second requirement for the entry of an order recognizing the Kazakh Proceeding under section 1517(a) of the Bankruptcy Code.

### (iii) The Petition Meets the Requirements of Section 1515

57. The third and final requirement for recognition of a foreign proceeding under section 1517(a) of the Bankruptcy Code is that the petition for recognition meets the requirements of section 1515 of the Bankruptcy Code. See 11 U.S.C. § 1517(a)(3). Specifically, section 1515 of the Bankruptcy Code sets forth certain procedural requirements which the petition for recognition must meet, including evidence of the foreign proceeding.

58. Here, all of the requirements of section 1515 of the Bankruptcy Code have been met. First, the Bank's chapter 15 case was duly and properly commenced by the Bank's foreign representative, Petitioner Maxat Rakhimzhanovich Kabashev, through the filing of this Petition as required by section 1515(a) of the Bankruptcy Code.

59. Second, evidence of the existence of the Kazakh Proceeding and the appointment of the Petitioner as foreign representative thereof have been provided to the Court as required under section 1515(b)(1) and (d) of the Bankruptcy Code. See Exhibits A-D to the Kabashev Declaration (attaching true and correct copies of the Kazakh Decision and November Order and English translations thereof).

60. Third, in accordance with section 1515(c) of the Bankruptcy Code, the Kabashev Declaration contains a statement identifying the Kazakh Proceeding as the only foreign main proceeding currently pending with respect to the Bank and notes that, in addition, an order of recognition of the Kazakh Proceeding as a foreign main proceeding was issued on 18 December 2009 by the Chancery Division of the High Court Justice of England and Wales in the United Kingdom under that country's Cross-Border Insolvency Regulations 2006.[7] See Kabashev Declaration ¶ 36.

---

[7] Like chapter 15 of the Bankruptcy Code, the Cross-Border Insolvency Regulations 2006 implement the Model Law on Cross-Border Insolvency as adopted by the United Nations Commission on International Trade Law

61. For all of the reasons set forth above, Petitioner respectfully submits that all of the requirements of section 1517(a) have been satisfied and, thus, that the entry of an order recognizing the Kazakh Proceeding as a foreign main proceeding is proper.

B. **The Debtor is Entitled to Relief under 11 U.S.C. § 1520**

62. Section 1520 of the Bankruptcy Code sets forth a series of statutory protections that apply automatically upon the entry of an order recognizing a foreign main proceeding (see 11 U.S.C. § 1520) including the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to the Bank worldwide and to the Bank's property that is within the territorial jurisdiction of the United States. Given that the protections set forth in section 1520 flow automatically from the recognition of a foreign main proceeding under section 1517, the Petitioner respectfully submits that no further showing is required.

## NOTICE

63. Notice of this Petition has been provided to (i) the Office of the United States Trustee for the Southern District of New York and (ii) all parties required to be given notice under Bankruptcy Rule 2002(q)(1) of which the Petitioner is currently aware. The Petitioner submits that no other or further notice need be provided.

## NO PRIOR REQUEST

64. No previous request for the relief requested herein has been made to this or any other court.

---

on 30 May 1997. Compare Regulation 2 of the Cross-Border Insolvency Regulations 2006 ("The UNCITRAL Model Law shall have the force of law in Great Britain . . . .") with 11 U.S.C. § 1501(a) ("The purpose of this chapter [15] is to incorporate the Model Law on Cross-Border Insolvency . . . .").

WHEREFORE, for the reasons set forth herein, the Petitioner respectfully requests that this Court enter an order (i) granting the relief requested herein and (ii) granting the Debtor such other and further relief as the Court deems proper and just.

Dated: New York, New York
February 16, 2010

WHITE & CASE LLP

By: *[signature]*
Abraham L. Zylberberg
Evan C. Hollander
Richard A. Graham
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113

Attorneys for Maxat Rakhimzhanovich Kabashev as Foreign Representative of JSC Alliance Bank

## VERIFICATION

MAXAT RAKHIMZHANOVICH KABASHEV hereby declares:

1. I hold the title of Chairman of the Management Board of JSC Alliance Bank and have been authorized by the Specialized Financial Court of Almaty City to commence this ancillary case.

2. I have read this Verification and the foregoing Petition and I am informed and believe that the factual allegations contained therein are true and correct.

3. I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed: Almaty, Kazakhstan
February 10, 2010

_____
MAXAT RAKHIMZHANOVICH KABASHEV