WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Abraham L. Zylberberg
Evan C. Hollander
Richard A. Graham

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 15 |
| JSC Alliance Bank, | Case No. 10-____ ( ) |
| Debtor in a Foreign Proceeding. | |

## DECLARATION OF MAXAT RAKHIMZHANOVICH KABASHEV PURSUANT TO 28 U.S.C. § 1746

I, Maxat Rakhimzhanovich Kabashev, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1. I submit this declaration (the "Declaration") in support of the Verified Petition for Recognition of Foreign Main Proceeding and Request for Related Relief (the "Petition"), which is to be filed contemporaneously herewith, and which seeks entry of an order (i) recognizing as a foreign main proceeding pursuant to sections 1515 and 1517 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), the voluntary judicial restructuring proceeding (the "Kazakh Proceeding") that was initiated by JSC Alliance Bank (the "Bank," or the "Debtor") in the Specialized Financial Court of Almaty City (the "Financial Court") in Kazakhstan and opened pursuant to a 18 September 2009 decision of the Financial Court (the "Kazakh Decision"), and (ii) granting related relief pursuant to section 1520 of the Bankruptcy Code. I make this Declaration on the basis of documentation in my possession or supplied to me

and on facts and matters that are known to me or of which I have been informed by others. Where I have been informed by others, the information is true to the best of my knowledge and belief and I state the source of that information.

2.  Although Kazakh is my native language, I am fluent in English and have elected to execute and submit this Declaration in English.

3.  I am the Chairman of the Bank's Management Board. Pursuant to the Kazakh Decision,[1] I have been duly appointed as foreign representative of the Bank and been made responsible to conduct the restructuring of the Bank and authorized to act in restructuring-related proceedings concerning the Bank outside Kazakhstan, including proceedings concerning the recognition of the Kazakh Proceeding and of my appointment in it. As such, I have supervisory control over the business records concerning the financial condition of the Bank, all of which are generally created contemporaneously with the events they reflect and are kept in the ordinary course of business by the Bank. I should mention, however, that the Bank is in the process of seeking to recover certain records of some past, possibly fraudulent, transactions entered into by the Bank's former management.

4.  Contemporaneously herewith, I have caused this chapter 15 case to be commenced through the filing of the Petition.

5.  The Bank was incorporated under the laws of the Republic of Kazakhstan on 14 May 1993 as an open joint stock company under the name IrtyshBusinessBank OJSC. Since then, it has operated as a bank, accepting deposits and making loans. In 1999, IrtyshBusinessBank OJSC merged with Semipalatinsk City Bank, another regional bank which was based in Eastern Kazakhstan. The combined bank primarily served large industrial

---

[1] A true and correct copy of the Kazakh Decision is attached hereto as Exhibit "A." An English translation of the Decision is attached hereto as Exhibit "B."

enterprises in the Eastern Kazakhstan and Pavlodar regions.

6. In October 2001, a consortium of Kazakhstan companies led by Seimar Alliance Financial Corporation acquired 64% of the issued shares in the Bank. Following the completion of this transaction, the Bank changed its name to JSC Alliance Bank.

7. The Bank's banking license number is 250, dated 26 December 2007, and its registration number with the Ministry of Justice is 4241-1900-AO, dated 13 March 2004. The registered office of the Bank and its principal place of business, in the sense of decision-making and other head office functions, are located at 50, Furmanov Street, Almaty 050004, Republic of Kazakhstan.

8. The Bank, together with its subsidiary companies, is known as the "Alliance Bank Group."[2]

9. The Bank has no branch or agency in the United States. The Bank's only assets in the United States are certain correspondent accounts with US banks.

10. Substantially all the Bank's operations are in the Republic of Kazakhstan, where, as of 30 June 2009, it operated 137 branches (including cash offices) and 1084 ATMs. As of 5 November 2009, the Bank was the sixth largest bank in Kazakhstan, as measured by total net loans. As of 30 June 2009 the Bank's net assets constituted 4.9 % of the total assets of the banking system in Kazakhstan. As of 30 June 2009, the Bank had 3,907 employees, all within Kazakhstan. Most of the Bank's directors and executive officers reside in Kazakhstan.

11. Most of the Bank's assets are concentrated in Kazakhstan (approx. 68% by value as of 31 December 2009).

---

[2] The Bank's (wholly-owned) subsidiaries are ALB Finance B.V., which operates in the Netherlands, and Alliance Finance LLC, which operates in the Russian Federation. Both were established primarily to raise funds for the group in international capital markets. Neither is a debtor in the Kazakh Proceeding or seeks chapter 15 relief.

12. During the period 2004–2007 the Bank expanded rapidly, primarily funded by short- and medium-term bank borrowings and debt securities issued in the international capital markets. The Bank experienced severe liquidity difficulties as a result of the world-wide financial crisis which began in the middle of 2007 and also faced a serious deterioration in the quality of its loan portfolio as the Republic of Kazakhstan's economic growth slowed.

13. On 19 March 2007 the Bank and Calyon Bank, as investment agent, entered into an Islamic financing agreement (the "Master Murabaha Agreement"), which provided the Bank with financing of US$150 million.

14. Following a recapitalization backed by the government of the Republic of Kazakhstan in late 2008 and early 2009, as well as a due diligence process initiated by a new management team in 2009, additional provisions against guarantees and loan losses were put in place by the Bank.

15. Due to a lack of funds, the Bank was unable to settle a payment demand under the Master Murabaha Agreement within 7 days of 19 March 2009, and a payment default occurred thereunder. Subsequently, the Bank was also unable to fulfill its obligations to repay creditors under other agreements. This inability to pay its debts as they fell due formed the basis for the Bank's application to the Financial Court for restructuring (as described in more detail below).

16. In April 2009 the Bank suspended the repayment of all outstanding principal amounts under certain of its obligations but continued servicing interest. Around the same time, the Bank breached the capital adequacy and liquidity requirements of one of its principal regulators, the Agency of the Republic of Kazakhstan for Regulation and Supervision of Financial Markets and Financial Organizations (the "FMSA").

17. In light of the foregoing, the Bank agreed with the FMSA to initiate negotiations with its creditors and entered into an agreement with the FMSA in April 2009 (as amended, the "FMSA Agreement") concerning the restructuring of the Bank (the "Restructuring"). The FMSA Agreement imposed certain restrictions on the Bank, and the Bank agreed to develop and present to the FMSA an indicative restructuring and recapitalization plan (the "Indicative Restructuring Plan") by 15 July 2009.

18. Following negotiations with a steering committee comprised of certain financial creditors of the Bank (the "Steering Committee")[3] in April and May 2009, the Bank and the Steering Committee signed a Memorandum of Understanding with respect to the Restructuring on 6 July 2009.

19. On 14 July 2009, the Bank submitted the Indicative Restructuring Plan to the FMSA in accordance with the FMSA Agreement. The FMSA approved the Indicative Restructuring Plan on 21 July 2009.

20. The Bank made an application for restructuring under the Civil Procedural Code, the Banking Law and the Amending Law (each used herein throughout as defined in the Declaration of Yuriy Vladimirovich Maltsev pursuant to 28 U.S.C. § 1746 (filed herewith)) on 10 September 2009, which was docketed on 11 September 2009. Pursuant to the Kazakh Decision, the application was granted by the Financial Court on 18 September 2009. This decision resulted in an automatic stay of all relevant claims of the Bank's creditors and protection of the Bank's property from execution and attachment until completion of the Restructuring.

---

[3] The Steering Committee members are Asian Development Bank, Calyon, Commerzbank Aktiengesellschaft, DEG – Deutsche Investitions- und Entwicklungsgesellschaft mbH, HSBC Bank plc, ING Asia Private Bank Limited, JPMorgan Chase Bank, N.A., Sumitomo Mitsui Banking Corporation Europe Limited and Wachovia Bank N.A.

NEWYORK 7464355 (2K)

21. On 19 November 2009 the Bank obtained an order of the Financial Court (the "November Order"), which slightly modified the terms of the 18 September 2009 decision by extending certain deadlines in relation to the Restructuring. A copy of the November Order is annexed hereto as Exhibit C, and an English translation thereof is attached as Exhibit D.

22. As part of the Kazakh Decision (as modified by the November Order), the Financial Court ordered that:

   a) the restructuring of the Bank must be completed by no later than 15 March 2010;

   b) I should be responsible for conducting the Restructuring;

   c) the proceeding should be recognized as a judicial proceeding conducted in accordance with the insolvency legislation of the Republic of Kazakhstan in which the Bank's activity is subject to supervision by the FMSA;

   d) the Bank should undertake various actions to notify and inform its creditors in relation to steps to be taken pursuant to the Restructuring, including publishing an information memorandum; and

   e) previous court decisions regarding claims against the Bank should be suspended.

23. On 5 October 2009 the Bank and the Steering Committee signed a term sheet setting out key commercial terms of the Restructuring and of the Bank's corporate governance and other aspects of its operations and business following the Restructuring.

24. Pursuant to the order of the Financial Court, the Bank distributed by publishing on its web site an information memorandum dated 5 November 2009, a copy of which is annexed hereto as Exhibit E, as supplemented by a supplemental information memorandum dated 24 November 2009, a copy of which is annexed hereto as Exhibit F (together, the "Information Memorandum"). The Information Memorandum contains the definitive restructuring plan (the "Restructuring Plan").

25. The Restructuring Plan was approved a meeting held on 15 December 2009 by creditors holding over 94% in amount of the claims being restructured.

26. A brief description of the Restructuring Plan can be found at pages 7-11 of the Information Memorandum with the actual Restructuring Plan contained at pages 222-241 of the Information Memorandum. In summary, the Restructuring Plan will be effected through the restructuring of the existing claims of all financial creditors and other creditors of the Bank, save for certain categories of excluded creditors (such as depositors and day to day trade creditors). Pursuant to the Restructuring Plan, cash will be paid and/or shares and/or notes will be allocated to those creditors whose claims are being restructured. The Restructuring Plan is expected to come into effect in March 2010.

27. Depending on the nature of their claims, creditors may choose and/or be eligible for one of several options to participate in the Restructuring. For example, Option 1, available to holders of unsubordinated claims, involves the payment of 22.5% the face amount of such claims (payable in the relevant currency). Option 2 involves the issuance by the Bank of seven-year notes with a principal amount equal to 50% of the amount of a creditor's unsubordinated claims, and "Recovery Notes" in a principal amount representing approximately the remaining 50% of such claims. Recovery notes will be paid from recoveries on assets in the Bank's corporate and SME (Small and Medium-Sized Enterprise) portfolios, litigation recoveries and certain tax assets.

28. On 20 December 2009 the Restructuring Plan approved at the creditors' meeting was delivered to the FMSA for its review.

29. Pursuant to Resolution No. 268 adopted on 30 December 2009 by the FMSA, the entire issued share capital of the Bank was compulsorily acquired by the FMSA and transferred

NEWYORK 7464355 (2K)

to the JSC National Welfare Fund Samruk-Kazyna ("Samruk-Kazyna"), which is wholly-owned by the Republic of Kazakhstan. Accordingly, the Bank is now wholly-owned by Samruk-Kazyna. The FMSA undertook this action pursuant to the Banking Law primarily as a result of the Bank's negative equity capital position and its failure to comply with prudential requirements, which were not cured within the time period allowed under Kazakhstan legislation.

30. On 1 February 2010 the FMSA approved the Restructuring Plan. The Restructuring Plan was submitted to the Financial Court for its approval on 3 February 2010. A hearing before the Financial Court is expected to occur on 26 February 2010. All claimants are entitled to appear at that hearing.

31. The Restructuring Plan covers over US$ 5 billion of the Bank's financial indebtedness.

32. The Bank's principal assets in the United States are balances in its accounts at correspondent banks located in New York City used to facilitate its wire transfer and credit operations. It is anticipated that the Bank will use such balances to make restructuring payments that are to be made with US dollars. Its major American creditors are a diverse group of banks, mutual funds, hedge funds and government agencies, such as the Export-Import Bank of the United States.

33. Recognition at this time is considered necessary to prevent the risk of parties taking action against the Bank or seeking attachments over the Bank's assets that are located in the United States, which would disrupt its operations and the implementation of the Restructuring Plan.

34. Recognition in the United States will therefore help to facilitate the implementation of the Restructuring.

NEWYORK 7464355 (2K)

## STATEMENT PURSUANT TO
## SECTION 1515(c) OF THE BANKRUPTCY CODE

35. I am informed that section 1515(c) of the Bankruptcy Code provides that "[a] petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative."

36. In compliance with section 1515(c) of the Bankruptcy Code, I hereby declare that the only foreign proceeding (as such term is defined in section 101(23) of the Bankruptcy Code) pending with respect to the Bank that is known to me is the Kazakh Proceeding. In addition, an order of recognition of the Kazakh Proceeding as a foreign main proceeding was issued on 18 December 2009 by the Chancery Division of the High Court Justice of England and Wales in the United Kingdom under that country's Cross-Border Insolvency Regulations 2006. That order is attached hereto as Exhibit G.

## LIST PURSUANT TO
## INTERIM BANKRUPTCY RULE 1007(a)(4)

37. I am informed that Bankruptcy Rule 1007(a)(4) provides as follows:

> In addition to the documents required under § 1515 of the Code, a foreign representative filing a petition for recognition under chapter 15 shall file with the petition: (A) a corporate ownership statement containing the information described in Rule 7007.1; and (B) unless the court orders otherwise, a list containing the names and addresses of all persons or bodies authorized to administer foreign proceedings of the debtor, all parties to litigation pending in the United States in which the debtor is a party at the time of the filing of the petition, and all entities against whom provisional relief is being sought under § 1519 of the Code.

38. In compliance with Interim Bankruptcy Rule 1007(a)(4), I hereby provide the following lists:

### Corporate Ownership Statement

39. Pursuant to Bankruptcy Rule 7007.1, the following corporations directly or

NEWYORK 7464355 (2K)

indirectly own 10% or more of the Bank's equity interests: JSC National Welfare Fund Samruk-Kazyna owns 100% of the Bank's common shares and 100% of the Bank's preferred shares. JSC National Welfare Fund Samruk-Kazyna is wholly-owned by the government of the Republic of Kazakhstan.

### Administrators in the Kazakh Proceeding

As noted above, I caused an application for restructuring pursuant to the Amending Law, the Civil Procedural Code and the Banking Law to be filed on 10 September 2009. On 18 September 2009 the Financial Court issued the Kazakh Decision, granting the application, commencing the Kazakh Proceeding and appointing me as the person responsible to restructure the Bank and as foreign representative of the Bank. My office address is 50, Furmanov Street, Almaty 050004, Republic of Kazakhstan.

### Parties to Litigation in the United States

As of the date of this Declaration, the Bank is not a party to any litigation pending in the United States of which I am aware.

### Entities Against Whom Provisional Relief is Sought under Section 1519

The Bank is not currently seeking any provisional relief but reserves its right to do so should the need arise.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: February 10, 2010
       Almaty, Kazakhstan

_____
Maxat Rakhimzhanovich Kabashev