**EXHIBIT F**

**SUPPLEMENTAL INFORMATION MEMORANDUM**

**THIS SUPPLEMENTAL INFORMATION MEMORANDUM IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION.** If you are in any doubt as to the action you should take, you are recommended to immediately seek advice from your own appropriately authorised independent financial adviser.

**SUPPLEMENTAL INFORMATION MEMORANDUM**

*Prepared for the information of the holders of certain financial indebtedness of JSC Alliance Bank and its subsidiaries in connection with its Restructuring Plan.*



# JSC Alliance Bank

*(a joint stock company incorporated in the Republic of Kazakhstan with registered number 4241-1900-AO)*

Terms defined in the Information Memorandum (the "Information Memorandum") dated 5 November 2009 published by the Bank in connection with its Restructuring Plan are used in this Supplemental Information Memorandum as so defined.

This Supplemental Information Memorandum should be read in conjunction with the Information Memorandum and, as used herein, the term "Information Memorandum" shall mean the Information Memorandum as supplemented by this Supplemental Information Memorandum unless the context otherwise requires. In making its investment decision, a Claimant should rely only on the information contained in the Information Memorandum.

The New Notes and Shares have not been and will not be registered under the Securities Act. As a result, Claimants who are in the United States or who are U.S. Persons will be eligible to participate in the Restructuring Plan only if they are either QIBs or Accredited Investors unless the Bank in any instance otherwise agrees. Offers and issuances of New Notes and Shares to persons outside the United States who are not U.S. Persons will be made in reliance on Regulation S.

No person has been authorised by the Bank to give any information or make any representation other than those contained in the Information Memorandum and the accompanying documents and, if given or made, such information or representation must not be relied upon as having been so authorised.

This Supplemental Information Memorandum is, subject to certain restrictions, available on the Bank's websites at www.albinvestorrelations.com and www.alb.kz.

24 November 2009

**IMPORTANT NOTICE**

**YOU MUST READ THE FOLLOWING BEFORE CONTINUING**. The following applies to this Supplemental Information Memorandum, and you are therefore advised to read this carefully before reading, accessing or making any other use of this Supplemental Information Memorandum. In accessing this Supplemental Information Memorandum, you agree to be bound by the following terms and conditions, including any modifications to them any time you receive any information from us as a result of such access.

THIS SUPPLEMENTAL INFORMATION MEMORANDUM MAY NOT BE FORWARDED OR DISTRIBUTED OTHER THAN AS PROVIDED BELOW AND MAY NOT BE REPRODUCED IN ANY MANNER WHATSOEVER. ANY FORWARDING, DISTRIBUTION OR REPRODUCTION OF THIS DOCUMENT IN WHOLE OR IN PART IS UNAUTHORISED. FAILURE TO COMPLY WITH THIS NOTICE MAY RESULT IN A VIOLATION OF THE SECURITIES ACT OR THE APPLICABLE LAWS OF OTHER JURISDICTIONS.

**THE NEW NOTES AND SHARES ARE BEING OFFERED, AND WILL BE ISSUED ONLY TO, CLAIMANTS (I) OUTSIDE THE UNITED STATES TO PERSONS THAT ARE NOT U.S. PERSONS OR (II) WITHIN THE UNITED STATES IN A PRIVATE TRANSACTION PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT TO PERSONS (AN "ELIGIBLE INVESTOR") WHO ARE EITHER ACCREDITED INVESTORS OR QIBS UNLESS THE BANK IN ANY INSTANCE OTHERWISE AGREES. ONLY ELIGIBLE INVESTORS AND CLAIMANTS WHO ARE OUTSIDE THE UNITED STATES, ARE NOT U.S. PERSONS AND ARE OTHERWISE ELIGIBLE, AS PROVIDED HEREIN, ARE AUTHORIZED TO ACCESS OR RECEIVE THIS SUPPLEMENTAL INFORMATION MEMORANDUM.**

**THIS SUPPLEMENTAL INFORMATION MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY SECURITY. NONE OF THE SECURITIES REFERRED TO IN THIS SUPPLEMENTAL INFORMATION MEMORANDUM SHALL BE SOLD, ISSUED OR TRANSFERRED IN ANY JURISDICTION IN CONTRAVENTION OF APPLICABLE LAW.**

**The New Notes and Shares are subject to restrictions on transferability and resale and may not be transferred or resold except in accordance with the Securities Act and other applicable securities laws, pursuant to registration or an exemption therefrom. See "*Issuance and Transfer Restrictions*" in the Information Memorandum.**

**CONFIRMATION OF YOUR REPRESENTATION**: By accessing this Supplemental Information Memorandum you shall be deemed to represent that you are either (i) a person other than a U.S. Person and have received this Supplemental Information Memorandum outside the United States or (ii) an Eligible Investor that is acquiring the New Notes and Shares for its own account or the account of another person that is an Eligible Investor.

If you wish to participate in the Restructuring Plan, and you are a Claimant who is a U.S. Person and are not an Eligible Investor, please contact the Bank on +7 727 258 4040 extension 52432 or investorrelations@alb.kz.

Lazard Frères is acting as the Bank's financial adviser and no one else in connection with the Restructuring, and will not be responsible to anyone other than the Bank for providing the protections afforded to clients of Lazard Frères nor for giving advice in relation to the Restructuring.

You should not construe the contents of the Information Memorandum as legal, tax or financial advice. You are recommended to consult your own professional advisers as to legal, tax, financial or other matters relevant to the action you should take in connection with the Restructuring Plan. The Information Memorandum has been prepared to assist Claimants to decide whether and how to vote on the Restructuring Plan. Pursuant to Clause 2 of the Restructuring Plan various provisions of the

Information Memorandum forms an integral part of the Restructuring Plan. Each Claimant is advised to read and carefully consider the full text of the Information Memorandum and the Restructuring Plan contained therein.

The distribution of this Supplemental Information Memorandum and the distribution of New Notes and Shares may be restricted by law in certain jurisdictions. The Bank makes no representation that this Supplemental Information Memorandum or the New Notes and Shares may be lawfully distributed in any jurisdiction or assumes any responsibility for facilitating any such distribution. Accordingly, neither this Supplemental Information Memorandum nor any other offering material may be distributed or published, and none of the New Notes and Shares may be distributed, in any jurisdiction, except under circumstances that will result in compliance with all applicable laws and regulations. Persons into whose possession this Supplemental Information Memorandum may come must inform themselves about, and observe, any such restrictions on the distribution of this Supplemental Information Memorandum and the distribution of the New Notes and Shares.

Claimants entitled to the distribution of New Notes and Shares under the Restructuring Plan must comply with all laws and regulations applicable to them in force in any jurisdiction and must obtain any consent, approval or permission required to be obtained by them under the laws and regulations applicable to them in force in any jurisdiction to which they are subject and the Bank shall not have any responsibility therefor.

Nothing in the Information Memorandum or any other document issued with or appended to it should be relied on for any purpose other than to make a decision on the Restructuring Plan. In particular and without limitation, nothing in the Information Memorandum or any other document issued with or appended to it should be relied on in connection with the purchase of any shares or assets of the Bank. The Information Memorandum has been prepared in connection with the proposal in relation to the Restructuring Plan of the Bank under the Restructuring Law.

The information contained in this Supplemental Information Memorandum has been prepared based upon information available to the Bank. To the best of the Bank's knowledge, information and belief, the information contained in this Supplemental Information Memorandum is in accordance with the facts and (when read in conjunction with the Information Memorandum) does not omit anything likely to affect the import of such information. The Bank has taken all reasonable steps to ensure that the Information Memorandum contains the information reasonably necessary to enable Claimants to make an informed decision about the Restructuring.

None of the Bank's legal, financial or tax advisers, the members of the Steering Committee, the Steering Committee's legal, financial or tax advisers, the Trustee or the Trustee's legal advisors have (i) authorised the contents of this Supplemental Information Memorandum or any part of it, nor do they accept any responsibility or the accuracy, completeness or reasonableness of the statements contained within it; or (ii) verified that the information contained in this Supplemental Information Memorandum is in accordance with the facts and does not omit anything likely to affect the import of such information and each of those persons expressly disclaims any responsibility for such information.

Claimants should inform themselves about and observe any legal requirements applicable in their own jurisdictions to the participation in the Restructuring Plan and the receipt of any New Notes and Shares and should consult his or her professional advisers and satisfy himself or herself as to the full observance of the laws of the relevant jurisdiction in connection therewith, including obtaining any requisite governmental or other consents, observing any other requisite formalities and paying any issue, transfer or other taxes due in all applicable jurisdictions. Any failure to comply with these restrictions may constitute a violation of the securities law of any such jurisdiction.

Claimants should consult their own financial, legal and tax advisers with respect to the financial, legal and tax consequences of the Restructuring Plan in light of their particular circumstances. No member of the Steering Committee expresses any opinion as to the merits of the Restructuring Plan.

The management board of the Bank has approved the contents of the Information Memorandum.

## NO ADMISSION OF LIABILITY

All the statements in the Information Memorandum are made solely in connection with the Restructuring Plan. Accordingly, they do not constitute, and should not be deemed to be, admissions of liability on the part of the Bank or any other party. Nothing herein shall prejudice any right of the Bank in any pending or future legal or other proceedings to dispute the claim of any person in respect of or in connection with any indebtedness or the amounts of such indebtedness and nothing shall imply that any person described herein as a Claimant or having the benefit of a claim has a valid claim against the Bank or any other party.

## NOTICE TO CLAIMANTS IN THE UNITED STATES

THE NEW NOTES AND SHARES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE OR OTHER JURISDICTION IN THE UNITED STATES AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN COMPLIANCE WITH ANY APPLICABLE STATE SECURITIES LAWS. NEITHER THE U.S. SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED THE NEW NOTES AND SHARES NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE NEW NOTES OR SHARES OR THE ACCURACY OR ADEQUACY OF THIS SUPPLEMENTAL INFORMATION MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENCE IN THE UNITED STATES.

## NOTICE TO CLAIMANTS IN THE EUROPEAN ECONOMIC AREA

The Information Memorandum is only addressed to and directed at persons in member states of the European Economic Area (the "EEA") who are "Qualified Investors" within the meaning of Article 2(1)(e) of the Prospectus Directive. The New Notes and Shares are only available to Qualified Investors, unless in any instance the Bank otherwise agrees. The Information Memorandum and its contents should not be acted upon or relied upon in any member state of the EEA by persons who are not Qualified Investors. The expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each relevant member state.

## NOTICE TO CLAIMANTS IN THE REPUBLIC OF KAZAKHSTAN

The New Notes and Shares referred to herein may only be distributed in the Republic of Kazakhstan to institutions or individuals in the Republic of Kazakhstan, including banks, brokers, dealer participants, pension funds and collective investments institutions, as well as central government, large international and supranational organisations, other institutional investors and other parties, including treasury departments of commercial enterprises, which as an ancillary activity regularly invest in securities.

**TABLE OF CONTENTS**

Page

SUPPLEMENTAL INFORMATION.................................................................................................1
SCHEDULE 1:  TERMS AND CONDITIONS OF THE RECOVERY NOTES ...................................4
SCHEDULE 2:  CONDITION 8(d) OF THE TERMS AND CONDITIONS OF THE DISCOUNT
    DOLLAR NOTES AND THE PAR DOLLAR NOTES .................................................................31
SCHEDULE 3:  FORM OF THE NEW NOTES DENOMINATED IN TENGE AND
    PROVISIONS RELATING TO SUCH NOTES IN GLOBAL FORM ............................................34
SCHEDULE 4:  TERMS AND CONDITIONS OF THE TENGE-DENOMINATED NOTES..........38
ANNEX 1  TERMS AND CONDITIONS OF THE DISCOUNT TENGE NOTES ..........................38
ANNEX 2  TERMS AND CONDITIONS OF THE PAR TENGE NOTES.......................................58
ANNEX 3  TERMS AND CONDITIONS OF THE SUBORDINATED TENGE A NOTES.............79
ANNEX 4  TERMS AND CONDITIONS OF THE SUBORDINATED TENGE B NOTES.............94

# SUPPLEMENTAL INFORMATION

## Supplemental Information in Relation to Trade Finance

In the event that the aggregate amount of Trade Finance Debt (as determined by the Trade Finance Adjudicator) exceeds U.S.$100 million each Claim deemed to be Trade Finance Debt shall be reduced pro rata so that the aggregate amount of Trade Finance Debt subject to Clauses 4.8(d) or (e) of the Restructuring Plan equals U.S.$100 million. In such case a Trade Finance Creditor shall have a Claim (and may submit an Option Election Form in respect of such Claim) equal to the amount by which its Trade Finance Debt was reduced (a "Remainder Claim") but such Remainder Claim will not be treated as Trade Finance Debt for the purposes of the Restructuring Plan. Notwithstanding the provisions of the Restructuring Plan, Trade Finance Creditors are not required to submit a Claim Form in respect of a Remainder Claim as the Bank will determine the value of any Remainder Claims and no further notice is required.

## The Recovery Notes, Surplus Cash Mechanism and the Tenge-denominated Notes

Schedule 1 to this Supplemental Information Memorandum contains the Terms and Conditions of the Recovery Notes and supersedes in its entirety Annex 4 of Schedule 6 to the Information Memorandum.

Schedule 2 to this Supplemental Information Memorandum contains the text (subject to completion and amendment) of Condition 8(d) (*Redemption by way of Surplus Cash*) of the Terms and Conditions of each of the Discount Dollar Notes and the Par Dollar Notes and supersedes in its entirety the corresponding sections of Annexes 1 and 2 of Schedule 6 to the Information Memorandum.

Schedule 3 to this Supplemental Information Memorandum contains a summary description of the form of the Tenge-denominated New Notes and of the provisions relating to such notes in global form.

Schedule 4 to this Supplemental Information Memorandum contains the Terms and Conditions of the Tenge-denominated New Notes governed by English law and supersedes in its entirety Annex 5 of Schedule 6 to the Information Memorandum.

If the take-up for any series of the Tenge-denominated New Notes governed by English law is less than U.S.$5 million, the Bank will issue Tenge-denominated New Notes governed by Kazakhstan law. The terms of such Notes will be posted on the Bank's websites in due course. Such Notes will be repaid in one instalment of principal (and if applicable, capitalised interest) on the sixth anniversary of the Issue Date (in the case of the Discount Notes), on the ninth anniversary of the Issue Date (in the case of the Par Notes) and on the twelfth anniversary of the Issue Date (in the case of the Subordinated Notes).

## Submission of Claim Forms

Claimants are reminded that they must submit their Claim Forms to the Bank by post, fax or email on or prior to the Claims Submission Date. If the amount of any Claim specified in a Claim Form has been reduced by reason of any set off, the Claimant should provide the details of it and the date when such set off arose.

The contact details for the submission of Claim Forms to the Bank are as follows:

Contact:     Victoria Tyo
Tel:         +7 727 258 4040 extension 52432
Fax:         +7 727 259 8071
Email:       gardenia.collection@alb.kz

Please note that the correct fax number for the Bank is as follows: +7 727 259 8071.

Service shall be effective upon receipt by the Bank (whether by fax, phone, email or Post) on a Business Day in Almaty; provided, however that (i) any such communication which would otherwise take effect after 6:00 p.m. on any particular day shall not take effect until 10:00 a.m. on the immediately succeeding Business Day in Almaty. Creditors are accordingly urged to contact the Bank by email at gardenia.collection@alb.kz or by phone on +7 727 258 4040 extension 52432 in order to obtain confirmation from the Bank that their Claim Form has been received by the Bank.

**The Trust Deed and the Agency Agreement**

The Trust Deed and the Agency Agreement referred to in the Recovery Notes, the Discount Dollar Notes, the Par Dollar Notes and Tenge-denominated New Notes will constitute part of the Restructuring Documentation.

**Revised Definitions in the Information Memorandum**

The definitions of "Claimant", "Shares" and "Share Entitlement" contained in the Information Memorandum are superseded in their entirety by the following definitions:

> "**Claimant**" means any person with a Claim on the Bank, ALB Finance or Alliance Finance including, but not limited to, Euronoteholders (and the Trustee on their behalf) and the Creditors, namely Rouble Noteholders, Domestic Noteholders, Trade Finance Creditors, derivatives counterparties and syndicated and bilateral creditors of the Bank, but does not include Excluded Creditors or (except with respect to attending or voting at the Claimants' Meeting and the submission of any Form of Proxy) Related Parties;

> "**Shares**" means the Preference Shares and Common Shares of the Bank, including those allocated to the relevant Claimants in accordance with the Allocation and Reallocation Mechanism;

> "**Share Entitlement**" means the entitlement to Preference Shares and Common Shares of each Claimant (other than as regards Trade Finance Debt and Samruk-Kazyna) with an Agreed Claim pursuant to the terms of the Restructuring Plan;

**Clause 3.6 (Set off) of the Restructuring Plan**

Clause 3.6 (Set off) of the Restructuring Plan is superseded in its entirety by the following provision:

> **Set off**

> 3.6 (a)  No Claimant may set off a Claim acquired on or after 13 April 2009 against a claim the Bank has against it.

> (b)  Where a guarantee or surety is treated as satisfied, released and paid in full, the Bank shall be entitled to set off against any person's obligation to reimburse the Bank for payments made under the guarantee or surety any obligation of the Bank to such person as if the guarantee or surety had actually been paid in full.

**Clause 5.4 of the Allocation and Reallocation of Claims Mechanism**

Clause 5.4 of the Allocation and Reallocation of Claims Mechanism contained in Schedule 1, Annex 1 of the Information Memorandum is superseded in its entirety by the following provision:

> 5.4  Claimants who do not make an election (but are eligible to do so) or did not submit a Claim Form prior to the Claims Submission Date will be allocated into Option 5 subject to the Initial Allocation and Reallocation of:

> (a)  Claimants who elected Preferred Option 5 and/or were reallocated into Option 5 in accordance with Clause 5.2; and

(b) Claims comprised solely of Perpetual Securities,

with (a) and (b) ranking pari passu.

## Amendment to the Instructions to the Claim Form contained in the Information Memorandum

The instructions for Box 2 of the Claim Form on page 247 of the Information Memorandum and on page 6 of the Claim Form shall now include the following wording:

"If the amount of any Claim specified in a Claim Form has been reduced by reason of any set off, the Claimant should provide the details of it and the date when such set off arose."

The last reference to "Box 4" at the end of page 248 of the Information Memorandum and on page 7 of the Claim Form is changed to "Box 3".

## Amendment to the "Terms of Options" contained in the Information Memorandum

The reference to "preferred shares" on page 35 of the Information Memorandum is changed to "Preference Shares".

## Amendment to the Issuance and Transfer Restrictions contained in the Information Memorandum

The word "except" is inserted in the fifth line of part (3)(i) in page 211 of the Information Memorandum, after the words "made by it" and inserted in the third line of part (ii) in page 213 of the Information Memorandum, after the words "New Notes or Shares".

## Amendment to the Representations and Undertakings in the Claim Form contained in the Information Memorandum

The word "except" is inserted in fifth line of part 7(i) in page 244 of the Information Memorandum, after the words "made by it".

## Amendment to the Terms and Conditions of the Discount Dollar Notes

The word "to" before the word "decides" in the last line of Condition 13(a) on page 295 of the Information Memorandum is changed to "so".

## TERMS AND CONDITIONS OF THE RECOVERY NOTES

*The following is the text of the terms and conditions of the Recovery Notes which, subject to amendment and completion, will be endorsed on each Note Certificate pertaining to the Recovery Notes and will be attached and (subject to the provisions thereof) apply to the relevant Global Note, and which supersedes in its entirety Annex 4 of Schedule 6 to the Information Memorandum:*

The U.S.$[100,000] 5.8 per cent. Notes due _____ 2020 (the "**Notes**"), of JSC Alliance Bank (the "**Bank**") are (a) constituted by, and subject to, and have the benefit of a trust deed dated_____ 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and BNY Corporate Trustee Services Limited as trustee (the "**Trustee**", which expression includes all persons for the time being appointed as trustee for the holders of the Notes ("**Noteholders**") under the Trust Deed) and (b) the subject of a paying agency agreement dated _____ 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") between the Bank, the Trustee, The Bank of New York Mellon as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**", which expression includes any successor or additional paying and transfer agents appointed from time to time in connection with the Notes) and The Bank of New York Mellon (Luxembourg) S.A. as registrar (the "**Registrar**" which expression shall include any successor registrar appointed from time to time in connection with the Notes).

Certain provisions of these Conditions are summaries of the Trust Deed and the Agency Agreement and subject to their detailed provisions. The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them. Copies of the Trust Deed and the Agency Agreement are available for inspection during normal business hours at the Specified Offices (as defined in the Agency Agreement) of the Principal Paying and Transfer Agent. Copies are also available for inspection during normal business hours at the registered office for the time being of the Trustee, One Canada Square, London E14 5AL, United Kingdom. References herein to the "**Agents**" are to the Registrar and the Paying and Transfer Agents and any reference to an "**Agent**" is to any one of them.

1.      **Definitions**

Terms not defined in these Conditions shall have the meaning set out in the Trust Deed and for the purposes of these Conditions:

"**Adjusted IFRS**" means International Financial Reporting Standards adjusted to reflect the FMSA's requirements for the preparation of financial statements of a bank for regulatory purposes;

"**Amortisation Date**" means the date that falls on the seventh anniversary of the Issue Date;

"**Cash Management Agreement**" means the cash management agreement entered into in relation to the Collection Account between the Trustee, the Bank and _____ and dated _____;

"**Charged Property**" means all the property and rights of the Bank which are subject to the Charge and Assignment (as defined in Condition 2(c) (*Security*));

"**Cause of Action**" means any and all statutory, legal or equitable cause or causes of action, whether to be capable of being enforced in the Republic of Kazakhstan, the United Kingdom or in any other jurisdiction, that are or may be available to the Bank against any Person in relation, directly or indirectly, to the T-Bill Strips Transactions;

"**Collected**" means in respect of the collection of any Recoveries, collected, recovered, obtained or received by or on behalf of the Bank in any manner whatsoever and, in respect of Tax Assets, means receiving (lawfully and in compliance with applicable regulations) the financial benefit of any deduction for tax purposes obtained by the Bank in respect of any tax,

including a credit against, relief or remission for, set-off or repayment of, any tax. For the purposes of this definition, the date on which the Bank is treated as receiving the financial benefit of any deduction for tax purposes in respect of any tax is the date on which such tax would have been payable by the Bank to the relevant tax authority if it had not obtained (lawfully and in compliance with applicable regulations) a deduction for tax purposes in respect of the tax;

"**Collection Account**" means the account opened in the name of the Bank in accordance with the Trust Deed (the details of which are set out in Schedule ____ (*Details of Collection Account*) to the Trust Deed) and into which the Bank shall pay the Specified Percentage of any and all Recoveries pursuant to Condition 6(a) (*Conversion and Payment*);

"**Corporate and SME Pool**" means the pool of provisioned loans and other related provisioned assets (including collection agency receivables and related party loans, but excluding loans to customers funded or supported by Government Funding) as at 31 May 2009 relating to customers of the Bank classified as corporate legal entities and small and medium enterprises identified in the Recovery Notes Balance Sheet and comprised as follows[1]:

(a)     loans to corporate customers of the Bank with an aggregate outstanding amount of approximately KZT [294,287] million and a 31 May 2009 Net Book Value of approximately KZT 43,080 million; and

(b)     loans to customers of the Bank that are small and medium enterprises, with an aggregate outstanding amount of approximately KZT [53,771] million and a 31 May 2009 Net Book Value of approximately KZT [12,528] million;

"**Corporate and SME Pool Cash Recoveries**" means any and all cash amounts actually collected or recovered by the Bank in respect of each asset in the Corporate and SME Pool but only to the extent that such amounts are in excess of the 31 May 2009 Net Book Value of each such asset and, in calculating cash amounts collected or recovered by the Bank, the following shall (without limitation) be included:

(i)      amounts in respect of principal, interest, premium, penalty, late payment or similar charges, compromise or settlement;

(ii)     the gross proceeds of enforcement or realisation of any collateral guarantee or security in respect of each such asset (including any ownership interest, charge, encumbrance, proprietary or security interest, right of retention, lien or other right or claim in, over or on any Person's assets) and the sale or disposal of any other asset received or obtained by the Bank in settlement or compromise;

(iii)    the gross proceeds of the sale of any asset in the Corporate and SME Pool;

(iv)     the financial benefit to the Bank of any set-off, netting, consolidation of accounts or similar arrangement in respect of each such asset the exercise of which results in a financial benefit accruing to the Bank; and

(v)      the proceeds of any insurance claim relating to any asset in the Corporate and SME Pool received by the Bank.

In determining the amount of Corporate and SME Pool Cash Recoveries, the amount of cash collected or recovered shall be determined (i) on a gross, pre-tax basis and (ii) on an asset-by-asset basis such that amounts collected in respect of any individual asset in excess of the 31 May 2009 Net Book Value shall not be reduced by reference to, netted or set off

---

[1] The figures in this definition are subject to adjustments which may be required as a result of the review of the Recovery Notes Asset Schedule.

against any shortfall in the cash collected in respect of any other asset that does not generate Recoveries where the cash collection in respect of that other asset is less than its 31 May Net Book Value. If any loan in the Corporate and SME Pool is refinanced by a new loan, it shall be replaced, to the extent that no further amounts are lent by the Bank under such new loan, by the new loan, and the 31 May 2009 Net Book Value shall apply to the new loan;

"**Homogeneous Retail Loans Portfolios**" means pools of individual Retail Loans grouped in accordance with the FMSA rules and the Bank's internal documentation, and a list of which is set out in the definition of Retail Pool;

"**Litigation Recoveries**" means any and all amounts (including all costs, interests and taxes) actually recovered by the Bank directly or indirectly as a result of any judgment, award, compromise or settlement relating to any Proceedings, insurance claim or otherwise in connection with or arising out of the Causes of Action, whether a cash sum or any other amount realised by the Bank as a result of a sale, auction, enforcement process or other disposal by or on behalf of the Bank of any asset, right, claim or security received by the Bank in connection with the Causes of Action;

"**31 May 2009 Net Book Value**" means the outstanding amount of a loan or related asset minus the provisions applicable to such loan or asset, each calculated in accordance with the FMSA rules applicable on 31 May 2009, and as set out in the Recovery Notes Balance Sheet;

"**Proceedings**" means any legal proceedings, arbitration, mediation or other steps taken in contemplation of legal action, arbitration or mediation in relation to any Causes of Action, including but not limited to all forms of alternative dispute resolution and whether proposed to be conducted in the Republic of Kazakhstan or in any other jurisdiction;

"**Put Option**" means the option contained in Condition 11(c) (*Redemption at the Option of the Noteholders*) pursuant to which the Bank may be required to redeem a Note at the option of the holder of such Note;

"**Recoveries**" means Corporate and SME Pool Cash Recoveries, Retail Pool Cash Recoveries and Litigation Recoveries;

"**Recovery Notes Asset Schedule**[2]" means the balance sheet as at 31 May 2009 specially prepared by the Bank in accordance with Adjusted IFRS for the purpose of tracking the Recoveries;

"**Recovery Notes Payments**" means, in relation to all outstanding Notes and in respect of all Recoveries Collected by the Bank during a Recovery Notes Payment Period, the Specified Percentage of such Recoveries payable pursuant to Condition 7(b) (*Recovery Notes Payments*);

"**Recovery Notes Payment Period**" means each period beginning on (and including) the Issue Date or any Recovery Notes Payment Date and ending on (but excluding) the next Recovery Notes Payment Date;

"**Reference Amount**" means U.S.$ _____ (as capitalised in accordance with Condition 9 (*Reference Amount*));

"**Residual Amounts**" means the outstanding Tax Assets and the expected future Recoveries as at the Valuation Date or any Put Settlement Date occurring prior to the Valuation Date, as the case may be;

---

[2] The Recovery Notes Asset Schedule is subject to review and approval by an independent international accounting firm which at the date hereof is expected to be Ernst & Young LLP. A list of assets in the Corporate and SME Pool will be provided to the Trustee on a 'no names' basis in order to comply with applicable confidentiality requirements under Kazakhstan law.

"**Retail Loans**" means loans provided by the Bank to individuals;

"**Retail Pool**" means all provisioned Homogeneous Retail Loans Portfolios and provisioned individual Retail Loans (including collection agency receivables in respect of Retail Loans but excluding loans to customers funded or supported by Government Funding) of the Bank as at 31 May 2009, as identified in the Recovery Notes Balance Sheet, the Retail Pool having an aggregate outstanding amount of approximately KZT [207,713] million and a 31 May 2009 Net Book Value of approximately KZT [81,504] million and being comprised as follows:[3]

(i)     Homogeneous Retail Loans Portfolios:

| Homogeneous Retail Loans Portfolio | Outstanding Amount KZT | 31 May 2009 Net Book Value KZT |
|---|---|---|
| Auto Loans | [7,900,000,000] | [4,530,000,000] |
| Personal Instalment Loans | [93,769,000,000] | [49,735,000,000] |
| Credit Cards Loyalty Loans | [2,811,000,000] | [1,780,000,000] |
| Staff Loans | [92,000,000] | [88,000,000] |
| **Subtotal** | [104,572,000] | [56,133,000,000] |

(ii)    Retail Loans not in Homogeneous Loans Portfolio

| Outstanding Amount | 31 May 2009 Net Book Value |
|---|---|
| KZT [81,607,000] | KZT [25,371,000] |

(iii)   Collection agency receivables

| Outstanding Amount | 31 May 2009 Net Book Value |
|---|---|
| KZT [21, 534,000] | [0] |

"**Retail Pool Cash Recoveries**" means any and all cash amounts actually collected or recovered by the Bank in respect of each asset in the Retail Pool (with each Homogeneous Retail Loans Portfolio being treated as a single asset) but only to the extant that such amounts are in excess of the 31 May 2009 Net Book Value of each such asset and, in calculating cash amounts collected or recovered by the Bank, the following shall (without limitation) be included:

(i)     amounts in respect of principal, interest, premium, penalty, late payment or similar charges, compromise or settlement;

(ii)    the gross proceeds of enforcement or realisation of any collateral guarantee or security in respect of each such asset (including any ownership interest, charge, encumbrance, proprietary or security interest, right of retention, lien or other right or claim in, over or on any Person's assets) and the sale or disposal of any other asset received or obtained by the Bank in settlement or compromise;

(iii)   the gross proceeds of the sale of any asset in the Retail Pool;

---

[3] The figures in this definition are subject to adjustments which may be required as a result of the review of the Recovery Notes Asset Schedule.

(iv)     the financial benefit to the Bank of any set-off, netting, consolidation of accounts or similar arrangement in respect of each such asset the exercise of which results in a financial benefit accruing to the Bank; and

(v)     the proceeds of any insurance claim relating to any asset in the Retail Pool received by the Bank.

In determining the amount of Retail Pool Cash Recoveries, the amount of cash collected or recovered shall be determined (i) on a gross, pre-tax basis and (ii) on an asset-by-asset basis (with each Homogeneous Retail Loans Portfolio being treated as a single asset) such that amounts collected in respect of any individual asset in excess of the 31 May 2009 Net Book Value shall not be reduced by reference to, netted or set off against any shortfall in the cash collected in respect of any other asset that does not generate Recoveries where the cash collection in respect of that other asset is less than its 31 May Net Book Value. If any loan in the Retail Pool is refinanced by a new loan, it shall be replaced, to the extent that no further amounts are lent by the Bank under such new loan, by the new loan, and the 31 May 2009 Net Book Value shall apply to the new loan;

"**Security Interests**" means the security interests created in favour of the Trustee in relation to the Collection Account and the Cash Management Agreement pursuant to Clause ____ (*Security Interests*) of the Trust Deed;

"**Specified Percentage**" means the following percentages in relation to the following Recoveries and in relation to the Tax Assets (as the case may be):

(i)     Corporate and SME Pool Cash Recoveries:     53 per cent.

(ii)     Litigation Recoveries:     50 per cent.

(iii)     Retail Pool Cash Recoveries:     0 per cent.

(iv)     Tax Assets:     50 per cent.

*provided that*, on the occurrence of a Relevant Event as defined in Condition 11(c) (*Redemption at the Option of the Noteholders*) prior to the Valuation Date:

(A)     in respect of those Noteholders who do not choose to exercise the Put Option, after the Put Settlement Date the Specified Percentages for the outstanding Notes shall be equal to the relevant figures in (i)-(iv) above in each case multiplied by the percentage of outstanding Notes in respect of which the Put Option has not been exercised; and

(B)     for the purpose of determining the redemption amount payable to any holder which exercises the Put Option on the occurrence of a Relevant Event, the Specified Percentages shall all be 50 per cent. multiplied by the percentage of outstanding Notes in respect of which the Put Option has been exercised;

"**Spot Rate of Exchange**" means the spot rate of exchange quoted by [SB "HSBC Kazakhstan" JSC] (or any other internationally recognized financial institution) for the purchase of United States Dollars with the relevant currency at or about 11:00 a.m. Almaty time on the relevant day;

"**T Bill Strips Transactions**" means transactions entered into by the Bank and other parties from 2006 to 2008 involving U.S. Treasury Strips in the amount of approximately U.S.$1,100,000,000, and reflected in Note 30 to the audited consolidated financial statements of the Bank as at and for the year ended 31 December 2008;

"**Tax Assets**" means the financial benefit of any deduction for tax purposes obtained by the Bank in relation to (i) the provisions made in the Bank's accounts in respect of the T Bill

Strips Transactions and (ii) any provisions made in respect of loans to related parties, which benefit shall be calculated as follows:

Benefit = {[tax payable before accounting for any 2009 loss carryforward – tax payable after accounting for any 2009 loss carryforward] x [(a+b)/(a+b+c-d)]} x 50%

where, for the purpose of calculating taxable profit, any profit from the write off of debt as part of the Restructuring shall be excluded and:

a = any deduction for tax purposes in relation to provisions in respect of loans to related parties for the financial year ended 31 December 2009;

b = any deduction for tax purposes in relation to provisions in respect of the T Bill Strips Transactions for the financial year ended 31 December 2009;

c = any deduction for tax purposes in relation to other provisions and expenses for the financial year ended 31 December 2009; and

d = tax charge related to debt write off on Restructuring; and

"**Valuation Date**" means the date which falls on the day before the seventh anniversary of the Issue Date.

2. **Status**

(a) *Status Prior to and Including the Valuation Date*

This Condition 2(a) applies to all the Notes from and including the Issue Date up to and including the Valuation Date or, in relation to any Notes in respect of which the Put Option has been exercised, up to the Put Settlement Date.

(i) The Notes constitute direct, general, unconditional and, subject to and in accordance with Clause ____ (*Security Interests*) of the Trust Deed, Condition 6(b) (*Preservation of Security Interests*) and Condition 2(a)(ii), unsecured and limited recourse obligations of the Bank. The Notes rank at all times without preference or priority *pari passu* among themselves.

(ii) Each of the Noteholders agrees with the Bank that notwithstanding any other provisions in the Notes and the Trust Deed, all obligations of the Bank to the Noteholders are limited in recourse as set out below:

(A) each Noteholder will have a claim only in respect of the Charged Property and will not have any claim, by operation of law or otherwise, against or recourse to any of the Bank's other assets;

(B) sums payable to each Noteholder in respect of the Bank's obligations to such Noteholder shall be limited to the lesser of the aggregate amount of all sums due and payable to such Noteholder and the aggregate amounts received, realised or otherwise recovered by or for the account of the Bank in respect of the Charged Property whether pursuant to enforcement of the Security Interests or otherwise; and

(C) if following final distribution of the proceeds of enforcement of the Security Interests, the Trustee certifies, in its sole discretion, that the Charged Property has been fully realised and no further funds are available from the Charged Property to make any further payment, then such Noteholder shall have no further claim against the Bank in respect of any such unpaid amounts and such unpaid amounts shall be discharged in full.

(b) *Status After Valuation Date*

This Condition 2(b) applies to all the Notes after the Valuation Date and to those Notes in respect of which the Put Option has been exercised.

After the Valuation Date (or on the Put Settlement Date, as the case may be), the Notes shall constitute direct, general, unconditional, unsubordinated and (subject as provided in Clause ____ (Negative Pledge) of the Trust Deed) unsecured obligations of the Bank which shall rank at least *pari passu* in right of payment with all other present and future unsecured obligations of the Bank, save only for such obligations as may be preferred by mandatory provisions of applicable law.

(c) *Security*

This Condition 2(c) applies to all the Notes from and including the Issue Date up to and including the Valuation Date or, in relation to any Notes in respect of which the Put Option has been exercised, up to the Put Settlement Date.

As continuing security for the payment of all sums due under the Notes, and subject always to Condition 2(a) (*Status Prior to and Including the Valuation Date*), the Bank will, in favour of the Trustee, for itself and on trust for the Noteholders, in accordance with the terms of the Trust Deed, charge with full title guarantee and by way of a first fixed charge all monies held from time to time in the Collection Account and assign with full title guarantee all its right, title and interest in, to and under the Cash Management Agreement and the Collection Account and all sums derived therefrom (the "**Charge and Assignment**").

In certain circumstances, the Trustee may (subject to it being indemnified, prefunded or secured to its satisfaction) be required by Noteholders holding at least 20 per cent. of the principal amount of the Notes outstanding or by an Extraordinary Resolution of the Noteholders to exercise its powers under the Trust Deed arising under the Charge and Assignment.

3. **Form, Denomination and Title**

(a) *Form and Denomination*

The Notes are in registered form, without interest coupons attached, and shall be serially numbered. Notes shall be issued in nominal denominations of U.S.$[0.10] and integral multiples of U.S.$[0.10] in excess thereof (each denomination an "**authorised denomination**").

(b) *Title*

Title to the Notes will pass by transfer and registration as described in Conditions 4 (*Registration*) and 5 (*Transfers*). The holder (as defined below) of any Notes shall (except as otherwise required by law or as ordered by a court of competent jurisdiction) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein, any writing thereon (other than a duly executed transfer thereof in the form endorsed thereon) or any notice of any previous loss or theft thereof) and no person shall be liable for so treating such holder.

In these Conditions, "**holder**" means the person in whose name a Note is registered in the Register (as defined below) (or, in the case of joint holders, the first named thereof) and "**holders**" and "**Noteholders**" shall be construed accordingly.

4. **Registration**

The Bank shall procure that the Registrar will maintain a register (the "**Register**") at the Specified Office of the Registrar in respect of the Notes in accordance with the provisions of the Agency Agreement. A certificate (each, a "**Note Certificate**") will be issued to each Noteholder in respect of its registered holding. Each Note Certificate will be numbered serially with an identifying number which will be recorded in the Register.

5. **Transfers**

(a) Subject to Conditions 5(d) and 5(e), a Note may be transferred in whole or in part upon surrender of the relevant Note Certificate, with the endorsed form of transfer (the "**Transfer Form**") duly completed, at the Specified Office of an Agent, together with such evidence as the Registrar or (as the case may be) such Agent may reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer; *provided, however, that* a Note may not be transferred unless the principal amount of Notes transferred and (where not all of the Notes held by a holder are being transferred) the principal amount of the balance of Notes not transferred are authorised denominations. Transfer Forms are available from any Agent and the Bank upon the request of any holder.

(b) Within five business days of the surrender of a Note Certificate in accordance with Condition 5(a), the Registrar will register the transfer in question and deliver a new Note Certificate of alike principal amount to the Notes transferred to each relevant holder at its Specified Office or (as the case may be) the Specified Office of any Agent or (at the request and risk of any such relevant holder) by uninsured first class mail (airmail if overseas) to the address specified for the purpose by such relevant holder. In this Condition 5(b), "**business day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in foreign currencies) in the city where the Registrar or (as the case may be) the relevant Agent has its Specified Office.

(c) The transfer of a Note will be effected without charge by the Registrar or any Agent but against such indemnity as the Registrar or (as the case may be) such Agent may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such transfer.

(d) Noteholders may not require transfers to be registered during the period of 15 days ending on the due date for any payment of principal or interest in respect of the Notes.

(e) All transfers of Notes and entries on the Register are subject to the detailed regulations concerning the transfer of the Notes scheduled to the Agency Agreement, a copy of which will be made available as specified in the preamble to these Conditions. The regulations may be changed by the Bank with the prior written approval of the Trustee and the Registrar. A copy of the current regulations will be mailed (free of charge) by the Registrar to any Noteholder who requests in writing a copy of such regulations.

6.  **Covenants**

The Noteholders will have the benefit of certain covenants in the Trust Deed relating to, amongst other things, restrictions on the creation of security interests, incurrence of indebtedness, disposal of assets and payment of dividends.  In addition, the Bank covenants as follows:

(a)  *Conversion and Payment*

The Bank shall, within 10 Business Days of receipt of any Recoveries causing the aggregate amount of undistributed Recoveries Collected by the Bank to exceed the equivalent in any currency or currencies of U.S.$1,000,000 convert the Specified Percentage of such Recoveries to U.S. Dollars at the Spot Rate of Exchange and deposit such converted amounts into the Collection Account.

In this Condition 6(a) (*Conversion and Payment*) "**Business Day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in foreign currencies) in Almaty, London and New York City.

(b)  *Preservation of Security Interests*

The Bank shall ensure that the Security Interests created in the Trust Deed shall at all times be in full force and effect.  In addition, the Bank shall not take or omit to take any action that would have the result of materially impairing the Security Interests created in the Trust Deed and the Bank will not grant any person other than the Trustee for the benefit of the Noteholders any interests whatsoever with respect to the Charged Property.

7.  **Interest and Recovery Notes Payments**

This Condition 7 (*Interest and Recovery Notes Payments*) shall apply in respect of all Notes other than Notes in respect of which the Put Option has been exercised.  This Condition 7 (*Interest and Recovery Notes Payments*) shall cease to apply to the Notes in respect of which the Put Option has been exercised from the Put Settlement Date.

(a)  *Interest*

(i)  *Interest Accrual*

The Notes shall bear interest on their outstanding principal amount (subject to adjustment pursuant to Condition 10(a) (*Adjustment to Principal Amount After Valuation Date*)) from (and including) the Amortisation Date at the rate of 5.8 per cent. per annum (the "**Rate of Interest**"), payable in arrear on ____ in each year (each, an "**Interest Payment Date**"), subject as provided in Condition 8 (*Payments*).

Each period beginning on (and including) the Amortisation Date or any Interest Payment Date and ending on (but excluding) the next Interest Payment Date is herein called an "**Interest Period**".

(ii)  *Cessation of Interest*

Each Note will cease to bear interest from the due date for final redemption unless, upon due presentation, payment of principal is improperly withheld or refused, in which case it will continue to bear interest at such rate (as well after as before judgment) until whichever is the earlier of (i) the day on which all sums due in respect of such Notes up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Principal Paying and Transfer Agent or the Trustee has notified the

Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(iii) *Calculation of Interest for an Interest Period*

The amount of interest payable in respect of each Note for any Interest Period shall be calculated by applying the Rate of Interest to the principal amount of such Note and rounding the resulting figure to the nearest cent (half a cent being rounded upwards).

(iv) *Calculation of Interest for any Other Period*

If interest is required to be calculated for any period other than an Interest Period, it will be calculated on the basis of a year of 360 days consisting of 12 months of 30 days each and, in the case of an incomplete month, the actual number of days elapsed.

The determination of the amount of interest payable under Condition 7(b) (*Calculation of Interest for an Interest Period*) by the Principal Paying and Transfer Agent shall, in the absence of manifest error, be binding on all parties.

(b) *Recovery Notes Payments*

In the period commencing on ____ 2010 (the "**Issue Date**") and ending on the Valuation Date, the Bank shall make Recovery Notes Payments pro rata to Noteholders on ____, ____, ____ and ____ of each year (each, a "**Recovery Notes Payment Date**") *provided that*:

(i) Recovery Notes Payments will only be made if and to the extent that the Collection Account contains any funds; and

(ii) the aggregate of the Recovery Notes Payments made by the Bank shall not exceed the initial Reference Amount (plus any Capitalisation Amounts capitalised from time to time in accordance with Condition 9 (*Reference Amount*) and added to the Reference Amount) on such Recovery Note Payment Date.

On the making of any Recovery Notes Payment, the balance of the Reference Amount with respect to the Notes (as so increased by capitalisation) shall be reduced by the amount of such Recovery Notes Payment with effect from the relevant Recovery Notes Payment Date, unless the Recovery Notes Payment is improperly withheld or refused, in which case such amount shall remain outstanding until the date of payment of such Recovery Notes Payment. If the balance of the Reference Amount is reduced to zero, no further Recovery Notes Payments shall be made by the Bank, and the outstanding principal shall be redeemed in full.

8. **Payments**

(a) *Recovery Notes Payments*

Recovery Notes Payments will be made from the Collection Account to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or of any Agent.

(b)     *Principal*

Payments of the principal in respect of the Notes will be made to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or of any Agent.

(c)     *Interest*

Payments of interest due on an Interest Payment Date will be made to the Persons shown in the Register at the close of business on the Record Date for such Interest Payment Date, subject to (in the case of interest payable on redemption) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or any Agent. Payments of all amounts other than as provided in Conditions 8(a) (*Recovery Notes Payments*), 8(b) (*Principal*) and this Condition 8(c) (*Interest*) will be made as provided in these Conditions.

(d)     *Record Date*

Each payment in respect of a Note will be made to the Person shown as the holder in the Register at the opening of business (in the place of the Registrar's specified office) on the fifteenth day before the due date for such payment (the "**Record Date**").

(e)     *Payments*

Each payment in respect of the Notes pursuant to Conditions 8(a) (Recovery Notes Payments), 8(b) (Principal) and 8(c) (Interest) will be made by wire transfer to a United States Dollar account maintained by the payee with a bank in New York City.

(f)     *Payments Subject to Fiscal Laws*

All payments in respect of the Notes are subject in all cases to any applicable or other laws and regulations in the place of payment, but without prejudice to the provisions of Condition 12 (*Taxation*). No commissions or expenses shall be charged to the Noteholders in respect of such payments.

(g)     *Payment on a Business Day*

If the due date for payment of any amount in respect of any Note is not a business day in the place of presentation, the holder thereof shall not be entitled to payment in such place of the amount due until the next succeeding business day in such place. A holder of a Note shall not be entitled to any interest or other payment in respect of any delay in payment resulting from the due date for a payment not being a business day. In this Condition 8(g) (*Payment on a Business Day*), "**business day**" means any day on which banks are open for business (including dealings in foreign currencies) in New York City and, in the case of surrender (or, in the case of partial payment only, endorsement) of a Note Certificate, in the place in which the Note Certificate is surrendered (or, as the case may be, endorsed).

(h)     *Agents*

In acting under the Agency Agreement and in connection with the Notes, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Noteholders. The Bank reserves the right (with the prior written approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to

appoint a successor principal paying and transfer agent or registrar and additional or successor agent or agents; *provided, however, that* the Bank shall at all times maintain a principal paying and transfer agent with a specified office in a European member state, that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any other European Directive implementing the conclusions of the ECOFIN Council meeting of June 3, 2003 on the taxation of savings income or any law implementing or complying with, or introduced to conform to, such Directive, and a registrar. Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Noteholders in accordance with Condition 17 (*Notices*).

9.    **Reference Amount**

This Condition 9 (*Reference Amount*) applies in respect of all Notes other than Notes in respect of which the Put Option has been exercised and, accordingly, shall cease to apply to the Notes in respect of which the Put Option has been exercised as from the Put Settlement Date.

(a)    *Capitalisation*

The balance of the Reference Amount shall be capitalised from the earlier of the Issue Date and 1 March 2010 up to the Valuation Date at the rate of 3.4 per cent. per annum (the "**Rate of Capitalisation**") on ____, ____, ____ and ____ of each year (each, a "**Capitalisation Amount Accrual Date**"), with the amount capitalised per annum being herein referred to as a "**Capitalisation Amount**". At the end of each Capitalisation Amount Accrual Period during the period beginning on the Issue Date and ending on the Valuation Date, the Capitalisation Amount accrued on the Notes from time to time during that Capitalisation Amount Accrual Period shall be automatically capitalised and added to the balance of the Reference Amount in respect of the Notes. Any such accrued Capitalisation Amount shall, after being so capitalised, be (and be treated as) part of the Reference Amount in respect of the Notes.

Each period beginning on (and including) the Issue Date (or 1 March 2010, as the case may be) or any Capitalisation Amount Accrual Date and ending on (but excluding) the next Capitalisation Amount Accrual Date is herein called a "**Capitalisation Amount Accrual Period**".

(b)    *Cessation of Capitalisation Amount*

The Capitalisation Amount will cease to accrue from the Valuation Date unless any payment due under the Notes prior to the Valuation Date is improperly withheld or refused, in which case the Capitalisation Amount shall continue to accrue at the rate of 3.4 per cent. per annum (as well after as before judgment) until the earlier of (i) the day on which all sums due in respect of such Notes up to that day are paid to or on behalf of the relevant Noteholders and (ii) the day which is seven days after the Principal Paying and Transfer Agent or the Trustee has notified the Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(c)    *Calculation of Capitalisation Amount for a Capitalisation Amount Accrual Period*

The Capitalisation Amount in respect of each Note for any Capitalisation Amount Accrual Period shall be calculated by applying the Rate of Capitalisation to the balance of the Reference Amount of such Note, dividing the product by four and rounding the resulting figure to the nearest cent (half a cent being rounded upwards), *provided that* if the Issue Date is later than 1 March 2010, the Capitalisation Amount

for the first Interest Period shall be U.S.$ _____ for each U.S.$[0.10] in nominal principal amount of Note.

(d)    *Calculation of Capitalisation Amount for any Other Period*

If the Capitalisation Amount is required to be calculated for any period other than a Capitalisation Amount Accrual Period, it will be calculated on the basis of a year of 360 days consisting of 12 months of 30 days each and, in the case of an incomplete month, the actual number of days elapsed.

The determination of the Capitalisation Amount by the Principal Paying and Transfer Agent under Condition 9(c) (*Calculation of Capitalisation Amount for a Capitalisation Amount Accrual Period*) shall, in the absence of manifest error, be binding on all parties.

10.    **Valuation**

(a)    *Adjustment to Principal Amount After Valuation Date*

To the extent that there are any Notes outstanding as at the Valuation Date, a valuation of the Residual Amounts shall be carried out on the Valuation Date by an independent valuer of recognised standing appointed by the Bank and approved by the Trustee.  The valuation shall be carried out on a discounted cash flow basis and, in the case of the Tax Assets, shall take into account both the actual cash benefit received in respect of the Tax Assets for the period from 31 May 2009 up to and including the Valuation Date as well as the potential additional benefit in respect of the Tax Assets expected to be received after the Valuation Date.

After the Valuation Date, the aggregate principal amount outstanding in respect of the Notes shall be adjusted for all purposes (including for the purposes of Condition 11 (*Redemption and Purchase*)) to be an amount equal to the lesser of (i) the balance of the Reference Amount (including the Capitalised Amount) and (ii) an amount equal to U.S.$[100,000] plus the relevant Specified Percentages of the Residual Amounts. The principal amount of the Notes as so adjusted, is referred to as the "**Adjusted Principal Amount**".

(b)    *Valuation on Put Settlement Date*

If a Relevant Event occurs prior to the Valuation Date, for the purposes of calculating the amounts due to the Noteholders wishing to exercise the Put Option, a valuation of the Residual Amounts shall be carried out on the Put Settlement Date by an independent valuer of recognised standing appointed by the Bank and approved by the Trustee.  The valuation shall be carried out on a discounted cash flow basis and, in the case of the Tax Assets, shall take into account both the actual cash benefit received in respect of the Tax Assets for the period up to and including the Put Settlement Date as well as the potential benefit in respect of the Tax Assets after the Put Settlement Date.

After the Put Settlement Date, in respect of the Notes in relation to which the Put Option has not been exercised, the principal amount outstanding and the balance of the Reference Amount shall each be reduced by the percentage of Notes in respect of which the Put Option has been exercised.

11.    **Redemption and Purchase**

Conditions 11(a) (*Scheduled Redemption*) and 11(b) (*Application of Surplus Cash*) only apply to Notes in respect of which the Put Option has not been exercised.

(a) *Scheduled Redemption*

The Adjusted Principal Amount of the Notes will be redeemed in three equal annual instalments on ____ of each year, with the first such instalment being payable on ____ 2018 and the last such instalment being payable on ____ 2020. The outstanding principal amount of each Note shall be reduced by the amount of any instalments paid (including by way of payment of any amounts pursuant to Condition 11(b) (*Application of Surplus Cash*)) with effect from the related instalment payment date, unless payment of the instalment is improperly withheld or refused on presentation of the Note, in which case such amount shall remain outstanding until the date of payment thereof.

(b) *Application of Surplus Cash*

The Trust Deed provides that from and including the Amortisation Date, any surplus cash (calculated as set out below) shall be applied towards the instalments of principal payable with respect to the outstanding Notes. The amount of any surplus cash is calculated and applied as provided below every six months.

For the purposes of calculating the surplus cash, a cash flow statement, based on the most recently available annual or semi-annual consolidated financial statements of the Bank prepared in accordance with Adjusted IFRS, shall be prepared and sent to the Trustee and published on the Bank's website within one month of the end of the first financial half year following the Amortisation Date and the end of each financial half year or year thereafter.

The surplus cash shall be calculated in accordance with the following formula:

$$\text{Surplus cash} = 50\% \times (B - C)$$

where:

B = the amount shown as "cash inflow from operating activities before changes in operating assets and liabilities" in such cash flow statement and

C = the amount of cash which the Bank forecasts it will need in its operations the next three months while exceeding by a multiple of 1.1 each applicable liquidity ratio specified by the FMSA from time to time.

(c) *Redemption at the Option of the Noteholders*

Unless the Noteholders have previously by an Extraordinary Resolution disapplied this Condition 11(c) (*Redemption at the Option of the Noteholders*) in relation to the applicable Relevant Event, following the occurrence of a Relevant Event (as defined below), the Bank shall promptly, and in any event within five Business Days thereafter, give notice (the "**Relevant Event Notice**") of such Relevant Event to the Noteholders (with a copy to the Trustee) in accordance with Condition 17 (*Notices*), which notice shall specify the date (which shall not be less than 30 days nor more than 60 days after the Relevant Event Notice (the "**Put Settlement Date**")) on which the Bank shall, at the option of the holder of any Note, redeem such Note in accordance with the following:

(i)     if the Relevant Event occurs prior to the Valuation Date:

(A)     if C − D is greater than or equal to zero, the amount payable with respect to the Notes in respect of which the Put Option has been exercised shall be calculated as follows:

[The lesser of (I) the Specified Percentage of the Residual Amounts and (II) the balance of the Reference Amount x the percentage of Notes in respect of which the Put Option has been exercised] + [(C-D) x the percentage of Notes in respect of which the Put Option has been exercised]; or

(B)     if C - D is less than zero, the amount payable with respect to the Notes in respect of which the Put Option has been exercised shall equal the lesser of (I) the Specified Percentage of the Residual Amounts and (II) the balance of the Reference Amount x the percentage of Notes in respect of which the Put Option has been exercised,

where:

C = 50% x the Retail Pool Cash Recoveries made in the period up to the Put Settlement Date; and

D = Σ {[4.7% x (number of days in each year/360)] x amount outstanding under the Discount Notes on the Issue Date, on each anniversary thereof prior to the Put Settlement Date and on the Put Settlement Date},

where each year shall begin on the Issue Date or an anniversary thereof and end on the earlier of the day preceding the first or following anniversary as the case may be (in which case it shall be deemed to have 360 days) or the Put Settlement Date (in which case it shall be deemed to have the actual number of days elapsed in the relevant year to the Put Settlement Date),

save that:

(I)     the sum of (x) C x the percentage of Notes in respect of which the Put Option has been exercised and (y) the Specified Percentage of the net present value of the Retail Pool Cash Recoveries expected from the Put Settlement Date must not exceed the percentage of Notes in respect of which the Put Option has been exercised x the net present value of seven notional interest payments of 4.7% of the outstanding principal amount of the Notes as at the first anniversary of the Issue Date and the following six anniversaries thereafter; and

(II)    the sum of (x) the Recovery Notes Payments made to the Put Settlement Date in respect of the Notes in relation to which the Put Option has been exercised and (y) the Residual Amounts paid in respect of the Notes in relation to which the Put Option has been exercised must not exceed the product of the Reference Amount and the percentage of Notes in relation to which the Put Option has been exercised; and

(ii)     if the Relevant Event occurs on or after the Valuation Date, the amount payable in respect of the outstanding Notes in respect of which the Put Option has been exercised shall equal the Adjusted Principal Amount.

In order to exercise the Put Option, the holder of a Note must, not less than 15 days before the Put Settlement Date, deposit with any Paying Agent the relevant Note Certificate and a duly completed put option notice (a "**Put Option Notice**") in the form obtainable from any Paying Agent. No Note Certificate, once deposited with a duly completed Put Option Notice in accordance with this Condition 11(c) (*Redemption at the Option of the Noteholders*), may be withdrawn; *provided*, *however*, *that* if, prior to the Put Settlement Date, any such Note becomes immediately due and payable or, upon due presentation of any such Note Certificate on the Put Settlement Date, payment of the redemption monies is improperly withheld or refused, such Note Certificate shall, without prejudice to the exercise of the Put Option, be returned to the holder by uninsured first class mail (airmail if overseas) at such address as may have been given by such Noteholder in the relevant Put Option Notice. The Trustee shall not be responsible for monitoring whether or not any Relevant Event has occurred and shall be entitled to assume unless it receives written notice to the contrary, that no Relevant Event has occurred. In the event that a Relevant Event occurs but no Relevant Event Notice is given by the Bank, the Bank shall be deemed to have given a Relevant Event Notice specifying a Put Settlement Date on the date which is 60 days after the occurrence of the Relevant Event, unless such day is not a Business Day, in which event the Put Settlement Date shall be the immediately following Business Day thereafter.

(d)     *Purchase*

The Bank may at any time purchase or procure others to purchase for its account the Notes in the open market or otherwise and at any price. Notes so purchased may be held or resold (*provided that* such resale is in compliance with all applicable laws) or surrendered for cancellation at the option of the Bank, in compliance with Condition 11(e) (*Cancellation of Notes*). Any Notes so purchased, while held by or on behalf of the Bank, shall not entitle the holder to vote at any meeting of Noteholders and shall not be deemed to be outstanding for the purposes of calculating quorum at such meetings.

(e)     *Cancellation of Notes*

All Notes which are redeemed or surrendered for cancellation pursuant to this Condition 11(e) (*Cancellation of Notes*) shall be cancelled and may not be reissued or resold.

(f)     *Definitions*

As used in this Condition 11 (*Redemption and Purchase*):

"**Capital Stock**" means, with respect to any Person, any and all shares, interests, participations, rights to purchase, warrants, options or any other equivalent of any of the foregoing (however designated) in relation to the share capital of a company and any and all equivalent ownership interests in a Person other than a company, in each case whether now outstanding or hereafter issued;

"**Control**" means the control exercised or capable of being exercised by any person, entity or undertaking over another undertaking by virtue of:

(i)     holding a majority of the voting rights in the undertaking, or

(ii)     being (directly or indirectly) a member, shareholder or participant (or equivalent) of the undertaking and having the right to appoint or remove a majority of its board of directors, or

(iii)    having the right to exercise, or actually exercising, a dominant influence over the undertaking:

(A)     by virtue of provisions contained in the undertaking's charter (or equivalent), or

(B)     by virtue of any contract, or

(iv)    being a member, shareholder or participant (or equivalent) of the undertaking and controlling, pursuant to an agreement with other members, shareholders or participants (or equivalents), a majority of the voting rights in the undertaking,

and the terms "**Controlled**" and "**Controlling**" have meanings correlative to the foregoing;

"**Rating Agency**" means Standard & Poors ("**S&P**") and its successors, Moody's Investors Service Inc. ("**Moody's**") and it successors or Fitch Ratings Ltd. ("**Fitch**") and its successors; and

"**Relevant Event**" shall be deemed to have occurred if:

the government of the Republic of Kazakhstan (i) whether through JSC National Welfare Fund Samruk-Kazyna ("**Samruk-Kazyna**") or any other Agency of or entity Controlled by the government of the Republic of Kazakhstan, ceases to own at least 51 per cent. of the Capital Stock of, or otherwise to Control, the Bank, or (ii) ceases to own at least 51 per cent. of the Capital Stock of, or otherwise to Control, Samruk-Kazyna, unless the Person to which is transferred 51 per cent. or more of the Capital Stock (or other Control) of the Bank or of Samruk-Kazyna (as the case may be) is at the time of transfer a bank or other financial institution authorised by the appropriate authority to accept deposits and having a foreign currency long-term debt rating by S&P no lower than:

(A)     A- in the case of a Relevant Event occurring before the anniversary of the Issue Date falling in 2012; or

(B)     BBB in the case of a Relevant Event occurring after the anniversary of the Issue Date falling in 2012

or at the relevant time the equivalent rating by another Rating Agency, *provided that* any agreement whereby management of the Bank is transferred to a third party (the "**manager**") that does not, in conjunction with any acquisition of any Capital Stock by such manager or its Affiliates (whether or not occurring at the same time), cause the government of the Republic of Kazakhstan to cease to own at least 51 per cent. of the Bank's Capital Stock, or otherwise to Control the Bank, will not constitute a Relevant Event if:

(I)      the Trustee, the CS Director and the Creditor Director have been provided with an opinion in form and substance satisfactory to them of independent legal advisers of recognised standing to the effect that the management agreement, in conjunction with any acquisition of any

Capital Stock by such manager or its Affiliates (whether or not occurring at the same time), does not cause the government of the Republic of Kazakhstan (directly or indirectly) to cease to Control the Bank or to have majority economic risk and/or benefit in the Bank and continues to allow the government of the Republic of Kazakhstan (directly or indirectly) to retain the sole right to exercise its rights as a majority shareholder (including in relation to the appointment of directors);

(II) any fees, commission or other compensation or reward payable to the manager are agreed by a Qualified Majority of the Board; and

(III) the manager (and any change to the manager) and the terms of appointment of the manager (and any change to those terms) are agreed by a Simple Majority of the Board.

12. **Taxation**

(a) *Taxation*

All Recovery Notes Payments as well as payments of principal and interest in respect of the Notes shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by or within the Republic of Kazakhstan or any other jurisdiction from or through which payment is made, or in any case, any political subdivision or any authority thereof or therein having power to tax (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law. In that event, the Bank shall pay such additional amounts as will result in the receipt by the Noteholders of such amounts as would have been received by them if no such withholding or deduction had been required, except that no such additional amounts shall be payable in respect of any Note:

(i) presented for payment by or on behalf of a holder who is liable to such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such holder, if such holder is an estate, a trust, a partnership or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein other than the mere holding of such Note; or

(ii) presented (in the case of a Recovery Notes Payment or a payment of principal or interest on redemption) for payment more than 30 days after the Relevant Date except to the extent that the relevant holder would have been entitled to such additional amounts if it had presented such Note on the last day of such period of 30 days; or

(iii) to a holder who is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent such payment would be required to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner who would not have been entitled to the additional amounts had such beneficiary, settlor, member or beneficial owner been the holder of the Note.

In the event that the foregoing obligation to pay additional amounts is for any reason unenforceable against the Bank, the Bank shall pay to any holder of a Note (subject to the exclusions set out in (i), (ii) and (iii) above) which has received a payment subject to deduction or withholding as aforesaid, upon written request of such holder (subject to the exclusions set out in (i), (ii) and (iii) above), and *provided that* reasonable supporting documentation is provided, an amount equal to the amount withheld or deducted, so that the net amount received by such holder after such payment would not be less than the net amount the holder would have received had such deduction or withholding not taken place. Any payment made pursuant to this paragraph shall be considered an additional amount.

If, at any time, the Bank is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Bank shall promptly notify the Trustee in writing, and shall deliver to the Trustee, within 30 days after it has made such payment to the applicable authority, a written certificate to the effect that it has made such payment to such authority of all amounts so required to be deducted or withheld in respect of each Note.

(b)     *Relevant Date*

As used in these Conditions, "**Relevant Date**" in respect of any Note means the date on which payment in respect of such Note first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which notice is duly given to the Noteholders that, upon further presentation of the Note being made in accordance with the Conditions, such payment will be made, *provided that* payment is in fact made upon such presentation.

(c)     *Additional Amounts*

Any reference in these Conditions to Recovery Notes Payments, principal or interest shall be deemed to include any additional amounts in respect of the Recovery Notes Payments, principal or interest (as the case may be) which may be payable under this Condition 12 (*Taxation*) or any undertaking given in addition to or in substitution of this Condition 12 (*Taxation*) pursuant to the Trust Deed.

(d)     *Taxing Jurisdiction*

If the Bank becomes subject at any time to any taxing jurisdiction other than the Republic of Kazakhstan references in this Condition 12 (*Taxation*) to the Republic of Kazakhstan shall be construed as references to the Republic of Kazakhstan and/or such other jurisdiction.

13.    **Prescription**

Claims for Recovery Notes Payments and for principal and interest on redemption shall become void unless the relevant Note Certificates are surrendered for payment within ten years, and claims for interest due other than on redemption shall become void unless made within five years, of the appropriate Relevant Date.

14.    **Events of Default**

The Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, give notice to the Bank that the Notes are and they shall become due and repayable at their outstanding principal amount, or (in the case of (iv) below) shall enforce the security created by the Trust Deed in respect of the Charged

Property, if any of the following events (each, an "**Event of Default**") occurs and is continuing:

(i)     *Non Payment*

the Bank fails to pay the principal of the Notes when the same becomes due and payable and, where such failure to pay is caused by technical or administrative errors affecting the transfer of funds by the Bank, the failure to pay continues for a period of three Business Days, or the Bank is in default with respect to the payment of interest and such default continues for a period of ten days; or

(ii)    *Bankruptcy*

any Person shall have instituted a proceeding or entered a decree or order for the appointment of a receiver, administrator or liquidator in any insolvency, rehabilitation, readjustment of debt, marshalling of assets and liabilities or similar arrangements in respect of the Bank or any Material Subsidiary, or all or substantially all of its properties and such proceeding, decree or order shall not have been vacated or shall have remained in force undischarged or unstayed for a period of 60 days or the Bank or any Material Subsidiary shall institute proceedings under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect to be adjudicated a bankrupt or shall consent to the filing of a bankruptcy, insolvency or similar proceeding against it or shall file a petition or answer or consent seeking reorganisation under any such law or shall consent to the filing of any such petition, or shall consent to the appointment of a receiver, administrator or liquidator or trustee or assignee in bankruptcy or liquidation of the Bank or any Material Subsidiary, or in respect of its property, or shall make an assignment for the benefit of its creditors or shall otherwise be unable or admit its inability to pay its debts generally as they become due or the Bank commences proceedings with a view to the general adjustment of its Indebtedness; or

(iii)   *Failure to Make Recovery Notes Payments*

if and to the extent that on the date that is three Business Days prior to any Recovery Notes Payment Date the Bank has actually received and is in possession of any Recoveries, and the aggregate value of such Recoveries exceeds U.S.$1,000,000, and the Bank fails to make the appropriate Recovery Notes Payment on such Recovery Notes Payment Date and the non payment continues for a period of three Business Days; or

(iv)    *Breach of Covenant to Preserve Security Interests*

the Bank is in breach of Condition 6(b) (*Preservation of Security Interests*) and such breach is not remedied within 10 Business Days, where "**Business Day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in foreign currencies) in New York and in the jurisdiction in which the Collection Account is located.

15.    **Replacement of Notes**

If any Note is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Principal Paying and Transfer Agent and the Agent, subject to all applicable laws and Stock Exchange requirements, upon payment by the claimant of the expenses incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank may reasonably require.  Mutilated or defaced Notes must be surrendered before replacements will be issued.

16. **Meetings of Noteholders; Modification and Waiver**

(a) *Meetings of Noteholders*

The Trust Deed contains provisions for convening meetings of Noteholders to consider any matters relating to the Notes, including the modification of any provision of these Conditions or the Trust Deed. Any such modification may be made if sanctioned by an Extraordinary Resolution. Such a meeting may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than one tenth of the aggregate principal amount of the outstanding Notes. The quorum at any meeting convened to vote on an Extraordinary Resolution will be two or more persons holding or representing a clear majority of the aggregate principal amount of the Notes for the time being outstanding, or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented; *provided, however, that* certain proposals (including any proposal to change any date fixed for payment of principal or interest in respect of the Notes, to reduce the amount of principal or interest payable on any date in respect of the Notes, to alter the method of calculating the amount of any payment in respect of the Notes or the date for any such payment, to change the currency of payment under the Notes or to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution) may only be sanctioned by an Extraordinary Resolution passed at a meeting of Noteholders at which two or more persons holding or representing not less than three quarters or at any adjourned meeting, one quarter of the aggregate principal amount of the outstanding Notes form a quorum (a "**special quorum resolution**"). Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Noteholders, whether present or not.

The Trust Deed contains provisions for convening meetings of holders of the Notes with holders of notes of other series issued under the Trust Deed if the Trustee so decides.

(b) *Written Resolution*

A resolution in writing will take effect as if it were an Extraordinary Resolution if it is signed (i) by or on behalf of all of Noteholders who for the time being are entitled to receive notice of a meeting of Noteholders under the Trust Deed or (ii) if such Noteholders have been given at least 21 clear days' notice of such resolution, by or on behalf of persons holding three quarters of the aggregate principal amount of the outstanding Notes. Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders.

(c) *Modification Without Noteholders' Consent*

The Trustee may, without the consent of the Noteholders, agree (i) to any modification of the Notes (including these Conditions) or the Trust Deed (other than in respect of a matter requiring a special quorum resolution), which, in the opinion of the Trustee, will not be materially prejudicial to the interests of Noteholders and (ii) to any modification of the Notes (including these Conditions) or the Trust Deed, which is of a formal, minor or technical nature or to correct a manifest error. In addition, the Trustee may, without the consent of the Noteholders, authorise or waive any proposed breach or breach of the Notes or the Trust Deed (other than a proposed breach or breach relating to the subject of a matter requiring a special quorum resolution) if, in the opinion of the Trustee, the interests of the Noteholders will not be materially prejudiced thereby. Any such modification, waiver or authorisation

shall be binding on the Noteholders and, unless the Trustee agrees otherwise, shall be promptly notified to the Noteholders in accordance with Condition 17 (*Notices*).

17. **Notices**

(a) *To the Noteholders*

Notices to Noteholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register. Any such notice shall be deemed to have been given on the fourth day (not being a Saturday or a Sunday) after the date of mailing. In addition, so long as the Notes are listed on the Luxembourg Stock Exchange or the Kazakhstan Stock Exchange and the relevant Stock Exchange so requires, notices to the Noteholders shall be published in a leading newspaper having general circulation in Luxembourg and/or in Kazakhstan. Any such notice shall be deemed to have been given on the date of first publication.

(b) *To the Bank*

Notices to the Bank will be deemed to be validly given if delivered to the Bank at 50, Furmanov Street, Almaty 050004, Republic of Kazakhstan and clearly marked on their exterior "Urgent — Attention: International Relations Department" (or at such other addresses and for such other attentions as may have been notified to the Noteholders in accordance with Condition 17(a)) and will, be deemed to have been validly given at the opening of business on the next day on which the Bank's principal offices, as applicable, are open for business.

(c) *To the Trustee and Agents*

Notices to the Trustee or any Agent will be deemed to have been validly given if delivered to the registered office, for the time being, of the Trustee or the Specified Office, for the time being, of such Agent, as the case may be, and will be validly given on the next day on which such office is open for business.

18. **Trustee**

(a) *Indemnification*

Under the Trust Deed, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and to be paid its costs and expenses in priority to the claims of the Noteholders. In addition, the Trustee is entitled to enter into business transactions with the Bank and any entity relating to the Bank without accounting for any profit.

The Trustee's responsibilities are solely those of trustee for the Noteholders on the terms of the Trust Deed. Accordingly, the Trustee makes no representations and assumes no responsibility for the validity or enforceability of the Notes or for the performance by the Bank of its obligations under or in respect of the Notes or the Trust Deed, as applicable.

(b) *Exercise of Power and Discretion*

In connection with the exercise of any of its powers, trusts, authorities or discretions (including but not limited to those referred to in these Conditions and the Trust Deed), the Trustee shall have regard to the interests of the Noteholders as a class and, in particular, shall not have regard to the consequences of such exercise for individual Noteholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or taxing jurisdiction. The Trustee shall not be entitled to require, and no Noteholder

shall be entitled to claim, from the Bank (in the case of a Noteholder) the Trustee any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders.

(c)     *Enforcement; Reliance*

The Trustee may at any time, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Notes, but it shall not be bound to do unless:

(i)      it has been so requested in writing by the holders of a least one fifth in principal amount of the outstanding Notes or has been so directed by an Extraordinary Resolution; and

(ii)     it has been indemnified or provided with security or pre funded to its satisfaction.

The Trust Deed provides that the Trustee may, at any time, or, in making any determination under these Conditions or the Trust Deed, act on the opinion or advice of, or information obtained from, any expert, auditor, lawyer or professional entity, without further enquiry or evidence.  In particular, the Trust Deed provides that the Trustee may rely on certificates or reports from auditors whether or not such certificate or report or any engagement letter or other document entered into by the Bank and the auditors contains any limit on liability (monetary or otherwise) of the auditors and provides further that nothing shall require the Trustee to enter into or to agree to be bound by the terms of any engagement letter or other document entered into by the Bank or any such auditor.  If such evidence is relied upon, the Trustee's determination shall be conclusive and binding on all parties, and the Trustee will not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience which may result from it so acting.

Until the Trustee has actual or express knowledge to the contrary, the Trustee may assume that no Event of Default or event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 14 (*Events of Default*) become an Event of Default has occurred.

The Trust Deed provides that the Bank is required to deliver to the Trustee, pursuant to, and in the circumstances detailed in, the Trust Deed, a certificate signed by any two of its Directors that there has not been and is not continuing any Event of Default, an event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 14 (*Events of Default*) become an Event of Default, or other breach of the Trust Deed.  The Trustee shall be entitled to rely without liability on such certificates. The Trustee shall not be responsible for monitoring any of the covenants and obligations of the Bank set out in these Conditions and shall be entitled to rely upon the information provided pursuant to these Conditions and the Trust Deed and to assume, unless it receives actual notice to the contrary, that the Bank is complying with all covenants and obligations imposed upon it, respectively, herein and therein.

(d)     *Failure to Act*

No Noteholder may proceed directly against the Bank or enforce the Security Interests unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

(e)     *Retirement and Removal*

Any Trustee may retire at any time on giving at least three months' written notice to the Bank without giving any reason or being responsible for any costs occasioned by such retirement and the Noteholders may by Extraordinary Resolution remove any Trustee, *provided that* the retirement or removal of a sole trust corporation will not be effective until a trust corporation is appointed as successor Trustee. If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, it will use all reasonable endeavours to procure that another trust corporation be appointed as Trustee. In the event of any change of the Trustee, two separate notices shall be published in two leading newspapers one of which will have general circulation in the Republic of Kazakhstan and the other in Luxembourg.

(f)     *Substitution*

The Trust Deed contains provisions to the effect that the Trustee may (without the consent of the Noteholders) agree on such terms as it may specify to the substitution of the Bank's successor in business in place of the Bank as issuer and principal obligor in respect of the Notes and as principal obligor under the Trust Deed, subject to all relevant conditions of the Trust Deed having been complied with (including an unconditional guarantee by the Bank of the obligation assumed by the substitute). Not later than 14 days after compliance with the aforementioned requirements, notice thereof shall be given by the Bank to the Noteholders in accordance with Condition 17 (*Notices*).

(g)     *Substitution for Tax Reasons*

The Bank may substitute in its place a special purpose vehicle as principal obligor (the "**New Principal Obligor**", on giving not less than 30 nor more than 60 days' notice to the Noteholders (which notice shall be irrevocable), if, immediately before giving such notice, the Bank satisfies the Trustee that (i) the Bank will become obliged to pay, on the next date on which any amount would be payable with respect to the Notes, additional amounts, as provided or referred to in Condition 12 (*Taxation*), to any greater extent than would have been required had such a payment been required to be made on [the date of the Claimants' Meeting], as a result of: (A) any change in, or amendment to, the laws or regulations of the Republic of Kazakhstan or any political subdivision or any authority thereof having power to tax therein, or any change in the application or official interpretation of such laws or regulations (including a ruling by a court of competent jurisdiction, but excluding any such change or amendment which obliges the Bank to pay additional amounts in respect of Notes held by or on behalf of a person resident, domiciled or organised in the Republic of Kazakhstan), which change or amendment becomes effective on or after [the date of the Claimants' Meeting]; or (B) the Notes ceasing to be listed on the Kazakhstan Stock Exchange, and (ii) such obligation cannot be avoided by the Bank taking reasonable measures available to it, and (iii) the Notes continue to be listed on the Luxembourg Stock Exchange, and (iv) the obligations of the New Principal Obligor in respect of the outstanding Recovery Notes are unconditionally and irrevocably guaranteed by the Bank and (v) the New Principal Obligor shall indemnify each Noteholder against any tax, duty, assessment or governmental charge which is imposed on it by the Republic of Kazakhstan or the jurisdiction of incorporation of such New Principal Obligor and which would not have been so imposed had the substitution not been made; *provided*, *however*, *that* no such notice of redemption shall be given earlier than 90 days prior to the earliest date on which the Bank would be obliged to pay such additional amounts if a payment in respect of the Notes were then due. Prior to the publication of any notice of redemption pursuant to this Condition 18(g) (*Substitution for Tax Reasons*), the Bank   shall

deliver or procure that there is delivered to the Trustee a certificate signed by two directors of the Bank stating that the Bank is entitled to effect such redemption and setting forth a statement of facts showing that the conditions precedent to the right of the Bank so to redeem have occurred and an opinion in form and substance satisfactory to the Trustee of independent legal advisers of recognised standing to the effect that the Bank has or will become obliged to pay such additional amounts as a result of such change or amendment. The Trustee shall be entitled to accept, without further enquiry, such certificate and opinion as sufficient evidence of the satisfaction of the circumstances set out in (i) and (ii) above, in which event these shall be conclusive and binding on the Noteholders. Upon the expiry of any such notice as is referred to in this Condition 18(g) (*Substitution for Tax Reasons*), the Bank shall be bound to redeem the Notes in accordance with this Condition 18(g) (*Substitution for Tax Reasons*).

19. **Currency Indemnity**

If any sum due from the Bank in respect of the Notes under the Trust Deed or any order or judgment given or made in relation thereto has to be converted from the currency (the "**first currency**") in which the same is payable under these Conditions, the Trust Deed or such order or judgment into another currency (the "**second currency**") for the purpose of making or filing a claim or proof against the Bank, obtaining an order or judgment in any court or other tribunal or enforcing any order or judgment given or made in respect of the Notes or in respect thereof under the Trust Deed, the Bank shall indemnify each Noteholder, on the written demand of such Noteholder addressed to the Bank and delivered to the Bank or to the Specified Office of the Principal Paying and Transfer Agent or the Agent having its Specified Office in London, against any loss suffered as a result of any discrepancy between the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and the rate or rates of exchange at which such Noteholder may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof. This indemnity constitutes a separate and independent obligation of the Bank and shall give rise to a separate and independent cause of action.

20. **Contracts (Rights of Third Parties) Act 1999**

No Person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999, but this does not affect the right or remedy of any Person which exists or is available apart from such Act.

21. **Governing Law; Arbitration and Jurisdiction**

(a) *Governing Law*

The Trust Deed, the Notes, the Agency Agreement and any non-contractual obligations arising out of or in connection therewith are governed by, and shall be construed in accordance with, English law.

(b) *Arbitration*

The Bank agrees that any claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non contractual obligations arising out of or in connection with the Trust Deed) (a "**Dispute**"), shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**") as at present in force and as modified by this Condition, which Rules shall be deemed incorporated into this Condition. The number of arbitrators shall be three, one of

whom shall be nominated by the Bank, one by the Trustee and the third of whom, who shall act as Chairman, shall be nominated by the two party nominated arbitrators, *provided that* if the third arbitrator has not been nominated within 30 days of the nomination of the second party nominated arbitrator, such third arbitrator shall be appointed by the LCIA. The parties may nominate and the LCIA may appoint arbitrators from among the nationals of any country, whether or not a party is a national of that country. The seat of arbitration shall be London, England and the language of arbitration shall be English. Sections 45 and 69 of the Arbitration Act 1996 shall not apply.

(c)     *Trustee's Option*

At any time before the Trustee has nominated an arbitrator to resolve any Dispute(s) pursuant to Condition 21(b) (*Arbitration*), the Trustee, at its sole option, may elect by notice in writing to the Bank that such Dispute(s) shall instead be heard by the courts of England, as more particularly described in Condition 21(d) (*Jurisdiction*). Following any such election, no arbitral tribunal shall have jurisdiction in respect of such Dispute(s).

(d)     *Jurisdiction*

In the event that the Trustee serves a written notice of election in respect of any Dispute(s) pursuant to Condition 21(c) (*Trustee's Option*), the Bank agrees for the benefit of the Trustee and the Noteholders that the courts of England shall have jurisdiction to hear and determine any such Dispute(s) and, for such purposes, irrevocably submits to the jurisdiction of such courts. Subject to Condition 21(b) (*Arbitration*), nothing in this Condition shall (or shall be construed so as to) limit the right of the Trustee to bring proceedings ("**Proceedings**") for the determination of any Dispute(s) in any other court of competent jurisdiction, nor shall the bringing of such Proceedings in any one or more jurisdictions preclude the bringing of Proceedings by the Trustee in any other jurisdiction (whether concurrently or not) if and to the extent permitted by law.

(e)     *Appropriate Forum*

The Bank has irrevocably waived any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and agrees not to claim in any Proceedings that any such court is not a convenient or appropriate forum.

(f)     *Agent for Service of Process*

The Bank has agreed that the process by which any Proceedings in England are begun may be served on it by being delivered to Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX or, if different, its registered office for the time being. If for any reason the Bank does not have such an agent in England, it will promptly appoint a substitute process agent and notify in writing the Trustee of such appointment. If such person is not or ceases to be effectively appointed to accept service of process on behalf of the Bank, the Bank shall, on the written demand of the Trustee, appoint a further person in England to accept service of process on its behalf and, failing such appointment within 15 days, the Trustee shall be entitled to appoint such a person by written notice to the Bank. Nothing herein shall affect the right to serve process in any other manner permitted by law.

(g)     *Consent to Enforcement, etc.*

The Bank has consented generally in respect of any Disputes (or Proceedings in accordance with Condition 21(d) (*Jurisdiction*)) to the giving of any relief or the issue of any process in connection with such Disputes or Proceedings, including (without limitation) the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment which may be given in such Proceedings or in connection with such Disputes.

(h)     *Waiver of Immunity*

To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity to the full extent permitted by the laws of such jurisdiction.

**SCHEDULE 2**

**CONDITION 8(d) OF THE TERMS AND CONDITIONS OF THE DISCOUNT DOLLAR
NOTES AND THE PAR DOLLAR NOTES**

*The following will be the text (subject to completion and amendment) of Condition 8(d) (Application
of Further Amounts) of the Discount Dollar Notes and the Par Dollar Notes and supersedes in its
entirety the corresponding section of Annexes 1 and 2 of Schedule 6 to the Information Memorandum:*

**Discount Notes**

***Condition 8(d) Application of Further Amounts***

Terms defined in the Information Memorandum dated 5 November 2009, as supplemented, published
by the Bank describing its Restructuring Plan are used in this Condition 8(d) (*Application of Further
Amounts*) as so defined.

(i)     *Application of Unallocated Cash*

If and to the extent that, after completion of the Allocation and Reallocation of Claims
Mechanism, the Bank determines that the amount of cash allocated to Option 1 and Option
1A under the Allocation and Reallocation of Claims Mechanism is less than
U.S.$500,000,000 the balance (the "**Unallocated Cash**") shall be distributed between the
Discount Notes and the Par Notes in the proportion which the aggregate principal amount of
the Designated Financial Indebtedness allocated to the Discount Notes bears to the aggregate
principal amount of the Designated Financial Indebtedness allocated to the Par Notes under
the Allocation and Reallocation of Claims Mechanism.

The Unallocated Cash that is to be distributed to holders of the Discount Notes shall then be
allocated between the Notes and the Discount Tenge Notes in the proportion which their
respective aggregate principal amounts bear to each other (for which purpose the aggregate
principal amount of the Discount Tenge Notes shall be converted into Dollars using the rate
displayed on the appropriate Thompson Reuters page at or about 11 a.m. Almaty time two
Business Days prior to the date of distribution).

The Bank shall inform the Noteholders within six months of the Issue Date of the amount of
any Unallocated Cash that is distributable in respect of the Notes. The proportion of the
Unallocated Cash that is distributed to the Notes shall then, not less than six and not more
than seven months after the Issue Date, be paid pro rata to the Noteholders and shall be
applied pro rata towards reduction pro tanto of the principal of the Notes and each instalment
of principal shall be reduced accordingly. A note of such application shall be endorsed on the
relevant Note Certificates.

(ii)    *Application of Surplus Cash*

(A)     While the Recovery Notes are outstanding, any surplus cash (calculated as set out
below) after any instalment of principal in respect of the Recovery Notes is paid shall
be applied pro rata towards the reduction pro tanto of the principal of the Discount
Notes and the Par Notes (and each instalment of principal of the Discount Notes and
the Par Notes shall be reduced accordingly) or, if the Discount Notes have already
been redeemed, shall be applied towards the reduction pro tanto of the principal of the
Par Notes (and each instalment of principal of the Par Notes shall be reduced
accordingly). A note of such application shall be endorsed on the relevant Note
Certificates.

(B)     The Trust Deed provides that if the Recovery Notes have been fully redeemed
(including following exercise of the Put Option), any surplus cash shall be applied pro
rata towards the reduction pro tanto of the principal of the Discount Notes and the Par

Notes (and each instalment of principal of the Discount Notes and the Par Notes shall be reduced accordingly) or, if the Discount Notes have already been redeemed, shall be applied towards the reduction pro tanto of the principal of the Par Notes (and each instalment of principal of the Par Notes shall be reduced accordingly). A note of such application shall be endorsed on the relevant Note Certificates.

The surplus cash that is allocated to the Discount Notes pursuant to (A) or (B) above will be allocated between the Notes and the Discount Tenge Notes in the proportion which their respective aggregate principal amounts bear to each other (for which purpose the aggregate principal amount of the Discount Tenge Notes shall be converted into Dollars using the rate displayed on the appropriate Thompson Reuters page at or about 11 a.m. Almaty time two Business Days prior to the date of distribution).

The surplus cash is calculated and applied every six months. For the purposes of calculating the surplus cash, the Bank shall prepare (and send to the Trustee and publish on the Bank's website within one month of the end of the first financial half year following _____ 2017 and every six months thereafter) a cash flow statement, based on the most recently available semi-annual or annual consolidated financial statements of the Bank prepared in accordance with Adjusted IFRS. The surplus cash shall be calculated in accordance with the following formula:

$$\text{Surplus cash} = 50 \text{ per cent. x (B - C)}$$

where:

B = the amount shown as "cash inflow from operating activities before changes in operating assets and liabilities" in such cash flow statement, and

C = the amount of cash which the Bank forecasts it will need in its operations in the next three months while exceeding by a multiple of 1.1 each applicable liquidity ratio specified by the FMSA from time to time.

**Par Notes**

***Condition 8(d) Application of Further Amounts***

Terms defined in the Information Memorandum dated 5 November 2009, as supplemented, published by the Bank describing its Restructuring Plan are used in this Condition 8(d) (*Application of Further Amounts*) as so defined.

(i)     *Application of Unallocated Cash*

If and to the extent that, after completion of the Allocation and Reallocation of Claims Mechanism, the Bank determines that the amount of cash allocated to Option 1 and Option 1A under the Allocation and Reallocation of Claims Mechanism is less than U.S.$500,000,000 the balance of the U.S.$500,000,000 (the "**Unallocated Cash**") shall be distributed between the Discount Notes and the Par Notes in the proportion which the aggregate principal amount of the Designated Financial Indebtedness allocated to the Discount Notes bears to the aggregate principal amount of the Designated Financial Indebtedness allocated to the Par Notes under the Allocation and Reallocation of Claims Mechanism.

The Unallocated Cash that is to be distributed to holders of the Par Notes shall then be allocated between the Notes and the Par Tenge Notes in the proportion which their respective aggregate principal amounts bear to each other (for which purpose the aggregate principal amount of the Par Tenge Notes shall be converted into Dollars using the rate displayed on the appropriate Thompson Reuters page at or about 11 a.m. Almaty time two Business Days prior to the date of distribution).

The Bank shall inform the Noteholders within six months of the Issue Date of the amount of any Unallocated Cash that is distributable in respect of the Notes. The proportion of the Unallocated Cash that is distributed to the Notes shall then, not less than six and not more than seven months after the Issue Date, be paid pro rata to the Noteholders and shall be applied pro rata towards reduction pro tanto of the principal of the Notes and each instalment of principal shall be reduced accordingly. A note of such application shall be endorsed on the relevant Note Certificates.

(ii)    *Application of Surplus Cash*

(A)    While the Recovery Notes are outstanding, any surplus cash (calculated as set out below) after any instalment of principal in respect of the Recovery Notes is paid shall be applied pro rata towards the reduction pro tanto of the principal of the Discount Notes and the Par Notes (and each instalment of principal of the Discount Notes and the Par Notes shall be reduced accordingly) or, if the Discount Notes have already been redeemed, shall be applied towards the reduction pro tanto of the principal of the Par Notes (and each instalment of principal of the Par Notes shall be reduced accordingly). A note of such application shall be endorsed on the relevant Note Certificates.

(B)    The Trust Deed provides that if the Recovery Notes have been fully redeemed (including by way of put option), any surplus cash shall be applied pro rata to the reduction pro tanto of the principal of the Discount Notes and the Par Notes (and each instalment of principal of the Discount Notes and the Par Notes shall be reduced accordingly) or, if the Discount Notes have already been redeemed, shall be applied towards the reduction pro tanto of the principal of the Par Notes (and each instalment of principal of the Par Notes shall be reduced accordingly). A note of such application shall be endorsed on the relevant Note Certificates.

The surplus cash that is allocated to the Par Notes pursuant to (A) or (B) above will be allocated between the Notes and the Par Tenge Notes in the proportion which their respective aggregate principal amounts bear to each other (for which purpose the aggregate principal amount of the Par Tenge Notes shall be converted into Dollars using the rate displayed on the appropriate Thompson Reuters page at or about 11 a.m. Almaty time two Business Days prior to the date of distribution).

The surplus cash is calculated and applied every six months. For the purposes of calculating the surplus cash, the Bank shall prepare (and send to the Trustee and publish on the Bank's website within one month of the end of the first financial half year following ____ 2017 and every six months thereafter) a cash flow statement, based on the most recently available semi-annual or annual consolidated financial statements of the Bank prepared in accordance with Adjusted IFRS. The surplus cash shall be calculated in accordance with the following formula:

$$\text{Surplus cash} = 50 \text{ per cent.} \times (B - C),$$

where:

B = the amount shown as "cash inflow from operating activities before changes in operating assets and liabilities" in such cash flow statement, and

C = the amount of cash which the Bank forecasts it will need in its operations in the next three months while exceeding by a multiple of 1.1 each applicable liquidity ratio specified by the FMSA from time to time.

**FORM OF THE NEW NOTES DENOMINATED IN TENGE AND PROVISIONS RELATING TO SUCH NOTES IN GLOBAL FORM**

*The following information relates to the form of the New Notes denominated in Tenge and to such New Notes when in global form. In this section, references to "Notes", "New Notes" "Restricted Global Notes" "Unrestricted Global Notes" and "Global Notes" are to Notes denominated in Tenge.*

1.      **Form of the New Notes**

        All New Notes will be in registered form, without interest coupons attached. New Notes offered and sold outside the United States in reliance on Regulation S to persons who are not U.S. Persons will be represented by interests in an Unrestricted Global Note, in definitive fully registered form, without interest coupons attached. New Notes allocated to Eligible Investors will be represented by interests in a Restricted Global Note, in fully registered form, without interest coupons attached. Both Global Notes will be deposited on or about the Restructuring Date with the Central Securities Depositary and registered in its name or in the name of its nominee.

        Each Restricted Global Note (and any Note Certificates issued in exchange therefor) will be subject to certain restrictions on transfer contained in a legend appearing on the face of such Note as set forth under paragraph (4) in the section entitled "*Issuance and Transfer Restrictions*" in the Information Memorandum.

        Each Global Note will have an ISIN number.

        For the purposes of the Restricted Global Notes and the Unrestricted Global Notes, any reference in the Conditions to "Note Certificate" or "Note Certificates" shall, except where the context otherwise requires, be construed so as to include the Restricted Global Note or, as the case may be, the Unrestricted Global Note and interests therein.

2.      **Notices**

        So long as any New Note is represented by a Global Note and such Global Note is held on behalf of the Central Securities Depositary, notices to the holder of such New Note may be given by delivery of the relevant notice to the Central Securities Depositary for communication by it to entitled accountholders in accordance with the rules of the Central Securities Depositary and for so long as the New Notes are listed on the KASE and the rules of such Exchange so require, notices shall also be published in a leading newspaper having general circulation in Kazakhstan.

3.      **Transfers between Global Notes**

        On or prior to the 40th day after the Closing Date, a beneficial interest in any Unrestricted Global Note may be transferred to a person who wishes to take delivery of such beneficial interest through the Restricted Global Note only upon receipt by the applicable registrar (the "**Registrar**") of a written certification from the transferor (in the form provided in the applicable agency agreement (the "**Agency Agreement**") to the effect that such transfer is being made to a person whom the transferor reasonably believes is a QIB, in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction. After such 40th day, such certification requirements will no longer apply to such transfers, but such transfers will continue to be subject to the transfer restrictions contained in the legend appearing on the face of such Note, as set out in "*Issuance and Transfer Restrictions*".

        A beneficial interest in a Restricted Global Note may also be transferred to a person who wishes to take delivery of such beneficial interest through the corresponding Unrestricted

Global Note only upon receipt by the Registrar of a written certification from the transferor (in the form provided in the Agency Agreement) to the effect that such transfer is being made in accordance with Regulation S or Rule 144 (if available) under the Securities Act.

Any beneficial interest in either a Restricted Global Note or any Unrestricted Global Note that is transferred to a person who takes delivery in the form of a beneficial interest in the other Global Note will, upon transfer, cease to be a beneficial interest in such Global Note and become a beneficial interest in the other Global Note and, accordingly, will thereafter be subject to the transfer restrictions set out in the section entitled "*Issuance and Transfer Restrictions*" and other procedures applicable to a beneficial interest in such other Global Note for so long as such person retains such an interest.

## 4.     Exchange of Interests in Global Notes for Note Certificates

A Global Note will become exchangeable, free of charge to the holder, in whole but not in part, for Restricted Note Certificates if the Central Securities Depositary (i) is closed for business for a continuous period of 14 days (other than by reason of legal holidays) or announces an intention permanently to cease business or does in fact do so or (ii) an Event of Default (as defined and set out in Condition 11 (*Events of Default*) of the relevant New Notes) occurs.  In such circumstances, such Note Certificates shall be registered in such names as the Central Securities Depositary shall direct in writing and the Bank will procure that the Registrar notify the holders as soon as practicable after the occurrence of the events specified in (i) and (ii).

In the event that a Restricted Global Note is to be exchanged for Restricted Note Certificates or an Unrestricted Global Note is to be exchanged for Unrestricted Note Certificates the relevant Global Note shall be exchanged in full for the relevant Note Certificates and the Bank will, without charge to the holder or holders thereof, but against such indemnity as the Registrar may require in respect of any tax or other duty of whatever nature which may be levied or imposed in connection with such exchange, cause sufficient Note Certificates to be executed and delivered to the Registrar for completion, authentication and dispatch to the relevant Noteholders.

On exchange, a person having an interest in a Global Note must provide the Registrar with (i) a written order containing instructions and such other information as the Bank and the Registrar may require to complete, execute and deliver such Note Certificates and (ii) in the case of a Restricted Global Note only, a fully completed, signed certification substantially to the effect that the exchanging holder is not transferring its interest at the time of such exchange or, in the case of simultaneous sale pursuant to Rule 144A, a certification that the transfer is being made in compliance with the provisions of Rule 144A.  Note Certificates issued in exchange for a beneficial interest in the Restricted Global Note shall bear the legends applicable to transfers pursuant to Rule 144A, as set out in "*Issuance and Transfer Restrictions*".   Restricted Note Certificates issued as described above will not be exchangeable for beneficial interests in a Unrestricted Global Note and Unrestricted Note Certificates issued as described above will not be exchangeable for beneficial interests in a Restricted Global Note.

In addition to the requirements described under "*Form of the New Notes Denominated in Tenge and Provisions Relating to Notes in Global Form — Transfer between the Global Notes*" above, the holder of a Note may transfer such Note only in accordance with the provisions of Conditions of the New Notes.

Upon the transfer, exchange or replacement of a Restricted Note Certificate bearing the legend referred to in "*Issuance and Transfer Restrictions*", or upon specific request for removal of the legend on a Restricted Note Certificate, the Bank will deliver only Restricted Note Certificates that bear such legend, or will refuse to remove such legend, as the case may be, unless there is delivered to the Bank and the Registrar such satisfactory evidence, which

may include an opinion of counsel, as may reasonably be required by the Bank that neither the legend nor the restrictions on transfer set forth therein are required to ensure compliance with the provisions of the Securities Act.

The Registrar will not register the transfer of any New Notes or exchange of interests in a Global Note for Note Certificates for a period of 15 days ending on the due date of any payment of principal or interest in respect of such New Notes.

## 5. Central Securities Depositary

The Central Securities Depository is a not-for-profit organisation established and registered in 1997 as the sole organisation in Kazakhstan that conducts depository activities. Its shares are held by professional securities market participants, trade organisations and international financial organisations. The Central Securities Depositary conducts activities on the securities market, opens and maintains bank accounts for legal entities in Tenge and foreign currency, processes money transfer instructions and performs activities related to the use of encrypted means of information protection.

The Central Securities Depositary's main functions include providing nominee shareholder services for its participants, settling trades of financial instruments conducted on organised securities markets and over-the-counter transactions involving its participants, depository servicing of state issued securities in accordance with the Kazakhstan law and its code of conduct, providing consultancy, information and other services that do not contradict Kazakhstan law, clearing trades of financial instruments both in exchange for financial instruments and money, providing settlement between brokers and dealers, providing paying agent functions for income payment and redemptions of financial instruments, designating money transfers for trades with securities and other financial instruments and receipt of income payments and redemptions.

According to Kazakhstan law, the clients of the Central Securities Depositary may be broker-dealers, custodian banks licensed by the authorised body dealing with the state regulation of securities market and foreign depositories and custodians.

Records of financial instruments held by the Central Securities Depositary are maintained on personal accounts of depositors. In order to separate the financial instruments of the depositor and its clients, each depositor has sub-accounts in which the financial instruments of its clients are held.

The Central Securities Depositary issues extracts in electronic or documentary form of the personal account of a depositor as proof of such depositor's ownership and nominal holding of its securities in accordance with the Code of Practice of the Central Securities Depositary.

The Central Securities Depositary also serves as a paying agent for short-term notes of the NBK by effecting payment on the primary market, as well as provides money transfers upon repayment of such short-term notes. It also acts as paying agent in respect of government bonds issued by the Ministry of Finance of Kazakhstan, as well as provides money transfers upon repayment of state treasury bills.

The Central Securities Depositary also transfers money to the holders of securities upon interest payment and settlement of securities issued in accordance with the laws of other states.

## 6. Settlement and Payments

Settlement of all trades and all payments in respect of the New Notes will be through the Central Securities Depositary. The New Notes must be held by each investor through their accounts in the Central Securities Depositary.

The Central Securities Depositary will be responsible for making payments of interest and principal under the New Notes to the Noteholders and for effecting transfers of New Notes from one investor to another. Its obligations to make such payments and transfers are contained in the individual agreements with each investor and in the rules and regulations of the Central Securities Depositary. Since investors can only be paid principal and interest under the New Notes by, and transfer New Notes only through, the Central Securities Depositary, investors may not receive payments due under the New Notes, and may be prevented from transferring New Notes, in a timely fashion or at all. The Bank will not be responsible for any failure by the Central Securities Depositary to carry out its obligations with respect to the New Notes. Each of the persons shown in the records of the Central Securities Depositary as the beneficial holder of a particular nominal amount of New Notes represented by a Global Note must look solely to the Central Securities Depositary for his share of each payment made by the Bank to, or to the order of, the holder of the relevant Global Note.

## 7. Prescription

Claims against the Bank in respect of principal and interest on a New Note while such New Note is represented by a Global Note will become void unless it is presented for payment within a period of ten years (in the case of principal) and five years (in the case of interest) from the appropriate Relevant Date (as defined in the relevant New Notes).

## 8. Meetings

The holder of a Global Note will be treated as being two persons for the purposes of any quorum requirements of, or the right to demand a poll at, a meeting of holders of New Notes and, at any such meeting, as having one vote in respect of KZT100 in principal amount of Tenge denominated New Notes for which the Global Note may be exchanged.

## 9. Purchase and Cancellation; Prepayments

Cancellation of any Note required by the Conditions to be cancelled following its purchase and any prepayment will be effected by a reduction in the principal amount of the relevant Global Note as provided in the New Notes Trust Deed.

## 10. Trustee's Powers

In considering the interests of holders of New Notes while a Global Note is held on behalf of the Central Securities Depositary, the Trustee may have regard to any information provided to it by the Central Securities Depositary as to the identity (either individually or by category) of its accountholders with entitlements to such Global Note and may consider such interests as if such accountholders were the holder of the relevant Global Note.

## 11. Put Option

The put option in the Conditions of the New Notes (other than Subordinated Notes) may be exercised by the holder of the relevant Global Note giving notice as provided in the Agency Agreement of the principal amount of such New Notes in respect of which the option is exercised and presenting the Global Note for endorsement of exercise within the time limits specified in such Condition and as otherwise provided in the Agency Agreement.

**SCHEDULE 4**

**TERMS AND CONDITIONS OF THE TENGE-DENOMINATED NOTES**

**ANNEX 1**

**TERMS AND CONDITIONS OF THE DISCOUNT TENGE NOTES**

*The following is the text of the terms and conditions of the Discount Tenge Notes which, subject to amendment and completion will be endorsed on each Note Certificate pertaining to the Discount Tenge Notes and will be attached and (subject to the provisions thereof) apply to the relevant Global Note, and which supersedes in its entirety the corresponding section of Annex 5 of Schedule 6 to the Information Memorandum*:

The KZT ____ 14.5 per cent. notes due ____ 2017 (the "**Notes**", which expression includes any further notes issued pursuant to Condition 16 (*Further Issues*) and forming a single series therewith) of JSC Alliance Bank (the "**Bank**") are (a) constituted by, and subject to, and have the benefit of a trust deed dated ____ 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and BNY Corporate Trustee Services Limited as trustee (the "**Trustee**", which expression includes all persons for the time being appointed as trustee for the holders of the Notes ("**Noteholders**") under the Trust Deed) and (b) the subject of a paying agency agreement dated ____ 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") between the Bank, the Trustee, ____ as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**"; which expression includes any successor or additional paying and transfer agents appointed from time to time in connection with the Notes) and ____ as registrar (the "**Registrar**", which expression shall include any successor registrar appointed from time to time in connection with the Notes).

Certain provisions of these Conditions are summaries of the Trust Deed and the Agency Agreement and subject to their detailed provisions. The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them. Copies of the Trust Deed and the Agency Agreement are available for inspection during normal business hours at the Specified Offices (as defined in the Agency Agreement) of the Principal Paying and Transfer Agent. Copies are also available for inspection during normal business hours at the registered office for the time being of the Trustee, One Canada Square, London E14 5AL, United Kingdom. References herein to the "**Agents**" are to the Registrar and the Paying and Transfer Agents and any reference to an "**Agent**" is to any one of them.

Terms defined in the Trust Deed shall, unless otherwise defined herein or the context requires otherwise, bear the same meanings herein.

1. **Status**

    The obligations under the Notes are unconditional, direct, unsubordinated and, subject as provided in Clause ____ (*Negative Pledge*) of the Trust Deed, unsecured obligations of the Bank, and will at all times rank at least *pari passu* amongst themselves and *pari passu* in right of payment with all other present and future (except as provided therein) unsubordinated obligations of the Bank, save only for such obligations as may be preferred by mandatory provisions of applicable law.

2. **Form, Denomination and Title**

    (a)  *Form and Denomination*

        The Notes are in registered form, without interest coupons attached, and shall be serially numbered. Notes shall be issued in denominations of KZT ____ and integral multiples of KZT ____ in excess thereof (each denomination an "**authorised denomination**").

(b)     *Title*

Title to the Notes will pass by transfer and registration as described in Conditions 3 (*Registration*) and 4 (*Transfers*).  The holder (as defined below) of any Notes shall (except as otherwise required by law or as ordered by a court of competent jurisdiction) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein, any writing thereon (other than a duly executed transfer thereof in the form endorsed thereon) or any notice of any previous loss or theft thereof) and no person shall be liable for so treating such holder.

In these Conditions, "**holder**" means the person in whose name a Note is registered in the Register (as defined below) (or, in the case of joint holders, the first named thereof) and "**holders**" and "**Noteholders**" shall be construed accordingly.

3.     **Registration**

The Bank shall procure that the Registrar will maintain a register (the "**Register**") at the Specified Office of the Registrar in respect of the Notes in accordance with the provisions of the Agency Agreement.  A certificate (each, a "**Note Certificate**") will be issued to each Noteholder in respect of its registered holding.  Each Note Certificate will be numbered serially with an identifying number which will be recorded in the Register.

4.     **Transfers**

(a)     Subject to Conditions 4(d) and 4(e), a Note may be transferred in whole or in part upon surrender of the relevant Note Certificate, with the endorsed form of transfer (the "**Transfer Form**") duly completed, at the Specified Office of an Agent, together with such evidence as the Registrar or (as the case may be) such Agent may reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer; *provided*, *however*, *that* a Note may not be transferred unless the principal amount of Notes transferred and (where not all of the Notes held by a holder are being transferred) the principal amount of the balance of Notes not transferred are authorised denominations.  Transfer Forms are available from any Agent and the Bank upon the request of any holder.

(b)     Within five business days of the surrender of a Note Certificate in accordance with Condition 4(a), the Registrar will register the transfer in question and deliver a new Note Certificate of alike principal amount to the Notes transferred to each relevant holder at its Specified Office or (as the case may be) the Specified Office of any Agent or (at the request and risk of any such relevant holder) by uninsured first class mail (airmail if overseas) to the address specified for the purpose by such relevant holder.  In this Condition 4(b), "**business day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in foreign currencies) in the city where the Registrar or (as the case may be) the relevant Agent has its Specified Office.

(c)     The transfer of a Note will be effected without charge by the Registrar or any Agent but against such indemnity as the Registrar or (as the case may be) such Agent may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such transfer.

(d)     Noteholders may not require transfers to be registered during the period of 15 days ending on the due date for any payment of principal or interest in respect of the Notes.

(e)     All transfers of Notes and entries on the Register are subject to the detailed regulations concerning the transfer of the Notes scheduled to the Agency Agreement,

a copy of which will be made available as specified in the preamble to these Conditions. The regulations may be changed by the Bank with the prior written approval of the Trustee and the Registrar. A copy of the current regulations will be mailed (free of charge) by the Registrar to any Noteholder who requests in writing a copy of such regulations.

5.  **Covenants**

The Noteholders will have the benefit of certain covenants in the Trust Deed relating to, amongst other things, restrictions on the creation of security interests, incurrence of indebtedness, disposal of assets and payment of dividends.

6.  **Interest**

(a)  *Interest Accrual*

The Notes shall bear (or, as the case may be, be deemed to bear) interest on their outstanding principal amount from the earlier of ____ 2010 (the "**Issue Date**") and 1 March 2010 at the rate of 14.5 per cent. per annum (the "**Rate of Interest**"), payable in arrear on ____ and ____ in each year (each, an "**Interest Payment Date**"), subject as provided in Condition 7 (*Payments*).

Each period beginning on (and including) the Issue Date (or 1 March 2010, as the case may be) or any Interest Payment Date and ending on (but excluding) the next Interest Payment Date is herein called an "**Interest Period**".

(b)  *Cessation of Interest*

Each Note will cease to bear interest from the due date for final redemption unless, upon due presentation, payment of principal is improperly withheld or refused, in which case it will continue to bear interest at such rate (as well after as before judgment) until whichever is the earlier of (i) the day on which all sums due in respect of such Notes up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Principal Paying and Transfer Agent or the Trustee has notified the Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(c)  *Calculation of Interest for an Interest Period*

The amount of interest payable in respect of each Note for any Interest Period shall be calculated by applying the Rate of Interest to the principal amount of such Note, dividing the product by two and rounding the resulting figure to the nearest tiyn (half a tiyn being rounded upwards), *provided that* if the Issue Date is later than 1 March 2010, the amount of interest payable for the first Interest Period shall be KZT ____ for each KZT ____ in principal amount of Note.

(d)  *Calculation of Interest for any Other Period*

If interest is required to be calculated for any period other than an Interest Period, it will be calculated on the basis of a year of 360 days consisting of 12 months of 30 days each and, in the case of an incomplete month, the actual number of days elapsed.

The determination of the amount of interest payable under Condition 6(c) (*Calculation of Interest for an Interest Period*) by the Principal Paying and Transfer Agent shall, in the absence of manifest error, be binding on all parties.

7.    **Payments**

(a)    *Principal*

Payments of principal in respect of the Notes will be made to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or of any Agent.

(b)    *Interest*

Payments of interest due on an Interest Payment Date will be made to the Persons shown in the Register at the close of business on the Record Date for such Interest Payment Date, subject to (in the case of interest payable on redemption) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or any Agent.  Payments of all amounts other than as provided in Conditions 7(a) (Principal) and this Condition 7(b) (*Interest*) will be made as provided in these Conditions.

(c)    *Record Date*

Each payment in respect of a Note will be made to the Person shown as the holder in the Register at the opening of business (in the place of the Registrar's specified office) on the fifteenth day before the due date for such payment (the "**Record Date**").

(d)    *Payments*

Each payment in respect of the Notes pursuant to Conditions 7(a) (Principal) and 7(b) (Interest) will be made by transfer to a Kazakhstan Tenge account maintained by the payee with a bank in Kazakhstan.

(e)    *Payments Subject to Fiscal Laws*

All payments in respect of the Notes are subject in all cases to any applicable or other laws and regulations in the place of payment, but without prejudice to the provisions of Condition 9 (*Taxation*).  No commissions or expenses shall be charged to the Noteholders in respect of such payments.

(f)    *Payment on a Business Day*

If the due date for payment of any amount in respect of any Note is not a business day in the place of presentation, the holder thereof shall not be entitled to payment in such place of the amount due until the next succeeding business day in such place.  A holder of a Note shall not be entitled to any interest or other payment in respect of any delay in payment resulting from the due date for a payment not being a business day.  In this Condition 7(f) (*Payment on a Business Day*), "**business day**" means any day on which banks are open for business (including dealings in foreign currencies) in London and Almaty and, in the case of surrender (or, in the case of partial payment only, endorsement) of a Note Certificate, in the place in which the Note Certificate is surrendered (or, as the case may be, endorsed).

(g)    *Agents*

In acting under the Agency Agreement and in connection with the Notes, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Noteholders.  The Bank reserves the right (with prior written approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to

appoint a successor principal paying and transfer agent or registrar and additional or successor agent or agents; *provided*, *however*, *that* the Bank shall at all times maintain a principal paying and transfer agent with a specified office in a European member state, that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any other European Directive implementing the conclusions of the ECOFIN Council meeting of June 3, 2003 on the taxation of savings income or any law implementing or complying with, or introduced to conform to, such Directive, and a registrar. Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Noteholders in accordance with Condition 14 (*Notices*).

8. **Redemption and Purchase**

(a) *Scheduled Redemption*

Unless previously redeemed or purchased and cancelled as provided below, subject as provided in Condition 7 (*Payments*), the Notes will be partially redeemed in six equal semi-annual instalments on ____ and ____ of each year, with the first such instalment being payable on ____ 2014 and the last such instalment being payable on ____ 2017. The outstanding principal amount of each Note shall be reduced by any repayment of principal in accordance with these Conditions, including (i) any instalment amount and (ii) any prepayment amount comprising any amounts paid pursuant to Condition 8(d) (*Redemption by way of Surplus Cash*) and any prepayment made in accordance with Condition 8(e) (*Redemption after Public Offering*) with effect from the related instalment payment date or the Prepayment Date (as the case may be), unless the payment of the instalment or the prepayment is improperly withheld or refused on presentation of the Note, in which case such amount shall remain outstanding until the date of payment of such instalment amount or of such prepayment. Each Note shall be finally redeemed on due payment of the final instalment amount payment or (to the extent that the amounts to be paid pursuant to Condition 8(e) (*Redemption after Public Offering*) are sufficient to finally redeem the Notes) on the Prepayment Date.

(b) *Redemption for Tax Reasons*

The Notes may be redeemed at the option of the Bank in whole, but not in part, at any time, on giving not less than 30 nor more than 60 days' notice to the Noteholders (which notice shall be irrevocable) at their principal amount, together with interest accrued but unpaid to the date fixed for redemption, if, immediately before giving such notice, the Bank satisfies the Trustee that (i) the Bank will become obliged to pay, on the next date on which any amount would be payable with respect to the Notes, additional amounts, as provided or referred to in Condition 9 (*Taxation*), to any greater extent than would have been required had such a payment been required to be made on the [date of the Claimants' Meeting], as a result of any change in, or amendment to, the laws or regulations of the Republic of Kazakhstan or any political subdivision or any authority thereof having power to tax therein, or any change in the application or official interpretation of such laws or regulations (including a ruling by a court of competent jurisdiction, but excluding any such change or amendment which obliges the Bank to pay additional amounts in respect of Notes held by or on behalf of a person resident, domiciled or organised in the Republic of Kazakhstan), which change or amendment becomes effective on or after the [date of the Claimants' Meeting] and (ii) such obligation cannot be avoided by the Bank taking reasonable measures available to it; *provided*, *however*, *that* no such notice of redemption shall be given earlier than 90 days prior to the earliest date on which the Bank would be obliged to pay such additional amounts if a payment in respect of the Notes were then due. Prior to the publication of any notice of redemption pursuant to this

Condition 8(b) (*Redemption for Tax Reasons*), the Bank shall deliver or procure that there is delivered to the Trustee a certificate signed by two directors of the Bank stating that the Bank is entitled to effect such redemption and setting forth a statement of facts showing that the conditions precedent to the right of the Bank so to redeem have occurred and an opinion in form and substance satisfactory to the Trustee of independent legal advisers of recognised standing to the effect that the Bank has or will become obliged to pay such additional amounts as a result of such change or amendment. The Trustee shall be entitled to accept, without further enquiry, such certificate and opinion as sufficient evidence of the satisfaction of the circumstances set out in (i) and (ii) above, in which event these shall be conclusive and binding on the Noteholders. Upon the expiry of any such notice as is referred to in this Condition 8(b) (*Redemption for Tax Reasons*), the Bank shall be bound to redeem the Notes in accordance with this Condition 8(b) (*Redemption for Tax Reasons*).

(c)     *Redemption at the Option of the Noteholders*

Unless the Noteholders have previously by an Extraordinary Resolution disapplied this Condition 8(c) (*Redemption at the Option of the Noteholders*) in relation to the applicable Relevant Event, following the occurrence of a Relevant Event (as defined below), the Bank shall promptly, and in any event within five Business Days thereafter, give notice (the "**Relevant Event Notice**") of such Relevant Event to the Noteholders (with a copy to the Trustee) in accordance with Condition 14 (*Notices*), which notice shall specify the date (which shall not be less than 30 days nor more than 60 days after the Relevant Event Notice (the "**Put Settlement Date**") on which the Bank shall, at the option of the holder of any Note, redeem such Note at its principal amount, together with interest accrued and unpaid to the Put Settlement Date. In order to exercise the option contained in this Condition 8(c) (*Redemption at the Option of the Noteholders*), the holder of a Note must, not less than 15 days before the Put Settlement Date, deposit with any Paying Agent the relevant Note Certificate and a duly completed put option notice (a "**Put Option Notice**") in the form obtainable from any Paying Agent. No Note Certificate, once deposited with a duly completed Put Option Notice in accordance with this Condition 8(c) (*Redemption at the Option of the Noteholders*), may be withdrawn; *provided*, *however*, *that* if, prior to the Put Settlement Date, any such Note becomes immediately due and payable or, upon due presentation of any such Note Certificate on the Put Settlement Date, payment of the redemption monies is improperly withheld or refused, such Note Certificate shall, without prejudice to the exercise of the Put Option, be returned to the holder by uninsured first class mail (airmail if overseas) at such address as may have been given by such Noteholder in the relevant Put Option Notice. The Trustee shall not be responsible for monitoring whether or not any Relevant Event has occurred and shall be entitled to assume unless it receives written notice to the contrary, that no Relevant Event has occurred. In the event that a Relevant Event occurs but no Relevant Event Notice is given by the Bank, the Bank shall be deemed to have given a Relevant Event Notice specifying a Put Settlement Date on the date which is 60 days after the occurrence of the Relevant Event, unless such day is not a Business Day, in which event the Put Settlement Date shall be the immediately following day thereafter which is a Business Day.

(d)     *Redemption by way of Surplus Cash*

Terms defined in the Information Memorandum dated 5 November 2009, as supplemented, published by the Bank describing its Restructuring Plan are used in this Condition 8(d) (*Application of Further Amounts*) as so defined.

(i)  *Application of Unallocated Cash*

If and to the extent that, after completion of the Allocation and Reallocation of Claims Mechanism, the Bank determines that the amount of cash allocated to Option 1 and Option 1A under the Allocation and Reallocation of Claims Mechanism is less than U.S.$500,000,000 the balance of the U.S.$500,000,000 (the "**Unallocated Cash**") shall be distributed between the Discount Notes and the Par Notes in the proportion which the aggregate principal amount of the Designated Financial Indebtedness allocated to the Discount Notes bears to the aggregate principal amount of the Designated Financial Indebtedness allocated to the Par Notes under the Allocation and Reallocation of Claims Mechanism.

The Unallocated Cash that is to be distributed to holders of the Discount Notes shall then be allocated between the Notes and the Discount Dollar Notes in the proportion which their respective aggregate principal amounts bear to each other (for which purpose the aggregate principal amount of the Notes shall be converted into Dollars using the rate displayed on the appropriate Thompson Reuters page at or about 11 a.m. Almaty time two Business Days prior to the date of distribution).

The Bank shall inform the Noteholders within six months of the Issue Date of the amount of any Unallocated Cash that is distributable in respect of the Notes. The proportion of the Unallocated Cash that is distributed to the Notes shall then, not less than six and not more than seven months after the Issue Date, be converted into Tenge at the Spot Rate of Exchange and paid pro rata to the Noteholders and shall be applied pro rata to the reduction pro tanto of the principal of the Notes and each instalment of principal shall be reduced accordingly.  A note of such application shall be endorsed on the relevant Note Certificates.

For the purposes of this Condition 8(d)(i) (*Application of Unallocated Cash*) "**Spot Rate of Exchange**" means the spot rate of exchange quoted by [SB "HSBC Kazakhstan" JSC] (or any other internationally recognized financial institution) for the purchase of Kazakhstan Tenge with United States Dollars at or about 11:00 a.m. Almaty time on the relevant day.

(ii)  *Application of Surplus Cash*

(A)  While the Recovery Notes are outstanding, any surplus cash (calculated as set out below) after any instalment of principal in respect of the Recovery Notes is paid shall be applied pro rata towards the reduction pro tanto of the principal of the Discount Notes and the Par Notes (and each instalment of principal of the Discount Notes and the Par Notes shall be reduced accordingly) or, if the Discount Notes have already been redeemed, shall be applied towards the reduction pro tanto of the principal of the Par Notes (and each instalment of principal of the Par Notes shall be reduced accordingly).  A note of such application shall be endorsed on the relevant Note Certificates.

(B)  The Trust Deed provides that if the Recovery Notes have been fully redeemed (including following exercise of the Put Option), any surplus cash shall be applied pro rata towards the reduction pro tanto of the principal of the Discount Notes and the Par Notes (and each instalment of principal of the Discount Notes and the Par Notes shall be reduced accordingly) or, if the Discount Notes have already been

redeemed, shall be applied towards the reduction pro tanto of the principal of the Par Notes (and each instalment of principal of the Par Notes shall be reduced accordingly). A note of such application shall be endorsed on the relevant Note Certificates.

The surplus cash that is allocated to the Discount Notes pursuant to (A) or (B) above will be allocated between the Notes and the Discount Dollar Notes in the proportion which their respective aggregate principal amounts bear to each other (for which purpose the aggregate principal amount of the Notes shall be converted into Dollars using the rate displayed on the appropriate Thompson Reuters page at or about 11 a.m. Almaty time two Business Days prior to the date of distribution).

The surplus cash is calculated and applied every six months. For the purposes of calculating the surplus cash, the Bank shall prepare (and send to the Trustee and publish on the Bank's website within one month of the end of the first financial half year following ____ 2017 and every six months thereafter) a cash flow statement, based on the most recently available semi-annual or annual consolidated financial statements of the Bank prepared in accordance with Adjusted IFRS. The surplus cash shall be calculated in accordance with the following formula:

$$\text{Surplus cash} = 50 \text{ per cent.} \times (B - C)$$

where:

B = the amount shown as "cash inflow from operating activities before changes in operating assets and liabilities" in such cash flow statement, and

C = the amount of cash which the Bank forecasts it will need in its operations in the next three months while exceeding by a multiple of 1.1 each applicable liquidity ratio specified by the FMSA from time to time.

(e)    *Redemption after Public Offering*

Following the completion of any public offering by the Bank of its common shares, warrants or instruments convertible or exchangeable into common shares or depositary receipts representing common shares after ____ 2015 (the "**Public Offering**"), the Bank shall promptly, and in any event within five Business Days thereafter, give notice of such Public Offering (the "**Public Offering Notice**") to the Noteholders (with a copy to the Trustee) in accordance with Condition 14 (*Notices*), which notice shall specify the date being a Business Day (which shall not be less than 30 days nor more than 60 days after the Public Offering (the "**Prepayment Date**")) on which the Bank shall apply 50 per cent. of the proceeds of the Public Offering to redeem the Notes in part in an amount equal to the proceeds and if sufficient proceeds have been raised, in full, at their principal amount together with interest accrued and unpaid to the Prepayment Date. The Trustee shall not be responsible for monitoring whether or not any Public Offering has occurred and shall be entitled to assume unless it receives written notice to the contrary, that no Public Offering has occurred. In the event that a Public Offering occurs but no Public Offering Notice is given by the Bank, the Bank shall be deemed to have given a Public Offering Notice specifying a Prepayment Date on the date which is 60 days after the occurrence of the Public Offering, unless such day is not a Business Day, in which event the Prepayment Date shall be the immediately following Business Day thereafter.

For the purposes of these Conditions, "**Business Day**" means a day other than a Saturday or Sunday on which commercial banks are open for business (including dealings in foreign currencies) in London and New York.

(f)     *Purchase*

The Bank may at any time purchase or procure others to purchase for its account the Notes in the open market or otherwise and at any price.  Notes so purchased may be held or resold (*provided that* such resale is in compliance with all applicable laws) or surrendered for cancellation at the option of the Bank, in compliance with Condition 8(g) (*Cancellation of Notes*).  Any Notes so purchased, while held by or on behalf of the Bank, shall not entitle the holder to vote at any meeting of Noteholders and shall not be deemed to be outstanding for the purposes of calculating quorum at such meetings.

(g)     *Cancellation of Notes*

All Notes which are redeemed or surrendered for cancellation pursuant to this Condition 8 (*Redemption and Purchase*) shall be cancelled and may not be reissued or resold.

(h)     *Definitions*

As used in this Condition 8 (*Redemption and Purchase*):

"**Adjusted IFRS**" means International Financial Reporting Standards adjusted to reflect the FMSA's requirements for preparation of financial statements for regulatory purposes;

"**Capital Stock**" means, with respect to any Person, any and all shares, interests, participations, rights to purchase, warrants, options or any other equivalent of any of the foregoing (however designated) in relation to the share capital of a company and any and all equivalent ownership interests in a Person other than a company, in each case whether now outstanding or hereafter issued;

"**Control**" means the control exercised or capable of being exercised by any person, entity or undertaking over another undertaking by virtue of:

(i)      holding a majority of the voting rights in the undertaking, or

(ii)     being (directly or indirectly) a member, shareholder or participant (or equivalent) of the undertaking and having the right to appoint or remove a majority of its board of directors, or

(iii)    having the right to exercise, or actually exercising, a dominant influence over the undertaking:

(A)     by virtue of provisions contained in the undertaking's charter (or equivalent), or

(B)     by virtue of any contract, or

(iv)     being a member, shareholder or participant (or equivalent) of the undertaking and controlling, pursuant to an agreement with other members, shareholders or participants (or equivalents), a majority of the voting rights in the undertaking.

and the terms "**Controlled**" and "**Controlling**" have meanings correlative to the foregoing;

"**Rating Agency**" means Standard & Poors ("**S&P**") and its successors, Moody's Investors Service Inc. ("**Moody's**") and it successors or Fitch Ratings Ltd. ("**Fitch**") and its successors; and

A "**Relevant Event**" shall be deemed to have occurred if the government of the Republic of Kazakhstan (i) whether through JSC National Welfare Fund Samruk-Kazyna ("**Samruk-Kazyna**") or any other Agency of or entity Controlled by the government of the Republic of Kazakhstan ceases to own at least 51 per cent. of the Capital Stock of, or otherwise to Control, the Bank or (ii) ceases to own at least 51 per cent. of the Capital Stock of, or otherwise to Control, Samruk-Kazyna, unless the Person to which is transferred 51 per cent. or more of the Capital Stock (or other Control) of the Bank or of Samruk-Kazyna (as the case may be) is at the time of transfer a bank or other financial institution authorised by the appropriate authority to accept deposits and having a foreign currency long-term debt rating by S&P no lower than:

(A)     A- in the case of a Relevant Event occurring before the anniversary of the Issue Date falling in 2012; or

(B)     BBB in the case of a Relevant Event occurring after the anniversary of the Issue Date falling in 2012

or at the relevant time the equivalent rating by another Rating Agency, *provided that* any agreement whereby management of the Bank is transferred to a third party (the "**manager**") that does not, in conjunction with any acquisition of any Capital Stock by such manager or its Affiliates (whether or not occurring at the same time), cause the government of the Republic of Kazakhstan to cease to own at least 51 per cent. of the Bank's Capital Stock or otherwise to Control the Bank, will not constitute a Relevant Event if:

(I)     the Trustee, the CS Director and the Creditor Director have been provided with an opinion in form and substance satisfactory to them of independent legal advisers of recognised standing to the effect that the management agreement, in conjunction with any acquisition of any Capital Stock by such manager or its Affiliates (whether or not occurring at the same time), does not cause the government of the Republic of Kazakhstan (directly or indirectly) to cease to Control the Bank or to have majority economic risk and/or benefit in the Bank and continues to allow the government of the Republic of Kazakhstan (directly or indirectly) to retain the sole right to exercise its rights as a majority shareholder (including in relation to the appointment of directors);

(II)    any fees, commission or other compensation or reward payable to the manager are agreed by a Qualified Majority of the Board; and

(III)   the manager (and any change to the manager) and the terms of appointment of the manager (and any change to those terms) are agreed by a Simple Majority of the Board.

9.     **Taxation**

(a)     *Taxation*

All payments of principal and interest in respect of the Notes shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by or within the Republic of Kazakhstan or any other jurisdiction from or

through which payment is made, or in any case, any political subdivision or any authority thereof or therein having power to tax (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law.  In that event, the Bank shall pay such additional amounts as will result in the receipt by the Noteholders of such amounts as would have been received by them if no such withholding or deduction had been required, except that no such additional amounts shall be payable in respect of any Note:

(i)      presented for payment by or on behalf of a holder who is liable to such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such holder, if such holder is an estate, a trust, a partnership or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein other than the mere holding of such Note; or

(ii)     presented (in the case of a payment of principal or interest on redemption) for payment more than 30 days after the Relevant Date except to the extent that the relevant holder would have been entitled to such additional amounts if it had presented such Note on the last day of such period of 30 days; or

(iii)     to a holder who is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent such payment would be required to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner who would not have been entitled to the additional amounts had such beneficiary, settlor, member or beneficial owner been the holder of the Note.

In the event that the foregoing obligation to pay additional amounts is for any reason unenforceable against the Bank, the Bank shall pay to any holder of a Note (subject to the exclusions set out in (i), (ii) and (iii) above) which has received a payment subject to deduction or withholding as aforesaid, upon written request of such holder (subject to the exclusions set out in (i), (ii) and (iii) above), and *provided that* reasonable supporting documentation is provided, an amount equal to the amount withheld or deducted, so that the net amount received by such holder after such payment would not be less than the net amount the holder would have received had such deduction or withholding not taken place.  Any payment made pursuant to this paragraph shall be considered an additional amount.

If, at any time, the Bank is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Bank shall promptly notify the Trustee in writing, and shall deliver to the Trustee, within 30 days after it has made such payment to the applicable authority, a written certificate to the effect that it has made such payment to such authority of all amounts so required to be deducted or withheld in respect of each Note.

(b)     *Relevant Date*

As used in these Conditions, "**Relevant Date**" in respect of any Note means the date on which payment in respect of such Note first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which notice is duly given to the Noteholders that, upon further presentation of the Note being made in

accordance with the Conditions, such payment will be made, *provided that* payment is in fact made upon such presentation.

(c) *Additional Amounts*

Any reference in these Conditions to principal or interest shall be deemed to include instalments of principal as well as any additional amounts in respect of principal or interest (as the case may be) which may be payable under this Condition 9 (*Taxation*) or any undertaking given in addition to or in substitution of this Condition 9 (*Taxation*) pursuant to the Trust Deed.

(d) *Taxing Jurisdiction*

If the Bank becomes subject at any time to any taxing jurisdiction other than the Republic of Kazakhstan references in this Condition 9 (*Taxation*) to the Republic of Kazakhstan shall be construed as references to the Republic of Kazakhstan and/or such other jurisdiction.

10. **Prescription**

Claims for principal and interest on redemption shall become void unless the relevant Note Certificates are surrendered for payment within ten years, and claims for interest due other than on redemption shall become void unless made within five years, of the appropriate Relevant Date.

11. **Events of Default**

The Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, give notice to the Bank that the Notes are and they shall become due and repayable at their principal amount together with accrued interest if any of the following events (each, an "**Event of Default**") occurs and is continuing:

(a) *Non Payment*

the Bank fails to pay the principal of the Notes when the same becomes due and payable and, where such failure to pay is caused by technical or administrative errors affecting the transfer of funds by the Bank, the failure to pay continues for a period of three Business Days, or the Bank is in default with respect to the payment of interest and such default continues for a period of ten days; or

(b) *Breach of Other Obligations*

the Bank is in default in the performance, or is otherwise in breach, of any covenant, obligation, undertaking or other agreement under the Notes or the Trust Deed or in respect of the Par Notes, Subordinated Notes or Recovery Notes (other than a default or breach elsewhere specifically dealt with in this Condition 11 (*Events of Default*)) and, where such default or breach is, in the opinion of the Trustee, capable of remedy, such default or breach is not remedied within 30 days after notice thereof has been given to the Bank, by the Trustee, and the Trustee certifies that such default or breach is materially prejudicial to the interests of the Noteholders; or

(c) *Cross Default*

(A) any Indebtedness for Borrowed Money of the Bank or any Subsidiary of the Bank becomes (or becomes capable of being declared) due and payable prior to the due date for the payment thereof by reason of default of the Bank or the relevant Subsidiary (as the case may be), or is not paid when due subject to any originally

applicable grace period or (B) any Indebtedness Guarantee given by the Bank or any Subsidiary of the Bank in respect of Indebtedness for Borrowed Money of another Person is not honoured when due and called, *provided that* the amount of Indebtedness for Borrowed Money referred to in (A) above and/or the amount payable under any Indebtedness Guarantee referred to in (B) above individually or in the aggregate exceeds U.S.$7,000,000 (or its equivalent in any other currency or currencies (as determined by the Trustee)); or

(d)     *Judgment Default*

a judgment or order or arbitration award for the payment of an aggregate amount in excess of U.S.$5,000,000 (or its equivalent in any other currency or currencies) is rendered or granted against the Bank or any Subsidiary or any part of their assets and continue(s) unsatisfied and unstayed for a period of 30 days after the date thereof or, if later, the date therein specified for payment; or

(e)     *Bankruptcy*

any Person shall have instituted a proceeding or entered a decree or order for the appointment of a receiver, administrator or liquidator in any insolvency, rehabilitation, readjustment of debt, marshalling of assets and liabilities or similar arrangements in respect of the Bank or any Material Subsidiary, or all or substantially all of its properties and such proceeding, decree or order shall not have been vacated or shall have remained in force undischarged or unstayed for a period of 60 days or the Bank or any Material Subsidiary shall institute proceedings under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect to be adjudicated a bankrupt or shall consent to the filing of a bankruptcy, insolvency or similar proceeding against it or shall file a petition or answer or consent seeking reorganisation under any such law or shall consent to the filing of any such petition, or shall consent to the appointment of a receiver, administrator or liquidator or trustee or assignee in bankruptcy or liquidation of the Bank or any Material Subsidiary, or in respect of its property, or shall make an assignment for the benefit of its creditors or shall otherwise be unable or admit its inability to pay its debts generally as they become due or the Bank commences proceedings with a view to the general adjustment of its Indebtedness or the Bank or any Material Subsidiary ceases or threatens to cease to carry on all or any substantial part of its business (otherwise than in connection with a disposal of assets pursuant to Clause ____ (Restrictions on Disposals) of the Trust Deed; or

(f)     *Maintenance of Business*

the Bank fails to take any action as is required of it under applicable banking regulations in Kazakhstan or otherwise to maintain in full effect its banking licence or corporate existence or fails to take any action to maintain any material rights, privileges, titles to property, franchises and the like necessary or desirable in the normal conduct of its business, activities or operations which is in the opinion of the Trustee materially prejudicial to the interests of the Noteholders and such failure is not remedied within 30 days (or such longer period as the Trustee may determine) after notice thereof has been given to the Bank; or

(g)     *Material Compliance with Applicable Laws*

the Bank fails to comply in any material respect (in the opinion of the Trustee) with any applicable laws or regulations (including any foreign exchange rules or regulations) of any governmental or other regulatory authority for any purpose to enable it lawfully to exercise its rights or perform or comply with its obligations under the Notes, the Trust Deed or the Agency Agreement or to ensure that those

obligations are legally binding and enforceable or that all necessary agreements or other documents are entered into and that all necessary consents and approvals of, and registrations and filings with, any such authority in connection therewith are obtained and maintained in full force and effect; or

(h)    *Removal of a Creditor Director or CS Director*

any CS Director or Creditor Director is removed within three years of the Issue Date without Cause or with Cause, but without the appointment of a successor to the relevant Director pursuant to the terms of the Trust Deed or following any removal of the relevant Director any decision requiring a Qualified Majority is taken by the Board prior to the appointment of a successor to the relevant Director pursuant to the terms of the Trust Deed, for which purpose "**Cause**" means, with respect to any removal of a CS Director or Creditor Director, a removal by reason of the incapacity or gross misconduct of the relevant Director.

(i)    *Shareholder Approval*

the Bank fails to obtain the Super Majority approval of its shareholders or the Qualified Majority approval of the Board for actions requiring such approval or fails to remedy any material breach of the terms of its charter or the Alliance Undertaking within 60 days after such breach has occurred; or

(j)    *Invalidity or Unenforceability*

the validity of the Notes, the Trust Deed or the Agency Agreement is contested by the Bank or the Bank denies any of its obligations under the Notes, the Trust Deed or the Agency Agreement (whether by a general suspension of payments or a moratorium on the payment of debt or otherwise) or it is or becomes unlawful for the Bank to perform or comply with all or any of its obligations set out in the Notes, the Trust Deed or the Agency Agreement or all or any of the obligations of the Bank provided in the Notes, the Trust Deed or the Agency Agreement shall be or become unenforceable or invalid and, following the occurrence of any of those events specified in this Condition 11(a)(x) (*Invalidity or Unenforceability*), the Trustee is of the opinion that such occurrence is materially prejudicial to the interests of the Noteholders; or

(k)    *Government Intervention*

all or any substantial part of the undertaking, assets and revenues of the Bank or any Material Subsidiary is condemned, seized, nationalised or otherwise appropriated by any person acting under the authority of any national, regional or local government (other than the purchase by Samruk-Kazyna of any shares of the Bank or any transfer by Samruk-Kazyna of any shares of the Bank owned by Samruk-Kazyna to any successor entity that is Controlled by the government of the Republic of Kazakhstan) or the Bank or any Material Subsidiary is prevented by any such person from exercising normal control over all or any substantial part of its undertaking, assets, revenues and, following the occurrence of any of the events specified in this Condition 11(a)(xi) (*Government Intervention*), the Trustee is of the opinion that such occurrence is materially prejudicial to the interests of the Noteholders; or

(l)    *Breach of Certain Covenants*

the Bank is in breach of (a) its covenants in the Trust Deed relating to Substantial Change of Business, Restriction on Intra-Group and Related Party Transactions, Limitation on Payment of Dividends or Additional Indebtedness or (b) any regulatory requirements applicable to the Bank, subject to any applicable cure period provided for by the applicable regulation; or

(m)    *Money Laundering, Corruption and Terrorism*

the Bank fails to comply with its covenants in the Trust Deed relating to Money Laundering, Corruption and Terrorism.

## 12.    Replacement of Notes

If any Note is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Principal Paying and Transfer Agent and the Agent, subject to all applicable laws and stock exchange requirements, upon payment by the claimant of the expenses incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank may reasonably require.  Mutilated or defaced Notes must be surrendered before replacements will be issued.

## 13.    Meetings of Noteholders; Modification and Waiver

(a)    *Meetings of Noteholders*

The Trust Deed contains provisions for convening meetings of Noteholders to consider any matters relating to the Notes, including the modification of any provision of these Conditions or the Trust Deed.  Any such modification may be made if sanctioned by an Extraordinary Resolution.  Such a meeting may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than one tenth of the aggregate principal amount of the outstanding Notes.  The quorum at any meeting convened to vote on an Extraordinary Resolution will be two or more persons holding or representing a clear majority of the aggregate principal amount of the Notes for the time being outstanding, or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented; *provided*, *however*, *that* certain proposals (including any proposal to change any date fixed for payment of principal or interest in respect of the Notes, to reduce the amount of principal or interest payable on any date in respect of the Notes, to alter the method of calculating the amount of any payment in respect of the Notes or the date for any such payment, to change the currency of payment under the Notes or to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution) may only be sanctioned by an Extraordinary Resolution passed at a meeting of Noteholders at which two or more persons holding or representing not less than three quarters or at any adjourned meeting, one quarter of the aggregate principal amount of the outstanding Notes form a quorum (a "**special quorum resolution**").  Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Noteholders, whether present or not.

The Trust Deed contains provisions for convening meetings of holders of the Notes with holders of notes of other series issued under the Trust Deed if the Trustee so decides.

(b)    *Written Resolution*

A resolution in writing will take effect as if it were an Extraordinary Resolution if it is signed (i) by or on behalf of all of Noteholders who for the time being are entitled to receive notice of a meeting of Noteholders under the Trust Deed or (ii) if such Noteholders have been given at least 21 clear days' notice of such resolution, by or on behalf of persons holding three quarters of the aggregate principal amount of the outstanding Notes.  Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders.

(c)     *Modification Without Noteholders' Consent*

The Trustee may, without the consent of the Noteholders, agree (i) to any modification of the Notes (including these Conditions) or the Trust Deed (other than in respect of a matter requiring a special quorum resolution), which, in the opinion of the Trustee, will not be materially prejudicial to the interests of Noteholders and (ii) to any modification of the Notes (including these Conditions) or the Trust Deed, which is of a formal, minor or technical nature or to correct a manifest error. In addition, the Trustee may, without the consent of the Noteholders, authorise or waive any proposed breach or breach of the Notes or the Trust Deed (other than a proposed breach or breach relating to the subject of a matter requiring a special quorum resolution) if, in the opinion of the Trustee, the interests of the Noteholders will not be materially prejudiced thereby. Any such modification, waiver or authorisation shall be binding on the Noteholders and, unless the Trustee agrees otherwise, shall be promptly notified to the Noteholders in accordance with Condition 14 (*Notices*).

14.     **Notices**

(a)     *To the Noteholders*

Notices to Noteholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register. Any such notice shall be deemed to have been given on the fourth day (not being a Saturday or a Sunday) after the date of mailing. In addition, so long as the Notes are listed on the Kazakhstan Stock Exchange and the Kazakhstan Stock Exchanges requires notices to the Noteholders shall be published in a leading newspaper having general circulation in Kazakhstan. Any such notice shall be deemed to have been given on the date of first publication.

(b)     *To the Bank*

Notices to the Bank will be deemed to be validly given if delivered to the Bank at 50 Furmanov Street, Almaty 050004, Republic of Kazakhstan and clearly marked on their exterior "Urgent — Attention: International Relations Department" (or at such other addresses and for such other attentions as may have been notified to the Noteholders in accordance with Condition 14(a)) and will, be deemed to have been validly given at the opening of business on the next day on which the Bank's principal offices, as applicable, are open for business.

(c)     *To the Trustee and Agents*

Notices to the Trustee or any Agent will be deemed to have been validly given if delivered to the registered office, for the time being, of the Trustee or the Specified Office, for the time being, of such Agent, as the case may be, and will be validly given on the next day on which such office is open for business.

15.     **Trustee**

(a)     *Indemnification*

Under the Trust Deed, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and to be paid its costs and expenses in priority to the claims of the Noteholders. In addition, the Trustee is entitled to enter into business transactions with the Bank and any entity relating to the Bank without accounting for any profit.

The Trustee's responsibilities are solely those of trustee for the Noteholders on the terms of the Trust Deed. Accordingly, the Trustee makes no representations and

assumes no responsibility for the validity or enforceability of the Notes or for the performance by the Bank of its obligations under or in respect of the Notes or the Trust Deed, as applicable.

(b)     *Exercise of Power and Discretion*

In connection with the exercise of any of its powers, trusts, authorities or discretions (including but not limited to those referred to in these Conditions and the Trust Deed), the Trustee shall have regard to the interests of the Noteholders as a class and, in particular, shall not have regard to the consequences of such exercise for individual Noteholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or taxing jurisdiction. The Trustee shall not be entitled to require, and no Noteholder shall be entitled to claim, from the Bank (in the case of a Noteholder) the Trustee any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders.

(c)     *Enforcement; Reliance*

The Trustee may at any time, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Notes, but it shall not be bound to do unless:

(i)      it has been so requested in writing by the holders of a least one fifth in principal amount of the outstanding Notes or has been so directed by an Extraordinary Resolution; and

(ii)     it has been indemnified or provided with security or pre funded to its satisfaction.

The Trust Deed provides that the Trustee may, at any time, or, in making any determination under these Conditions or the Trust Deed, act on the opinion or advice of, or information obtained from, any expert, auditor, lawyer or professional entity, without further enquiry or evidence. In particular, the Trust Deed provides that the Trustee may rely on certificates or reports from auditors whether or not such certificate or report or any engagement letter or other document entered into by the Bank and the auditors contains any limit on liability (monetary or otherwise) of the auditors and provides further that nothing shall require the Trustee to enter into or to agree to be bound by the terms of any engagement letter or other document entered into by the Bank or any such auditor. If such evidence is relied upon, the Trustee's determination shall be conclusive and binding on all parties, and the Trustee will not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience which may result from it so acting.

Until the Trustee has actual or express knowledge to the contrary, the Trustee may assume that no Event of Default or event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default has occurred.

The Trust Deed provides that the Bank is required to deliver to the Trustee, pursuant to, and in the circumstances detailed in, the Trust Deed, a certificate signed by any two of its Directors that there has not been and is not continuing any Event of Default, an event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default, or other breach of the Trust Deed. The Trustee shall be entitled to rely without liability on such certificates.

The Trustee shall not be responsible for monitoring any of the covenants and obligations of the Bank set out in these Conditions and shall be entitled to rely upon the information provided pursuant to these Conditions and the Trust Deed and to assume, unless it receives actual notice to the contrary, that the Bank is complying with all covenants and obligations imposed upon it, respectively, herein and therein.

(d) *Failure to Act*

No Noteholder may proceed directly against the Bank unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

(e) *Retirement and Removal*

Any Trustee may retire at any time on giving at least three months' written notice to the Bank without giving any reason or being responsible for any costs occasioned by such retirement and the Noteholders may by Extraordinary Resolution remove any Trustee, *provided that* the retirement or removal of a sole trust corporation will not be effective until a trust corporation is appointed as successor Trustee. If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, it will use all reasonable endeavours to procure that another trust corporation be appointed as Trustee. In the event of any change of the Trustee, a notice shall be published in a leading newspaper which will have general circulation in the Republic of Kazakhstan.

(f) *Substitution*

The Trust Deed contains provisions to the effect that the Trustee may (without the consent of the Noteholders) agree on such terms as it may specify to the substitution of the Bank's successor in business in place of the Bank as issuer and principal obligor in respect of the Notes and as principal obligor under the Trust Deed, subject to all relevant conditions of the Trust Deed having been complied with (including an unconditional guarantee by the Bank of the obligation assumed by the substitute). Not later than 14 days after compliance with the aforementioned requirements, notice thereof shall be given by the Bank to the Noteholders in accordance with Condition 14 (*Notices*).

16. **Further Issues**

The Bank may from time to time, without the consent of the Noteholders and in accordance with the Trust Deed, create and issue further Notes having the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest).

17. **Currency Indemnity**

If any sum due from the Bank in respect of the Notes under the Trust Deed or any order or judgment given or made in relation thereto has to be converted from the currency (the "**first currency**") in which the same is payable under these Conditions, the Trust Deed or such order or judgment into another currency (the "**second currency**") for the purpose of making or filing a claim or proof against the Bank, obtaining an order or judgment in any court or other tribunal or enforcing any order or judgment given or made in respect of the Notes or in respect thereof under the Trust Deed, the Bank shall indemnify each Noteholder, on the written demand of such Noteholder addressed to the Bank and delivered to the Bank or to the Specified Office of the Principal Agent or the Agent having its Specified Office in London, against any loss suffered as a result of any discrepancy between the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and the rate or rates of exchange at which such Noteholder may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it

in satisfaction, in whole or in part, of any such order, judgment, claim or proof. This indemnity constitutes a separate and independent obligation of the Bank and shall give rise to a separate and independent cause of action.

18. **Contracts (Rights of Third Parties) Act 1999**

No Person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999, but this does not affect the right or remedy of any Person which exists or is available apart from such Act.

19. **Governing Law; Arbitration and Jurisdiction**

(a) *Governing Law*

The Trust Deed, the Notes, the Agency Agreement and any non-contractual obligations arising out of or in connection therewith are governed by, and shall be construed in accordance with, English law.

(b) *Arbitration*

The Bank agrees that any claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non contractual obligations arising out of or in connection with the Trust Deed) (a "**Dispute**"), shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**") as at present in force and as modified by this Condition, which Rules shall be deemed incorporated into this Condition. The number of arbitrators shall be three, one of whom shall be nominated by the Bank, one by the Trustee and the third of whom, who shall act as Chairman, shall be nominated by the two party nominated arbitrators, *provided that* if the third arbitrator has not been nominated within 30 days of the nomination of the second party nominated arbitrator, such third arbitrator shall be appointed by the LCIA. The parties may nominate and the LCIA may appoint arbitrators from among the nationals of any country, whether or not a party is a national of that country. The seat of arbitration shall be London, England and the language of arbitration shall be English. Sections 45 and 69 of the Arbitration Act 1996 shall not apply.

(c) *Trustee's Option*

At any time before the Trustee has nominated an arbitrator to resolve any Dispute(s) pursuant to Condition 19(b) (*Arbitration*), the Trustee, at its sole option, may elect by notice in writing to the Bank that such Dispute(s) shall instead be heard by the courts of England, as more particularly described in Condition 19(d) (*Jurisdiction*). Following any such election, no arbitral tribunal shall have jurisdiction in respect of such Dispute(s).

(d) *Jurisdiction*

In the event that the Trustee serves a written notice of election in respect of any Dispute(s) pursuant to Condition 19(c) (*Trustee's Option*), the Bank agrees for the benefit of the Trustee and the Noteholders that the courts of England shall have jurisdiction to hear and determine any such Dispute(s) and, for such purposes, irrevocably submits to the jurisdiction of such courts. Subject to Condition 19(b) (*Arbitration*), nothing in this Condition shall (or shall be construed so as to) limit the right of the Trustee to bring proceedings ("**Proceedings**") for the determination of any Dispute(s) in any other court of competent jurisdiction, nor shall the bringing of such Proceedings in any one or more jurisdictions preclude the bringing of

Proceedings by the Trustee in any other jurisdiction (whether concurrently or not) if and to the extent permitted by law.

(e)     *Appropriate Forum*

The Bank has irrevocably waived any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and agrees not to claim in any Proceedings that any such court is not a convenient or appropriate forum.

(f)     *Agent for Service of Process*

The Bank has agreed that the process by which any Proceedings in England are begun may be served on it by being delivered to Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX or, if different, its registered office for the time being.  If for any reason the Bank does not have such an agent in England, it will promptly appoint a substitute process agent and notify in writing the Trustee of such appointment.  If such person is not or ceases to be effectively appointed to accept service of process on behalf of the Bank, the Bank shall, on the written demand of the Trustee, appoint a further person in England to accept service of process on its behalf and, failing such appointment within 15 days, the Trustee shall be entitled to appoint such a person by written notice to the Bank. Nothing herein shall affect the right to serve process in any other manner permitted by law.

(g)     *Consent to Enforcement, etc.*

The Bank has consented generally in respect of any Disputes (or Proceedings in accordance with Condition 19(d) (*Jurisdiction*)) to the giving of any relief or the issue of any process in connection with such Disputes or Proceedings, including (without limitation) the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment which may be given in such Proceedings or in connection with such Disputes.

(h)     *Waiver of Immunity*

To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity to the full extent permitted by the laws of such jurisdiction.

## TERMS AND CONDITIONS OF THE PAR TENGE NOTES

*The following is the text of the terms and conditions of the Par Tenge Notes which, subject to amendment and completion will be endorsed on each Note Certificate pertaining to the Par Tenge Notes and will be attached and (subject to the provisions thereof) apply to the relevant Global Note, and which supersedes in it entirety the corresponding section of Annex 5 of Schedule 6 to the Information Memorandum:*

The KZT ____ 9 per cent. notes due ____ 2020 (the "**Notes**", which expression includes any further notes issued pursuant to Condition 16 (*Further Issues*) and forming a single series therewith) of JSC Alliance Bank (the "**Bank**") are (a) constituted by, and subject to, and have the benefit of a trust deed dated ____ 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and BNY Corporate Trustee Services Limited as trustee (the "**Trustee**", which expression includes all persons for the time being appointed as trustee for the holders of the Notes ("**Noteholders**") under the Trust Deed) and (b) the subject of a paying agency agreement dated ____ 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") between the Bank, the Trustee, ____ as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**"; which expression includes any successor or additional paying and transfer agents appointed from time to time in connection with the Notes) and ____ as registrar (the "**Registrar**", which expression shall include any successor registrar appointed from time to time in connection with the Notes).

Certain provisions of these Conditions are summaries of the Trust Deed and the Agency Agreement and subject to their detailed provisions. The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them. Copies of the Trust Deed and the Agency Agreement are available for inspection during normal business hours at the Specified Offices (as defined in the Agency Agreement) of the Principal Paying and Transfer Agent. Copies are also available for inspection during normal business hours at the registered office for the time being of the Trustee, One Canada Square, London E14 5AL, United Kingdom. References herein to the "**Agents**" are to the Registrar and the Paying and Transfer Agents and any reference to an "**Agent**" is to any one of them.

Terms defined in the Trust Deed shall, unless otherwise defined herein or the context requires otherwise, bear the same meanings herein.

1.    **Status**

The obligations under the Notes are unconditional, direct, unsubordinated and, subject as provided in Clause ____ (*Negative Pledge*) of the Trust Deed, unsecured obligations of the Bank, and will at all times rank at least *pari passu* amongst themselves and *pari passu* in right of payment with all other present and future (except as provided therein) unsubordinated obligations of the Bank, save only for such obligations as may be preferred by mandatory provisions of applicable law.

2.    **Form, Denomination and Title**

(a)    *Form and Denomination*

The Notes are in registered form, without interest coupons attached, and shall be serially numbered. Notes shall be issued in denominations of KZT ____ and integral multiples of KZT ____ in excess thereof (each denomination an "**authorised denomination**").

(b)     *Title*

Title to the Notes will pass by transfer and registration as described in Conditions 3 (*Registration*) and 4 (*Transfers*). The holder (as defined below) of any Notes shall (except as otherwise required by law or as ordered by a court of competent jurisdiction) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein, any writing thereon (other than a duly executed transfer thereof in the form endorsed thereon) or any notice of any previous loss or theft thereof) and no person shall be liable for so treating such holder.

In these Conditions, "**holder**" means the person in whose name a Note is registered in the Register (as defined below) (or, in the case of joint holders, the first named thereof) and "**holders**" and "**Noteholders**" shall be construed accordingly.

3.     **Registration**

The Bank shall procure that the Registrar will maintain a register (the "**Register**") at the Specified Office of the Registrar in respect of the Notes in accordance with the provisions of the Agency Agreement. A certificate (each, a "**Note Certificate**") will be issued to each Noteholder in respect of its registered holding. Each Note Certificate will be numbered serially with an identifying number which will be recorded in the Register.

4.     **Transfers**

(a)     Subject to Conditions 4(d) and 4(e), a Note may be transferred in whole or in part upon surrender of the relevant Note Certificate, with the endorsed form of transfer (the "**Transfer Form**") duly completed, at the Specified Office of any Agent, together with such evidence as the Registrar or (as the case may be) such Agent may reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer; *provided*, *however*, *that* a Note may not be transferred unless the principal amount of Notes transferred and (where not all of the Notes held by a holder are being transferred) the principal amount of the balance of Notes not transferred are authorised denominations. Transfer Forms are available from any Agent and the Bank upon the request of any holder.

(b)     Within five business days of the surrender of a Note Certificate in accordance with Condition 4(a), the Registrar will register the transfer in question and deliver a new Note Certificate of alike principal amount to the Notes transferred to each relevant holder at its Specified Office or (as the case may be) the Specified Office of any Agent or (at the request and risk of any such relevant holder) by uninsured first class mail (airmail if overseas) to the address specified for the purpose by such relevant holder. In this Condition 4(b), "**business day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in foreign currencies) in the city where the Registrar or (as the case may be) the relevant Agent has its Specified Office.

(c)     The transfer of a Note will be effected without charge by the Registrar or any Agent but against such indemnity as the Registrar or (as the case may be) such Agent may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such transfer.

(d)     Noteholders may not require transfers to be registered during the period of 15 days ending on the due date for any payment of principal or interest in respect of the Notes.

(e)     All transfers of Notes and entries on the Register are subject to the detailed regulations concerning the transfer of the Notes scheduled to the Agency Agreement,

a copy of which will be made available as specified in the preamble to these Conditions. The regulations may be changed by the Bank with the prior written approval of the Trustee and the Registrar. A copy of the current regulations will be mailed (free of charge) by the Registrar to any Noteholder who requests in writing a copy of such regulations.

5. **Covenants**

The Noteholders will have the benefit of certain covenants contained in the Trust Deed relating to, amongst other things, restrictions on the creation of security interests, incurrence of indebtedness, disposal of assets and payment of dividends.

6. **Interest**

(a) *Interest Accrual*

The Notes shall bear or, as the case may be, be deemed to bear interest on their outstanding principal amount from the earlier of ____ 2010 (the "**Issue Date**") and 1 March 2010 up to but excluding ____ 2017 (the "**Amortisation Date**") at the rate of 9 per cent. per annum (the "**Initial Rate of Interest**") and thereafter until ____ 2020 at a rate per annum (the "**Step Up Rate of Interest**") equal to 12.5 per cent. payable in arrear on ____ and ____ in each year (each, an "**Interest Payment Date**"), subject as provided in Condition 7 (*Payments*), save that:

(i) if any Interest Payment Date after the Amortisation Date would otherwise fall on a day which is not a Business Day, it will be postponed to the next Business Day unless it would thereby fall into the next calendar month, in which case it will be brought forward to the preceding Business Day;

(ii) at the end of each Interest Period during the period beginning on the Issue Date (or 1 March 2010, as the case may be) and ending on (but excluding) the Amortisation Date, that portion of the interest payable equal to the Capitalisation Amount for that Interest Period accrued on the Notes during that Interest Period shall, unless the Bank elects to pay such accrued interest in cash on the corresponding Interest Payment Date by giving the Principal Paying and Transfer Agent not less than three Business Days' notice of such election (which notice shall be irrevocable for such Interest Payment Date), be automatically capitalised and added to the amount of the principal in respect of the Notes, for which purpose, the "**Capitalisation Amount**" for any Interest Period shall be an amount equal to the interest that would have accrued for that Interest Period had the Initial Rate of Interest been 4.75 per cent. per annum. Any such accrued interest shall, after being so capitalised, be (and be treated as) part of the principal in respect of the Notes and shall bear interest in accordance with this Condition 6 (*Interest*) and, except to the extent repaid or prepaid at an earlier time in accordance with these Conditions, shall be payable in accordance with the provisions of these Conditions and the Trust Deed. If all or part of the principal of the Notes is prepaid prior to the end of an Interest Period (including by way of the Put Option), any accrued and unpaid interest on such principal of the Notes that has not been so capitalised will be payable in cash on the date of such prepayment.

Each period beginning on (and including) the Issue Date (or 1 March 2010, as the case may be) or any Interest Payment Date and ending on (but excluding) the next Interest Payment Date is herein called an "**Interest Period**".

(b)     *Cessation of Interest*

Each Note will cease to bear interest from the due date for final redemption unless, upon due presentation, payment of principal is improperly withheld or refused, in which case it will continue to bear interest at such rate (as well after as before judgment) until whichever is the earlier of (i) the day on which all sums due in respect of such Notes up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Principal Paying and Transfer Agent or the Trustee has notified the Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(c)     *Calculation of Interest for an Interest Period*

The amount of interest payable in respect of each Note for any Interest Period shall be calculated by applying the Rate of Interest to the principal amount of such Note, dividing the product by two and rounding the resulting figure to the nearest tiyn (half a tiyn being rounded upwards) *provided that* if the Issue Date is later than 1 March 2010, the amount of interest payable for the first Interest Period shall be KZT ____ for each KZT ____ in principal amount of Note (subject always to automatic capitalisation of interest pursuant to Condition 6(a)(ii)).

(d)     *Calculation of Interest for any Other Period*

If interest is required to be calculated for any period other than an Interest Period, it will be calculated on the basis of a year of 360 days consisting of 12 months of 30 days each and, in the case of an incomplete month, the actual number of days elapsed.

The determination of the amount of interest payable under Condition 6(c) (*Calculation of Interest for an Interest Period*) by the Principal Paying Agent shall, in the absence of manifest error, be binding on all parties.

7.     **Payments**

(a)     *Principal*

Payments of principal in respect of the Notes will be made to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or of any Agent.

(b)     *Interest*

Payments of interest due on an Interest Payment Date will be made to the Persons shown in the Register at the close of business on the Record Date for such Interest Payment Date, subject to (in the case of interest payable on redemption) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or any Agent.  Payments of all amounts other than as provided in Conditions 7(a) (*Principal*) and this Condition 7(b) (*Interest*) will be made as provided in these Conditions.

(c)     *Record Date*

Each payment in respect of a Note will be made to the Person shown as the holder in the Register at the opening of business (in the place of the Registrar's specified office) on the fifteenth day before the due date for such payment (the "**Record Date**").

(d)     *Payments*

Each payment in respect of the Notes pursuant to Conditions 7(a) (*Principal*) and 7(b) (*Interest*) will be made by transfer to a Kazakhstan Tenge account maintained by the payee with a bank in Kazakhstan.

(e)     *Payments Subject to Fiscal Laws*

All payments in respect of the Notes are subject in all cases to any applicable or other laws and regulations in the place of payment, but without prejudice to the provisions of Condition 9 (*Taxation*).   No commissions or expenses shall be charged to the Noteholders in respect of such payments.

(f)     *Payment on a Business Day*

If the due date for payment of any amount in respect of any Note is not a business day in the place of presentation, the holder thereof shall not be entitled to payment in such place of the amount due until the next succeeding business day in such place.  A holder of a Note shall not be entitled to any interest or other payment in respect of any delay in payment resulting from the due date for a payment not being a business day.  In this Condition 7(f) (*Payment on a Business Day*), "**business day**" means any day on which banks are open for business (including dealings in foreign currencies) in London and Almaty and, in the case of surrender (or, in the case of partial payment only, endorsement) of a Note Certificate, in the place in which the Note Certificate is surrendered (or, as the case may be, endorsed).

(g)     *Agents*

In acting under the Agency Agreement and in connection with the Notes, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Noteholders.  The Bank reserves the right (with prior written approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to appoint a successor principal paying and transfer agent or registrar and additional or successor agent or agents; *provided*, *however*, *that* the Bank shall at all times maintain a principal paying and transfer agent with a specified office in a European member state, that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any other European Directive implementing the conclusions of the ECOFIN Council meeting of June 3, 2003 on the taxation of savings income or any law implementing or complying with, or introduced to conform to, such Directive, and a registrar.  Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Noteholders in accordance with Condition 14 (*Notices*).

8.     **Redemption and Purchase**

(a)     *Scheduled Redemption*

Unless previously redeemed or purchased and cancelled as provided below, subject as provided in Condition 7 (*Payments*), the Notes will be partially redeemed in six equal semi-annual instalments on _____ and _____ of each year, with the first such instalment being payable on _____ 2017 and the last such instalment being payable on _____ 2020. The outstanding principal amount of each Note shall be reduced by any repayment of principal in accordance with these Conditions, including (i) any instalment amount and (ii) any prepayment amount comprising any amounts paid pursuant to Condition 8(d) (*Redemption by way of Surplus Cash*) and any prepayment made in accordance with Condition 8(e) (*Redemption after Public Offering*), with effect from the related instalment payment date or the Prepayment Date (as the case may be),

unless the payment of the instalment or the prepayment is improperly withheld or refused on presentation of the Note, in which case such amount shall remain outstanding until the date of payment of such instalment amount or of such prepayment. Each Note shall be finally redeemed on due payment of the final instalment amount payment or (to the extent that the amounts to be paid pursuant to Condition 8(e) (*Redemption after Public Offering*) are sufficient to finally redeem the Notes) on the Prepayment Date.

(b)     *Redemption for Tax Reasons*

The Notes may be redeemed at the option of the Bank in whole, but not in part, at any time, on giving not less than 30 nor more than 60 days' notice to the Noteholders (which notice shall be irrevocable) at their principal amount, together with interest accrued but unpaid to the date fixed for redemption, if, immediately before giving such notice, the Bank satisfies the Trustee that (i) the Bank will become obliged to pay, on the next date on which any amount would be payable with respect to the Notes, additional amounts, as provided or referred to in Condition 9 (*Taxation*), to any greater extent than would have been required had such a payment been required to be made on the [date of the Claimants' Meeting], as a result of any change in, or amendment to, the laws or regulations of the Republic of Kazakhstan or any political subdivision or any authority thereof having power to tax therein, or any change in the application or official interpretation of such laws or regulations (including a ruling by a court of competent jurisdiction, but excluding any such change or amendment which obliges the Bank to pay additional amounts in respect of Notes held by or on behalf of a person resident, domiciled or organised in the Republic of Kazakhstan), which change or amendment becomes effective on or after the [date of the Claimant's Meeting] and (ii) such obligation cannot be avoided by the Bank taking reasonable measures available to it; *provided*, *however*, *that* no such notice of redemption shall be given earlier than 90 days prior to the earliest date on which the Bank would be obliged to pay such additional amounts if a payment in respect of the Notes were then due. Prior to the publication of any notice of redemption pursuant to this Condition 8(b) (*Redemption for Tax Reasons*), the Bank shall deliver or procure that there is delivered to the Trustee a certificate signed by two directors of the Bank stating that the Bank is entitled to effect such redemption and setting forth a statement of facts showing that the conditions precedent to the right of the Bank so to redeem have occurred and an opinion in form and substance satisfactory to the Trustee of independent legal advisers of recognised standing to the effect that the Bank has or will become obliged to pay such additional amounts as a result of such change or amendment. The Trustee shall be entitled to accept, without further enquiry, such certificate and opinion as sufficient evidence of the satisfaction of the circumstances set out in (i) and (ii) above, in which event these shall be conclusive and binding on the Noteholders. Upon the expiry of any such notice as is referred to in this Condition 8(b) (*Redemption for Tax Reasons*), the Bank shall be bound to redeem the Notes in accordance with this Condition 8(b) (*Redemption for Tax Reasons*).

(c)     *Redemption at the Option of the Noteholders*

Unless the Noteholders have previously by an Extraordinary Resolution disapplied this Condition 8(c) (*Redemption at the Option of the Noteholders*) in relation to the applicable Relevant Event, following the occurrence of a Relevant Event (as defined below), the Bank shall promptly, and in any event within five Business Days thereafter, give notice (the "**Relevant Event Notice**") of such Relevant Event to the Noteholders (with a copy to the Trustee) in accordance with Condition 14 (*Notices*), which notice shall specify the date, (which shall not be less than 30 days nor more than 60 days after the Relevant Event Notice (the "**Put Settlement Date**")), on which the Bank shall, at the option of the holder of any Note, redeem such Note at its initial

face value.   In order to exercise the option contained in this Condition 8(c) (*Redemption at the Option of the Noteholders*), the holder of a Note must, not less than 15 days before the Put Settlement Date, deposit with any Paying Agent the relevant Note Certificate and a duly completed put option notice (a "**Put Option Notice**") in the form obtainable from any Paying Agent.  No Note Certificate, once deposited with a duly completed Put Option Notice in accordance with this Condition 8(c) (*Redemption at the Option of the Noteholders*), may be withdrawn; *provided*, *however*, *that* if, prior to the Put Settlement Date, any such Note becomes immediately due and payable or, upon due presentation of any such Note Certificate on the Put Settlement Date, payment of the redemption monies is improperly withheld or refused, such Note Certificate shall, without prejudice to the exercise of the Put Option, be returned to the holder by uninsured first class mail (airmail if overseas) at such address as may have been given by such Noteholder in the relevant Put Option Notice.  The Trustee shall not be responsible for monitoring whether or not any Relevant Event has occurred and shall be entitled to assume unless it receives written notice to the contrary, that no Relevant Event has occurred.  In the event that a Relevant Event occurs but no Relevant Event Notice is given by the Bank, the Bank shall be deemed to have given a Relevant Event Notice specifying a Put Settlement Date on the date which is 60 days after the occurrence of the Relevant Event, unless such day is not a Business Day, in which event the Put Settlement Date shall be the immediately following day thereafter which is a Business Day.

(d)     *Redemption by way of Surplus Cash*

Terms defined in the Information Memorandum dated 5 November 2009, as supplemented, published by the Bank describing its Restructuring Plan are used in this Condition 8(d) (*Application of Further Amounts*) as so defined.

   (i)     *Application of Unallocated Cash*

If and to the extent that, after completion of the Allocation and Reallocation of Claims Mechanism, the Bank determines that the amount of cash allocated to Option 1 and Option 1A under the Allocation and Reallocation of Claims Mechanism is less than U.S.\$500,000,000 the balance of the U.S.\$500,000,000 (the "**Unallocated Cash**") shall be distributed between the Discount Notes and the Par Notes in the proportion which the aggregate principal amount of the Designated Financial Indebtedness allocated to the Discount Notes bears to the aggregate principal amount of the Designated Financial Indebtedness allocated to the Par Notes under the Allocation and Reallocation of Claims Mechanism.

The Unallocated Cash that is to be distributed to holders of the Par Notes shall then be allocated between the Notes and the Par Dollar Notes in the proportion which their respective aggregate principal amounts bear to each other (for which purpose the aggregate principal amount of the Notes shall be converted into Dollars using the rate displayed on the appropriate Thompson Reuters page at or about 11 a.m. Almaty time two Business Days prior to the date of distribution).

The Bank shall inform the Noteholders within six months of the Issue Date of the amount of any Unallocated Cash that is distributable in respect of the Notes. The proportion of the Unallocated Cash that is distributed to the Notes shall then, not less than six and not more than seven months after the Issue Date, be converted to Tenge at the Spot Rate of Exchange and paid pro rata to the Noteholders and shall be applied pro rata to the reduction pro tanto of the principal of the Notes and each instalment of principal shall be reduced

accordingly. A note of such application shall be endorsed on the relevant Note Certificates.

For the purposes of this Condition 8(d)(i) (*Application of Unallocated Cash*) "**Spot Rate of Exchange**" means the spot rate of exchange quoted by [SB "HSBC Kazakhstan" JSC] (or any other internationally recognized financial institution) for the purchase of Kazakhstan Tenge with United States Dollars at or about 11:00 a.m. Almaty time on the relevant day.

(ii)     *Application of Surplus Cash*

(A)     While the Recovery Notes are outstanding, any surplus cash (calculated as set out below) after any instalment of principal in respect of the Recovery Notes is paid shall be applied pro rata towards the reduction pro tanto of the principal of the Discount Notes and the Par Notes (and each instalment of principal of the Discount Notes and the Par Notes shall be reduced accordingly) or, if the Discount Notes have already been redeemed, shall be applied towards the reduction pro tanto of the principal of the Par Notes (and each instalment of principal of the Par Notes shall be reduced accordingly). A note of such application shall be endorsed on the relevant Note Certificates.

(B)     The Trust Deed provides that if the Recovery Notes have been fully redeemed (including following exercise of the Put Option), any surplus cash shall be applied pro rata towards the reduction pro tanto of the principal of the Discount Notes and the Par Notes (and each instalment of principal of the Discount Notes and the Par Notes shall be reduced accordingly) or, if the Discount Notes have already been redeemed, shall be applied towards the reduction pro tanto of the principal of the Par Notes (and each instalment of principal of the Par Notes shall be reduced accordingly). A note of such application shall be endorsed on the relevant Note Certificates.

The surplus cash that is allocated to the Par Notes pursuant to (A) or (B) above will be allocated between the Notes and the Par Dollar Notes in the proportion which their respective aggregate principal amounts bear to each other (for which purpose the aggregate principal amount of the Notes shall be converted into Dollars using the rate displayed on the appropriate Thompson Reuters page at or about 11 a.m. Almaty time two Business Days prior to the date of distribution).

The surplus cash is calculated and applied every six months. For the purposes of calculating the surplus cash, the Bank shall prepare (and send to the Trustee and publish on the Bank's website within one month of the end of the first financial half year following _____ 2017 and every six months thereafter) a cash flow statement, based on the most recently available semi-annual or annual consolidated financial statements of the Bank prepared in accordance with Adjusted IFRS. The surplus cash shall be calculated in accordance with the following formula:

$$\text{Surplus cash} = 50 \text{ per cent. x } (B - C)$$

where:

B = the amount shown as "cash inflow from operating activities before changes in operating assets and liabilities" in such cash flow statement, and

C = the amount of cash which the Bank forecasts it will need in its operations in the next three months while exceeding by a multiple of 1.1 each applicable liquidity ratio specified by the FMSA from time to time.

(e)     *Redemption after Public Offering*

Following the completion of any public offering by the Bank of its common shares, warrants or instruments convertible or exchangeable into common shares or depository receipts representing common shares after _____ 2015 (the "**Public Offering**"), the Bank shall promptly, and in any event within five Business Days thereafter, give notice of such Public Offering (the "**Public Offering Notice**") to the Noteholders (with a copy to the Trustee) in accordance with Condition 14 (*Notices*), which notice shall specify the date being a Business Day (which shall not be less than 30 days nor more than 60 days after the Public Offering (the "**Prepayment Date**")) on which the Bank shall apply 50 per cent. of the proceeds of the Public Offering to first redeem the Discount Notes at their principal amount together with interest accrued and unpaid to the Prepayment Date and then (to the extent that there are any amounts left over after redemption of the Discount Notes) to redeem the Notes in part in an amount equal to the proceeds left over and if sufficient proceeds have been raised, in full at their principal amount together with interest accrued and unpaid to the Prepayment Date. The Trustee shall not be responsible for monitoring whether or not any Public Offering has occurred and shall be entitled to assume unless it receives written notice to the contrary, that no Public Offering has occurred. In the event that a Public Offering occurs but no Public Offering Notice is given by the Bank, the Bank shall be deemed to have given a Public Offering Notice specifying a Prepayment Date on the date which is 60 days after the occurrence of the Public Offering, unless such day is not a Business Day, in which event the Prepayment Date shall be the immediately following Business Day thereafter.

For the purposes of this Condition 6 (*Interest*), "**Business Day**" means a day on which commercial banks are open for business (including dealings in foreign currencies) in London and New York.

(f)     *Purchase*

The Bank may at any time purchase or procure others to purchase for its account the Notes in the open market or otherwise and at any price. Notes so purchased may be held or resold (*provided that* such resale is in compliance with all applicable laws) or surrendered for cancellation at the option of the Bank, in compliance with

Condition 8(g) (*Cancellation of Notes*). Any Notes so purchased, while held by or on behalf of the Bank, shall not entitle the holder to vote at any meeting of Noteholders and shall not be deemed to be outstanding for the purposes of calculating quorum at such meetings.

(g)     *Cancellation of Notes*

All Notes which are redeemed or surrendered for cancellation pursuant to this Condition 8 (*Redemption and Purchase*) shall be cancelled and may not be reissued or resold.

(h)     *Definitions*

As used in this Condition 8 (*Redemption and Purchase*):

"**Adjusted IFRS**" means International Financial Reporting Standards adjusted to reflect the FMSA's requirements for preparation of financial statements for regulatory purposes.

"**Capital Stock**" means, with respect to any Person, any and all shares, interests, participations, rights to purchase, warrants, options or any other equivalent of any of the foregoing (however designated) in relation to the share capital of a company and any and all equivalent ownership interests in a Person other than a company, in each case whether now outstanding or hereafter issued;

"**Control**" means the control exercised or capable of being exercised by any person, entity or undertaking over another undertaking by virtue of:

(i)     holding a majority of the voting rights in the undertaking, or

(ii)    being (directly or indirectly) a member, shareholder or participant (or equivalent) of the undertaking and having the right to appoint or remove a majority of its board of directors, or

(iii)   having the right to exercise, or actually exercising, a dominant influence over the undertaking:

(A)    by virtue of provisions contained in the undertaking's charter (or equivalent), or

(B)    by virtue of any contract, or

(iv)    being a member, shareholder or participant (or equivalent) of the undertaking and controlling, pursuant to an agreement with other members, shareholders or participants (or equivalents), a majority of the voting rights in the undertaking.

and the terms "**Controlled**" and "**Controlling**" have meanings correlative to the foregoing;

"**Relevant Event**" shall be deemed to have occurred if the government of the Republic of Kazakhstan (i) whether through JSC National Welfare Fund Samruk-Kazyna ("**Samruk-Kazyna**") or any other Agency of or entity Controlled by the government of the Republic of Kazakhstan ceases to own at least 51 per cent. of the Capital Stock of, or otherwise to Control, the Bank or (ii) ceases to own at least 51 per cent. of the Capital Stock of, or otherwise to Control, Samruk-Kazyna, unless the Person to which is transferred 51 per cent. or more of the Capital Stock (or other Control) of the Bank or of Samruk-Kazyna (as the case may be) is at the time of transfer a bank or other

financial institution authorised by the appropriate authority to accept deposits and having a foreign long-term debt rating by S&P no lower than:

(A)     A- in the case of a Relevant Event occurring before the anniversary of the Issue Date falling in 2012; or

(B)     BBB in the case of a Relevant Event occurring after the anniversary of the Issue Date falling in 2012

or at the relevant time the equivalent rating by another Rating Agency, *provided that* any agreement whereby management of the Bank is transferred to a third party (the "**manager**") that does not, in conjunction with any acquisition of any Capital Stock by such manager or its Affiliates (whether or not occurring at the same time), cause the government of the Republic of Kazakhstan to cease to own at least 51 per cent. of the Bank's Capital Stock or otherwise to Control the Bank, will not constitute a Relevant Event if:

(I)     the Trustee, the CS Director and the Creditor Director have been provided with an opinion in form and substance satisfactory to them of independent legal advisers of recognised standing to the effect that the management agreement, in conjunction with any acquisition of any Capital Stock by such manager or its Affiliates (whether or not occurring at the same time), does not cause the government of the Republic of Kazakhstan (directly or indirectly) to cease to Control the Bank or to have the majority economic risk and/or benefit in the Bank and continues to allow the government of the Republic of Kazakhstan (directly or indirectly) to retain the sole right to exercise its rights as a majority shareholder (including in relation to the appointment of directors);

(II)    any fees, commission or other compensation or reward payable to the manager are agreed by a Qualified Majority of the Board; and

(III)   the manager (and any change to the manager) and the terms of appointment of the manager (and any change to those terms) are agreed by a Simple Majority of the Board.

## 9.     Taxation

(a)     *Taxation*

All payments of principal and interest in respect of the Notes shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by or within the Republic of Kazakhstan or any other jurisdiction from or through which payment is made, or in any case, any political subdivision or any authority thereof or therein having power to tax (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law.  In that event, the Bank shall pay such additional amounts as will result in the receipt by the Noteholders of such amounts as would have been received by them if no such withholding or deduction had been required, except that no such additional amounts shall be payable in respect of any Note:

(i)      presented for payment by or on behalf of a holder who is liable to such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such holder, if such holder is an estate, a trust, a partnership or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein other than the mere holding of such Note; or

(ii)     presented (in the case of a payment of principal or interest on redemption) for payment more than 30 days after the Relevant Date except to the extent that the relevant holder would have been entitled to such additional amounts if it had presented such Note on the last day of such period of 30 days; or

(iii)    to a holder who is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent such payment would be required to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner who would not have been entitled to the additional amounts had such beneficiary, settlor, member or beneficial owner been the holder of the Note.

In the event that the foregoing obligation to pay additional amounts is for any reason unenforceable against the Bank, the Bank shall pay to any holder of a Note (subject to the exclusions set out in (i), (ii) and (iii) above) which has received a payment subject to deduction or withholding as aforesaid, upon written request of such holder (subject to the exclusions set out in (i), (ii) and (iii) above), and *provided that* reasonable supporting documentation is provided, an amount equal to the amount withheld or deducted, so that the net amount received by such holder after such payment would not be less than the net amount the holder would have received had such deduction or withholding not taken place.  Any payment made pursuant to this paragraph shall be considered an additional amount.

If, at any time, the Bank is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Bank shall promptly notify the Trustee in writing, and shall deliver to the Trustee, within 30 days after it has made such payment to the applicable authority, a written certificate to the effect that it has made such payment to such authority of all amounts so required to be deducted or withheld in respect of each Note.

(b)     *Relevant Date*

As used in these Conditions, "**Relevant Date**" in respect of any Note means the date on which payment in respect of such Note first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which notice is duly given to the Noteholders that, upon further presentation of the Note being made in accordance with the Conditions, such payment will be made, *provided that* payment is in fact made upon such presentation.

(c)     *Additional Amounts*

Any reference in these Conditions to principal or interest shall be deemed to include instalments of principal as well as any additional amounts in respect of principal or interest (as the case may be) which may be payable under this Condition 9 (*Taxation*) or any undertaking given in addition to or in substitution of this Condition 9 (*Taxation*) pursuant to the Trust Deed.

(d)     *Taxing Jurisdiction*

If the Bank becomes subject at any time to any taxing jurisdiction other than the Republic of Kazakhstan references in this Condition 9 (*Taxation*) to the Republic of Kazakhstan shall be construed as references to the Republic of Kazakhstan and/or such other jurisdiction.

10.     **Prescription**

Claims for principal and interest on redemption shall become void unless the relevant Note Certificates are surrendered for payment within ten years, and claims for interest due other than on redemption shall become void unless made within five years, of the appropriate Relevant Date.

11.     **Events of Default**

The Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre funded to its satisfaction) shall, give notice to the Bank that the Notes are and they shall become due and repayable at their principal amount together with accrued interest if any of the following events (each, an "**Event of Default**") occurs and is continuing:

(a)     *Non Payment*

the Bank fails to pay the principal of the Notes when the same becomes due and payable and, where such failure to pay is caused by technical or administrative errors affecting the transfer of funds by the Bank, the failure to pay continues for a period of three Business Days, or the Bank is in default with respect to the payment of interest and such default continues for a period of ten days; or

(b)     *Breach of Other Obligations*

the Bank is in default in the performance, or is otherwise in breach, of any covenant, obligation, undertaking or other agreement under the Notes or the Trust Deed or in respect of the Discount Notes, Subordinated Notes or Recovery Notes (other than a default or breach elsewhere specifically dealt with in this Condition 11 (*Events of Default*)) and, where such default or breach is, in the opinion of the Trustee, capable of remedy, such default or breach is not remedied within 30 days after notice thereof has been given to the Bank, by the Trustee, and the Trustee certifies that such default or breach is materially prejudicial to the interests of the Noteholders; or

(c) *Cross Default*

(A) any Indebtedness for Borrowed Money of the Bank or any Subsidiary of the Bank becomes (or becomes capable of being declared) due and payable prior to the due date for the payment thereof by reason of default of the Bank or the relevant Subsidiary (as the case may be), or is not paid when due subject to any originally applicable grace period or (B) any Indebtedness Guarantee given by the Bank or any Subsidiary of the Bank in respect of Indebtedness for Borrowed Money of another Person is not honoured when due and called, *provided that* the amount of Indebtedness for Borrowed Money referred to in (A) above and/or the amount payable under any Indebtedness Guarantee referred to in (B) above individually or in the aggregate exceeds U.S.$7,000,000 (or its equivalent in any other currency or currencies (as determined by the Trustee)); or

(d) *Judgment Default*

a judgment or order or arbitration award for the payment of an aggregate amount in excess of U.S.$5,000,000 (or its equivalent in any other currency or currencies) is rendered or granted against the Bank or any Subsidiary or any part of their assets and continue(s) unsatisfied and unstayed for a period of 30 days after the date thereof or, if later, the date therein specified for payment; or

(e) *Bankruptcy*

any Person shall have instituted a proceeding or entered a decree or order for the appointment of a receiver, administrator or liquidator in any insolvency, rehabilitation, readjustment of debt, marshalling of assets and liabilities or similar arrangements in respect of the Bank or any Material Subsidiary, or all or substantially all of its properties and such proceeding, decree or order shall not have been vacated or shall have remained in force undischarged or unstayed for a period of 60 days or the Bank or any Material Subsidiary shall institute proceedings under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect to be adjudicated a bankrupt or shall consent to the filing of a bankruptcy, insolvency or similar proceeding against it or shall file a petition or answer or consent seeking reorganisation under any such law or shall consent to the filing of any such petition, or shall consent to the appointment of a receiver, administrator or liquidator or trustee or assignee in bankruptcy or liquidation of the Bank or any Material Subsidiary, or in respect of its property, or shall make an assignment for the benefit of its creditors or shall otherwise be unable or admit its inability to pay its debts generally as they become due or the Bank commences proceedings with a view to the general adjustment of its Indebtedness or the Bank or any Material Subsidiary ceases or threatens to cease all or any substantial part of its business (otherwise than in connection with a disposal of assets permitted pursuant to Clause ____ (*Restrictions on Disposals*) of the Trust Deed; or

(f) *Maintenance of Business*

the Bank fails to take any action as is required of it under applicable banking regulations in Kazakhstan or otherwise to maintain in full effect its banking licence or corporate existence or fails to take any action to maintain any material rights, privileges, titles to property, franchises and the like necessary or desirable in the normal conduct of its business, activities or operations which is in the opinion of the Trustee materially prejudicial to the interests of the Noteholders and such failure is not remedied within 30 days (or such longer period as the Trustee may determine) after notice thereof has been given to the Bank; or

(g)     *Material Compliance with Applicable Laws*

the Bank fails to comply in any material respect (in the opinion of the Trustee) with any applicable laws or regulations (including any foreign exchange rules or regulations) of any governmental or other regulatory authority for any purpose to enable it lawfully to exercise its rights or perform or comply with its obligations under the Notes, the Trust Deed or the Agency Agreement or to ensure that those obligations are legally binding and enforceable or that all necessary agreements or other documents are entered into and that all necessary consents and approvals of, and registrations and filings with, any such authority in connection therewith are obtained and maintained in full force and effect; or

(h)     *Removal of a Creditor Director or CS Director*

any CS Director or Creditor Director is removed within three years of the Issue Date without Cause or with Cause, without the appointment of a successor to the relevant Director pursuant to the terms of the Trust Deed or following any removal of the relevant Director any decision requiring a Qualified Majority is taken by the Board prior to the appointment of a successor to the relevant Director pursuant to the terms of the Trust Deed, for which purpose, "**Cause**" means, with respect to any removal of a CS Director or Creditor Director, a removal by reason of the incapacity or gross misconduct of the relevant Director.

(i)     *Shareholder Approval*

the Bank fails to obtain the Super Majority approval of its shareholders or the Qualified Majority approval of the Board for actions requiring such approval or fails to remedy any material breach of the terms of its charter or the Alliance Undertaking within 60 days after such breach has occurred; or

(j)     *Invalidity or Unenforceability*

the validity of the Notes, the Trust Deed or the Agency Agreement is contested by the Bank or the Bank denies any of its obligations under the Notes, the Trust Deed or the Agency Agreement (whether by a general suspension of payments or a moratorium on the payment of debt or otherwise) or it is or becomes unlawful for the Bank to perform or comply with all or any of its obligations set out in the Notes, the Trust Deed or the Agency Agreement or all or any of the obligations of the Bank provided in the Notes, the Trust Deed or the Agency Agreement shall be or become unenforceable or invalid and, following the occurrence of any of those events specified in this Condition 11(a)(x) (*Invalidity or Unenforceability*), the Trustee is of the opinion that such occurrence is materially prejudicial to the interests of the Noteholders; or

(k)     *Government Intervention*

all or any substantial part of the undertaking, assets and revenues of the Bank or any Material Subsidiary is condemned, seized, nationalised or otherwise appropriated by any person acting under the authority of any national, regional or local government (other than the purchase by Samruk-Kazyna of any shares of the Bank or any transfer by Samruk-Kazyna of any shares of the Bank owned by Samruk-Kazyna to any successor entity that is Controlled by the government of the Republic of Kazakhstan) or the Bank or any Material Subsidiary is prevented by any such person from exercising normal control over all or any substantial part of its undertaking, assets, revenues and, following the occurrence of any of the events specified in this Condition 11(a)(xi) (*Government Intervention*), the Trustee is of the opinion that such occurrence is materially prejudicial to the interests of the Noteholders; or

(l)     *Breach of Certain Covenants*

the Bank is in breach of (a) its covenants in the Trust Deed Relating to Substantial Change of Business, Restriction on Intra-Group and Related Party Transactions, Limitation on Payment of Dividends or Additional Indebtedness or (b) any regulatory requirements applicable to the Bank, subject to any applicable cure period provided for by the applicable regulation; or

(m)     *Money Laundering, Corruption and Terrorism*

the Bank fails to comply with its covenants in the Trust Deed relating to Money Laundering, Corruption and Terrorism.

12.     **Replacement of Notes**

If any Note is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Principal Paying and Transfer Agent and the Agent, subject to all applicable laws and stock exchange requirements, upon payment by the claimant of the expenses incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank may reasonably require. Mutilated or defaced Notes must be surrendered before replacements will be issued.

13.     **Meetings of Noteholders; Modification and Waiver**

(a)     *Meetings of Noteholders*

The Trust Deed contains provisions for convening meetings of Noteholders to consider any matters relating to the Notes, including the modification of any provision of these Conditions or the Trust Deed. Any such modification may be made if sanctioned by an Extraordinary Resolution. Such a meeting may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than one tenth of the aggregate principal amount of the outstanding Notes. The quorum at any meeting convened to vote on an Extraordinary Resolution will be two or more persons holding or representing a clear majority of the aggregate principal amount of the Notes for the time being outstanding, or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented; *provided*, *however*, *that* certain proposals (including any proposal to change any date fixed for payment of principal or interest in respect of the Notes, to reduce the amount of principal or interest payable on any date in respect of the Notes, to alter the method of calculating the amount of any payment in respect of the Notes or the date for any such payment, to change the currency of payment under the Notes or to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution) may only be sanctioned by an Extraordinary Resolution passed at a meeting of Noteholders at which two or more persons holding or representing not less than three quarters or at any adjourned meeting, one quarter of the aggregate principal amount of the outstanding Notes form a quorum (a "**special quorum resolution**"). Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Noteholders, whether present or not.

The Trust Deed contains provisions for convening meetings of holders of the Notes with holders of notes of other series issued under the Trust Deed if the Trustee so decides.

(b)     *Written Resolution*

A resolution in writing will take effect as if it were an Extraordinary Resolution if it is signed (i) by or on behalf of all of Noteholders who for the time being are entitled to

receive notice of a meeting of Noteholders under the Trust Deed or (ii) if such Noteholders have been given at least 21 clear days' notice of such resolution, by or on behalf of persons holding three quarters of the aggregate principal amount of the outstanding Notes. Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders.

(c)     *Modification Without Noteholders' Consent*

The Trustee may, without the consent of the Noteholders, agree (i) to any modification of the Notes (including these Conditions) or the Trust Deed (other than in respect of a matter requiring a special quorum resolution), which in the opinion of the Trustee, will not be materially prejudicial to the interests of Noteholders and (ii) to any modification of the Notes (including these Conditions) or the Trust Deed, which is of a formal, minor or technical nature or to correct a manifest error. In addition, the Trustee may, without the consent of the Noteholders, authorise or waive any proposed breach or breach of the Notes or the Trust Deed (other than a proposed breach or breach relating to the subject of a matter requiring a special quorum resolution) if, in the opinion of the Trustee, the interests of the Noteholders will not be materially prejudiced thereby. Any such modification, waiver or authorisation shall be binding on the Noteholders and, unless the Trustee agrees otherwise, shall be promptly notified to the Noteholders in accordance with Condition 14 (*Notices*).

14.     **Notices**

(a)     *To the Noteholders*

Notices to Noteholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register. Any such notice shall be deemed to have been given on the fourth day (not being a Saturday or a Sunday) after the date of mailing. In addition, so long as the Notes are listed on the Kazakhstan Stock Exchange and the Kazakhstan Stock Exchange so requires, notices to the Noteholders shall be published in a leading newspaper having general circulation in Kazakhstan. Any such notice shall be deemed to have been given on the date of first publication.

(b)     *To the Bank*

Notices to the Bank will be deemed to be validly given if delivered to the Bank at 50 Furmanov Street, Almaty 050004, Republic of Kazakhstan and clearly marked on their exterior "Urgent — Attention: International Relations Department" (or at such other addresses and for such other attentions as may have been notified to the Noteholders in accordance with Condition 14(a)) and will, be deemed to have been validly given at the opening of business on the next day on which the Bank's principal offices, as applicable, are open for business.

(c)     *To the Trustee and Agents*

Notices to the Trustee or any Agent will be deemed to have been validly given if delivered to the registered office, for the time being, of the Trustee or the Specified Office, for the time being, of such Agent, as the case may be, and will be validly given on the next day on which such office is open for business.

15. **Trustee**

(a) *Indemnification*

Under the Trust Deed, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and to be paid its costs and expenses in priority to the claims of the Noteholders. In addition, the Trustee is entitled to enter into business transactions with the Bank and any entity relating to the Bank without accounting for any profit.

The Trustee's responsibilities are solely those of trustee for the Noteholders on the terms of the Trust Deed. Accordingly, the Trustee makes no representations and assumes no responsibility for the validity or enforceability of the Notes or for the performance by the Bank of its obligations under or in respect of the Notes or the Trust Deed, as applicable.

(b) *Exercise of Power and Discretion*

In connection with the exercise of any of its powers, trusts, authorities or discretions (including but not limited to those referred to in these Conditions and the Trust Deed), the Trustee shall have regard to the interests of the Noteholders as a class and, in particular, shall not have regard to the consequences of such exercise for individual Noteholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or taxing jurisdiction. The Trustee shall not be entitled to require, and no Noteholder shall be entitled to claim, from the Bank (in the case of a Noteholder) the Trustee any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders.

(c) *Enforcement; Reliance*

The Trustee may at any time, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Notes, but it shall not be bound to do unless:

(i) it has been so requested in writing by the holders of a least one fifth in principal amount of the outstanding Notes or has been so directed by an Extraordinary Resolution; and

(ii) it has been indemnified or provided with security or pre funded to its satisfaction.

The Trust Deed provides that the Trustee may, at any time, or, in making any determination under these Conditions or the Trust Deed, act on the opinion or advice of, or information obtained from, any expert, auditor, lawyer or professional entity, without further enquiry or evidence. In particular, the Trust Deed provides that the Trustee may rely on certificates or reports from auditors whether or not such certificate or report or any engagement letter or other document entered into by the Bank and the auditors contains any limit on liability (monetary or otherwise) of the auditors and provides further that nothing shall require the Trustee to enter into or to agree to be bound by the terms of any engagement letter or other document entered into by the Bank or any such auditor. If such evidence is relied upon, the Trustee's determination shall be conclusive and binding on all parties, and the Trustee will not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience which may result from it so acting.

Until the Trustee has actual or express knowledge to the contrary, the Trustee may assume that no Event of Default or event or circumstance which could with the giving

of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default has occurred.

The Trust Deed provides that the Bank is required to deliver to the Trustee, pursuant to, and in the circumstances detailed in, the Trust Deed, a certificate signed by any two of its Directors that there has not been and is not continuing any Event of Default, an event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default, or other breach of the Trust Deed. The Trustee shall be entitled to rely without liability on such certificates. The Trustee shall not be responsible for monitoring any of the covenants and obligations of the Bank set out in these Conditions and shall be entitled to rely upon the information provided pursuant to these Conditions and the Trust Deed and to assume, unless it receives actual notice to the contrary, that the Bank is complying with all covenants and obligations imposed upon it, respectively, herein and therein.

(d)    *Failure to Act*

No Noteholder may proceed directly against the Bank unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

(e)    *Retirement and Removal*

Any Trustee may retire at any time on giving at least three months' written notice to the Bank without giving any reason or being responsible for any costs occasioned by such retirement and the Noteholders may by Extraordinary Resolution remove any Trustee, *provided that* the retirement or removal of a sole trust corporation will not be effective until a trust corporation is appointed as successor Trustee. If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, it will use all reasonable endeavours to procure that another trust corporation be appointed as Trustee. In the event of any change of the Trustee, a notice shall be published in a leading newspaper which will have general circulation in the Republic of Kazakhstan.

(f)    *Substitution*

The Trust Deed contains provisions to the effect that the Trustee may (without the consent of the Noteholders) agree on such terms as it may specify to the substitution of the Bank's successor in business in place of the Bank as issuer and principal obligor in respect of the Notes and as principal obligor under the Trust Deed, subject to all relevant conditions of the Trust Deed having been complied with (including an unconditional guarantee by the Bank of the obligations assumed by the substitute). Not later than 14 days after compliance with the aforementioned requirements, notice thereof shall be given by the Bank to the Noteholders in accordance with Condition 14 (*Notices*).

16.    **Further Issues**

The Bank may from time to time, without the consent of the Noteholders and in accordance with the Trust Deed, create and issue further Notes having the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest).

17.    **Currency Indemnity**

If any sum due from the Bank in respect of the Notes under the Trust Deed or any order or judgment given or made in relation thereto has to be converted from the currency (the "**first**

76

**currency**") in which the same is payable under these Conditions, the Trust Deed or such order or judgment into another currency (the "**second currency**") for the purpose of making or filing a claim or proof against the Bank, obtaining an order or judgment in any court or other tribunal or enforcing any order or judgment given or made in respect of the Notes or in respect thereof under the Trust Deed, the Bank shall indemnify each Noteholder, on the written demand of such Noteholder addressed to the Bank and delivered to the Bank or to the Specified Office of the Principal Agent or the Agent having its Specified Office in London, against any loss suffered as a result of any discrepancy between the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and the rate or rates of exchange at which such Noteholder may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof. This indemnity constitutes a separate and independent obligation of the Bank and shall give rise to a separate and independent cause of action.

18.    **Contracts (Rights of Third Parties) Act 1999**

No Person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999, but this does not affect the right or remedy of any Person which exists or is available apart from such Act.

19.    **Governing Law; Arbitration and Jurisdiction**

(a)    *Governing Law*

The Trust Deed, the Notes, the Agency Agreement and any non-contractual obligations arising out of or in connection therewith are governed by, and shall be construed in accordance with, English law.

(b)    *Arbitration*

The Bank agrees that any claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non contractual obligations arising out of or in connection with the Trust Deed) (a "**Dispute**"), shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**") as at present in force and as modified by this Condition, which Rules shall be deemed incorporated into this Condition. The number of arbitrators shall be three, one of whom shall be nominated by the Bank, one by the Trustee and the third of whom, who shall act as Chairman, shall be nominated by the two party nominated arbitrators, *provided that* if the third arbitrator has not been nominated within 30 days of the nomination of the second party nominated arbitrator, such third arbitrator shall be appointed by the LCIA. The parties may nominate and the LCIA may appoint arbitrators from among the nationals of any country, whether or not a party is a national of that country. The seat of arbitration shall be London, England and the language of arbitration shall be English. Sections 45 and 69 of the Arbitration Act 1996 shall not apply.

(c)    *Trustee's Option*

At any time before the Trustee has nominated an arbitrator to resolve any Dispute(s) pursuant to Condition 19(b) (*Arbitration*), the Trustee, at its sole option, may elect by notice in writing to the Bank that such Dispute(s) shall instead be heard by the courts of England, as more particularly described in Condition 19(d) (*Jurisdiction*). Following any such election, no arbitral tribunal shall have jurisdiction in respect of such Dispute(s).

(d)    *Jurisdiction*

In the event that the Trustee serves a written notice of election in respect of any Dispute(s) pursuant to Condition 19(c) (*Trustee's Option*), the Bank agrees for the benefit of the Trustee and the Noteholders that the courts of England shall have jurisdiction to hear and determine any such Dispute(s) and, for such purposes, irrevocably submits to the jurisdiction of such courts.   Subject to Condition 19(b) (*Arbitration*), nothing in this Condition shall (or shall be construed so as to) limit the right of the Trustee to bring proceedings ("**Proceedings**") for the determination of any Dispute(s) in any other court of competent jurisdiction, nor shall the bringing of such Proceedings in any one or more jurisdictions preclude the bringing of Proceedings by the Trustee in any other jurisdiction (whether concurrently or not) if and to the extent permitted by law.

(e)    *Appropriate Forum*

The Bank has irrevocably waived any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and agrees not to claim in any Proceedings that any such court is not a convenient or appropriate forum.

(f)    *Agent for Service of Process*

The Bank has agreed that the process by which any Proceedings in England are begun may be served on it by it being delivered to Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX or, if different, its registered office for the time being.  If for any reason the Bank does not have such an agent in England, it will promptly appoint a substitute process agent and notify in writing the Trustee of such appointment.  If such person is not or ceases to be effectively appointed to accept service of process on behalf of the Bank, the Bank shall, on the written demand of the Trustee, appoint a further person in England to accept service of process on its behalf and, failing such appointment within 15 days, the Trustee shall be entitled to appoint such a person by written notice to the Bank. Nothing herein shall affect the right to serve process in any other manner permitted by law.

(g)    *Consent to Enforcement, etc.*

The Bank has consented generally in respect of any Disputes (or Proceedings in accordance with Condition 19(d) (*Jurisdiction*)) to the giving of any relief or the issue of any process in connection with such Disputes or Proceedings, including (without limitation) the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment which may be given in such Proceedings or in connection with such Disputes.

(h)    *Waiver of Immunity*

To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity to the full extent permitted by the laws of such jurisdiction.

## ANNEX 3

## TERMS AND CONDITIONS OF THE SUBORDINATED TENGE A NOTES

*The following is the text of the terms and conditions of the Subordinated Tenge A Notes which, subject to amendment and completion will be endorsed on each Note Certificate pertaining to the Subordinated Tenge A Notes and will be attached and (subject to the provisions thereof) apply to the relevant Global Note, and which supersedes in its entirety the corresponding section of Annex 5 of Schedule 6 to the Information Memorandum. The wording of the Terms and Conditions of the Subordinated Tenge A Notes is subject to confirmation and/or further material amendments that may be required by the FMSA and/or the NBK.*

The KZT ____ 9.5 per cent. notes due ____ 2023 (the "**Notes**", which expression includes any further notes issued pursuant to Condition 16 (*Further Issues*) and forming a single series therewith) of JSC Alliance Bank (the "**Bank**") are (a) constituted by, and subject to, and have the benefit of a trust deed dated ____ 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and BNY Corporate Trustee Services Limited as trustee (the "**Trustee**", which expression includes all persons for the time being appointed as trustee for the holders of the Notes ("**Noteholders**") under the Trust Deed) and (b) the subject of a paying agency agreement dated ____ 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") between the Bank, the Trustee, ____ as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**"; which expression includes any successor or additional paying and transfer agents appointed from time to time in connection with the Notes) and ____ as registrar (the "**Registrar**", which expression shall include any successor registrar appointed from time to time in connection with the Notes).

Certain provisions of these Conditions are summaries of the Trust Deed and the Agency Agreement and subject to their detailed provisions. The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them. Copies of the Trust Deed and the Agency Agreement are available for inspection during normal business hours at the Specified Offices (as defined in the Agency Agreement) of the Principal Paying and Transfer Agent. Copies are also available for inspection during normal business hours at the registered office for the time being of the Trustee, One Canada Square, London E14 5AL, United Kingdom. References herein to the "**Agents**" are to the Registrar and the Paying and Transfer Agents and any reference to an "**Agent**" is to any one of them.

Terms defined in the Trust Deed shall, unless otherwise defined herein or the context requires otherwise, bear the same meanings herein.

1.    **Status**

Subject to exceptions provided by mandatory applicable law, the payment obligations under the Notes constitute direct, unconditional, unsecured and subordinated obligations of the Bank and shall, in case of (i) the bankruptcy in the Republic of Kazakhstan (*bankrotsvo*) of the Bank; (ii) the Bank being granted (provisional) suspension of payments in the Republic of Kazakhstan (*moratoriy na udovletvoreniye zadolzhennosti*) (such situation hereinafter being referred to as a "**Moratorium**"); or (iii) dissolution of the Bank in the Republic of Kazakhstan (*likvidatsiya*)) rank: (A) subordinate and junior only to present and future indebtedness of the Bank which by or under its terms ranks senior, or does not rank subordinate to, any indebtedness or other obligations of the Bank; (B) *pari passu* amongst themselves and with any other present and future indebtedness which ranks by or under its own terms or otherwise *pari passu* with subordinated indebtedness or other obligations of the Bank; and (C) senior to equity securities of the Bank and to any other present and future indebtedness which ranks by or under its own terms or otherwise, subordinate or junior to the Notes of the Bank.

By virtue of such subordination (i) payments to holders of Notes will, in the case of bankruptcy or dissolution of the Bank or in the event of a Moratorium with respect to the Bank, only be made after all payment obligations of the Bank ranking senior to such Notes have been satisfied; (ii) any right of set-off by a holder of Notes in respect of any amount owed to such holder by the Bank under or in connection with such Notes shall be excluded; and (iii) each holder of Notes shall, by virtue of being the holder of such Notes, be deemed to have waived all such rights of set-off.

2.    **Form, Denomination and Title**

(a)    *Form and Denomination*

The Notes are in registered form, without interest coupons attached, and shall be serially numbered.  Notes shall be issued in denominations of KZT _____ and integral multiples of KZT _____ in excess thereof (each denomination an "**authorised denomination**").

(b)    *Title*

Title to the Notes will pass by transfer and registration as described in Conditions 3 (*Registration*) and 4 (*Transfers*).  The holder (as defined below) of any Notes shall (except as otherwise required by law or as ordered by a court of competent jurisdiction) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein, any writing thereon (other than a duly executed transfer thereof in the form endorsed thereon) or any notice of any previous loss or theft thereof) and no person shall be liable for so treating such holder.

In these Conditions, "**holder**" means the person in whose name a Note is registered in the Register (as defined below) (or, in the case of joint holders, the first named thereof) and "**holders**" and "**Noteholders**" shall be construed accordingly.

3.    **Registration**

The Bank shall procure that the Registrar will maintain a register (the "**Register**") at the Specified Office of the Registrar in respect of the Notes in accordance with the provisions of the Agency Agreement.  A certificate (each, a "**Note Certificate**") will be issued to each Noteholder in respect of its registered holding.  Each Note Certificate will be numbered serially with an identifying number which will be recorded in the Register.

4.    **Transfers**

(a)    Subject to Conditions 4(d) and 4(e), a Note may be transferred in whole or in part upon surrender of the relevant Note Certificate, with the endorsed form of transfer (the "**Transfer Form**") duly completed, at the Specified Office of an Agent, together with such evidence as the Registrar or (as the case may be) such Agent may reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer; *provided, however, that* a Note may not be transferred unless the principal amount of Notes transferred and (where not all of the Notes held by a holder are being transferred) the principal amount of the balance of Notes not transferred are authorised denominations.  Transfer Forms are available from any Agent and the Bank upon the request of any holder.

(b)    Within five business days of the surrender of a Note Certificate in accordance with Condition 4(a), the Registrar will register the transfer in question and deliver a new Note Certificate of alike principal amount to the Notes transferred to each relevant holder at its Specified Office or (as the case may be) the Specified Office of any Agent or (at the request and risk of any such relevant holder) by uninsured first class

mail (airmail if overseas) to the address specified for the purpose by such relevant holder. In this Condition 4(b), "**business day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in foreign currencies) in the city where the Registrar or (as the case may be) the relevant Agent has its Specified Office.

(c)     The transfer of a Note will be effected without charge by the Registrar or any Agent but against such indemnity as the Registrar or (as the case may be) such Agent may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such transfer.

(d)     Noteholders may not require transfers to be registered during the period of 15 days ending on the due date for any payment of principal or interest in respect of the Notes.

(e)     All transfers of Notes and entries on the Register are subject to the detailed regulations concerning the transfer of the Notes scheduled to the Agency Agreement, a copy of which will be made available as specified in the preamble to these Conditions. The regulations may be changed by the Bank with the prior written approval of the Trustee and the Registrar. A copy of the current regulations will be mailed (free of charge) by the Registrar to any Noteholder who requests in writing a copy of such regulations.

5.      **Covenants**

The Noteholders will have the benefit of certain covenants contained in the Trust Deed relating to, amongst other things, restrictions on the incurrence of indebtedness, disposal of assets and payment of dividends.

6.      **Interest**

(a)     *Interest Accrual*

The Notes shall bear interest or, as the case may be, be deemed to bear interest on their outstanding principal amount from the earlier of ____ 2010 (the "**Issue Date**") and 1 March 2010 up to but excluding ____ 2020 (the "**Amortisation Date**") at the rate of 9.5 per cent. per annum (the "**Initial Rate of Interest**") and thereafter until ____ 2023 at the rate of 13.25 per cent. per annum (the "**Step Up Rate of Interest**") payable in arrear on and in each year (each, an "**Interest Payment Date**"), subject as provided in Condition 7 (*Payments*), save that at the end of each Interest Period during the period beginning on the Issue Date (or 1 March 2010, as the case may be) and ending on (but excluding) the Amortisation Date, that portion of the interest payable equal to the Capitalisation Amount for that Interest Period accrued on the Notes from time to time during that Interest Period shall, unless the Bank elects to pay such accrued interest in cash (an "**Elective Cash Payment**") on the corresponding Interest Payment Date by giving the Principal Paying and Transfer Agent not less than three Business Days' notice of such election (which notice shall be irrevocable for such Interest Payment Date), be automatically capitalised and added to the amount of the principal in respect of the Notes, for which purpose, the "**Capitalisation Amount**" for any Interest Period shall be an amount equal to the interest that would have accrued for that Interest Period had the Initial Interest Rate been 5 per cent. per annum. Any such accrued interest shall, after being so capitalised, be (and be treated as) part of the principal in respect of the Notes and shall bear interest in accordance with this Condition 6 (*Interest*) and, except to the extent repaid or prepaid at an earlier time in accordance with these Conditions, shall be payable in accordance with the provisions of these Conditions and the Trust Deed. If all or part of the principal of the Notes is prepaid prior to the end of an Interest

Period, any accrued and unpaid interest on such principal of the Notes that has not been so capitalised will be payable in cash on the date of such prepayment. No Elective Cash Payment shall be made unless a corresponding payment is made in respect of the Par Notes, the Subordinated Dollar Notes and the Subordinated Tenge B Notes.

Each period beginning on (and including) the Issue Date (or 1 March 2010, as the case may be) or any Interest Payment Date and ending on (but excluding) the next Interest Payment Date is herein called an "**Interest Period**".

(b)     *Cessation of Interest*

Each Note will cease to bear interest from the due date for final redemption unless, upon due presentation, payment of principal is improperly withheld or refused, in which case it will continue to bear interest at such rate (as well after as before judgment) until whichever is the earlier of (i) the day on which all sums due in respect of such Notes up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Principal Paying and Transfer Agent or the Trustee has notified the Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(c)     *Calculation of Interest for an Interest Period*

The amount of interest payable in respect of each Note for any Interest Period shall be calculated by applying the Rate of Interest to the principal amount of such Note, dividing the product by two and rounding the resulting figure to the nearest tiyn (half a tiyn being rounded upwards) *provided that* if the Issue Date is later than 1 March 2010, the amount of interest payable for the first Interest Period shall be KZT ____ for each KZT ____ in principal amount of Notes (subject always to automatic capitalisation of interest pursuant to Condition 6(a) (*Interest Accrual*)).

(d)     *Calculation of Interest for any Other Period*

If interest is required to be calculated for any period other than an Interest Period, it will be calculated on the basis of a year of 360 days consisting of 12 months of 30 days each and, in the case of an incomplete month, the actual number of days elapsed.

The determination of the amount of interest payable under Condition 6(c) (*Calculation of Interest for an Interest Period*) by the Principal Paying and Transfer Agent shall, in the absence of manifest error, be binding on all parties.

7.     **Payments**

(a)     *Principal*

Payments of principal in respect of the Notes will be made to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or of any Agent.

(b)     *Interest*

Payments of interest due on an Interest Payment Date will be made to the Persons shown in the Register at the close of business on the Record Date for such Interest Payment Date, subject to (in the case of interest payable on redemption) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note

Certificates at the Specified Office of the Registrar or any Agent. Payments of all amounts other than as provided in Conditions 7(a) (*Principal*) and this Condition 7(b) (*Interest*) will be made as provided in these Conditions.

(c)     *Record Date*

Each payment in respect of a Note will be made to the Person shown as the holder in the Register at the opening of business (in the place of the Registrar's specified office) on the fifteenth day before the due date for such payment (the "**Record Date**").

(d)     *Payments*

Each payment in respect of the Notes pursuant to Conditions 7(a) (*Principal*) and 7(b) (*Interest*) will be made by transfer to a Kazakhstan Tenge account maintained by the payee with a bank in Kazakhstan.

(e)     *Payments Subject to Fiscal Laws*

All payments in respect of the Notes are subject in all cases to any applicable or other laws and regulations in the place of payment, but without prejudice to the provisions of Condition 9 (*Taxation*). No commissions or expenses shall be charged to the Noteholders in respect of such payments.

(f)     *Payment on a Business Day*

If the due date for payment of any amount in respect of any Note is not a business day in the place of presentation, the holder thereof shall not be entitled to payment in such place of the amount due until the next succeeding business day in such place. A holder of a Note shall not be entitled to any interest or other payment in respect of any delay in payment resulting from the due date for a payment not being a business day. In this Condition 7(f) (*Payment on a Business Day*), "**business day**" means any day on which banks are open for business (including dealings in foreign currencies) in London and Almaty and, in the case of surrender (or, in the case of partial payment only, endorsement) of a Note Certificate, in the place in which the Note Certificate is surrendered (or, as the case may be, endorsed).

(g)     *Agents*

In acting under the Agency Agreement and in connection with the Notes, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Noteholders. The Bank reserves the right (with prior written approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to appoint a successor principal paying and transfer agent or registrar and additional or successor agent or agents; *provided*, *however*, *that* the Bank shall at all times maintain a principal paying and transfer agent with a specified office in a European member state, that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any other European Directive implementing the conclusions of the ECOFIN Council meeting of June 3, 2003 on the taxation of savings income or any law implementing or complying with, or introduced to conform to, such Directive, and a registrar. Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Noteholders in accordance with Condition 14 (*Notices*).

8.    **Redemption and Purchase**

(a)    *Scheduled Redemption*

Unless previously redeemed or purchased and cancelled as provided below, subject as provided in Condition 7 (*Payments*), the Notes will be partially redeemed in six equal semi-annual instalments on ____ and ____ of each year, with the first such instalment being payable on ____ 2020 and the last such instalment being payable on ____ 2023. The outstanding principal amount of each Note shall be reduced by any instalment amount, with effect from the related instalment payment date, unless payment of the instalment is improperly withheld or refused on presentation of the Note, in which case such amount shall remain outstanding until the date of payment of such instalment amount.  Each Note shall be finally redeemed in its final instalment amount payment.

(b)    *Redemption for Tax Reasons*

The Notes may be redeemed at the option of the Bank in whole, but not in part, at any time, on giving not less than 30 nor more than 60 days' notice to the Noteholders (which notice shall be irrevocable) at their principal amount, together with interest accrued but unpaid to the date fixed for redemption, if, immediately before giving such notice, the Bank satisfies the Trustee that (i) the Bank will become obliged to pay, on the next date on which any amount would be payable with respect to the Notes, additional amounts, as provided or referred to in Condition 9 (*Taxation*), to any greater extent than would have been required had such a payment been required to be made on the [date of the Claimants' Meeting,] as a result of any change in, or amendment to, the laws or regulations of the Republic of Kazakhstan or any political subdivision or any authority thereof having power to tax therein, or any change in the application or official interpretation of such laws or regulations (including a ruling by a court of competent jurisdiction, but excluding any such change or amendment which obliges the Bank to pay additional amounts in respect of Notes held by or on behalf of a person resident, domiciled or organised in the Republic of Kazakhstan), which change or amendment becomes effective on or after the [date of the Claimants' Meeting] and (ii) such obligation cannot be avoided by the Bank taking reasonable measures available to it:  *provided*, *however, that* no such notice of redemption shall be given earlier than 90 days prior to the earliest date on which the Bank would be obliged to pay such additional amounts if a payment in respect of the Notes were then due.    Prior to the publication of any notice of redemption pursuant to this Condition 8(b) (*Redemption for Tax Reasons*), the Bank shall deliver or procure that there is delivered to the Trustee a certificate signed by two directors of the Bank stating that the Bank is entitled to effect such redemption and setting forth a statement of facts showing that the conditions precedent to the right of the Bank so to redeem have occurred and an opinion in form and substance satisfactory to the Trustee of independent legal advisers of recognised standing to the effect that the Bank has or will become obliged to pay such additional amounts as a result of such change or amendment.    The Trustee shall be entitled to accept, without further enquiry, such certificate and opinion as sufficient evidence of the satisfaction of the circumstances set out in (i) and (ii) above, in which event these shall be conclusive and binding on the Noteholders.    Upon the expiry of any such notice as is referred to in this Condition 8(b) (*Redemption for Tax Reasons*), the Bank shall be bound to redeem the Notes in accordance with this Condition 8(b) (*Redemption for Tax Reasons*).

(c)    *Purchase*

The Bank may at any time purchase or procure others to purchase for its account the Notes in the open market or otherwise and at any price.  Notes so purchased may be

held or resold (*provided that* such resale is in compliance with all applicable laws) or surrendered for cancellation at the option of the Bank, in compliance with Condition 8(d) (*Cancellation of Notes*). Any Notes so purchased, while held by or on behalf of the Bank, shall not entitle the holder to vote at any meeting of Noteholders and shall not be deemed to be outstanding for the purposes of calculating quorum at such meetings.

(d)     *Cancellation of Notes*

All Notes which are redeemed or surrendered for cancellation pursuant to this Condition 8 (*Redemption and Purchase*) shall be cancelled and may not be reissued or resold.

9.     **Taxation**

(a)     *Taxation*

All payments of principal and interest in respect of the Notes shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by or within the Republic of Kazakhstan or any other jurisdiction from or through which payment is made, or in any case, any political subdivision or any authority thereof or therein having power to tax (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law. In that event, the Bank shall pay such additional amounts as will result in the receipt by the Noteholders of such amounts as would have been received by them if no such withholding or deduction had been required, except that no such additional amounts shall be payable in respect of any Note:

(i)     presented for payment by or on behalf of a holder who is liable to such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such holder, if such holder is an estate, a trust, a partnership or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein other than the mere holding of such Note; or

(ii)     presented (in the case of a payment of principal or interest on redemption) for payment more than 30 days after the Relevant Date except to the extent that the relevant holder would have been entitled to such additional amounts if it had presented such Note on the last day of such period of 30 days; or

(iii)     to a holder who is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent such payment would be required to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner who would not have been entitled to the additional amounts had such beneficiary, settlor, member or beneficial owner been the holder of the Note.

In the event that the foregoing obligation to pay additional amounts is for any reason unenforceable against the Bank, the Bank shall pay to any holder of a Note (subject to the exclusions set out in (i), (ii) and (iii) above) which has received a payment subject to deduction or withholding as aforesaid, upon written request of such holder (subject to the exclusions set out in (i), (ii) and (iii) above), and *provided that* reasonable

supporting documentation is provided, an amount equal to the amount withheld or deducted, so that the net amount received by such holder after such payment would not be less than the net amount the holder would have received had such deduction or withholding not taken place. Any payment made pursuant to this paragraph shall be considered an additional amount.

If, at any time, the Bank is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Bank shall promptly notify the Trustee in writing, and shall deliver to the Trustee, within 30 days after it has made such payment to the applicable authority, a written certificate to the effect that it has made such payment to such authority of all amounts so required to be deducted or withheld in respect of each Note.

(b)     *Relevant Date*

As used in these Conditions, "**Relevant Date**" in respect of any Note means the date on which payment in respect of such Note first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which notice is duly given to the Noteholders that, upon further presentation of the Note being made in accordance with the Conditions, such payment will be made, *provided that* payment is in fact made upon such presentation.

(c)     *Additional Amounts*

Any reference in these Conditions to principal or interest shall be deemed to include instalments of principal as well as any additional amounts in respect of principal or interest (as the case may be) which may be payable under this Condition 9 (*Taxation*) or any undertaking given in addition to or in substitution of this Condition 9 (*Taxation*) pursuant to the Trust Deed.

(d)     *Taxing Jurisdiction*

If the Bank becomes subject at any time to any taxing jurisdiction other than the Republic of Kazakhstan references in this Condition 9 (*Taxation*) to the Republic of Kazakhstan shall be construed as references to the Republic of Kazakhstan and/or such other jurisdiction.

10.    **Prescription**

Claims for principal and interest on redemption shall become void unless the relevant Note Certificates are surrendered for payment within ten years, and claims for interest due other than on redemption shall become void unless made within five years, of the appropriate Relevant Date.

11.    **Events of Default**

The Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, file a petition for the winding up of the Bank if any of the following events (each, an "**Event of Default**") occurs and is continuing and, in the case of (b) or (c) below the Notes have become due and payable as hereinafter provided:

(a)     *Non Payment*

the Bank fails to pay the principal of the Notes when the same becomes due and payable and, where such failure to pay is caused by technical or administrative errors

affecting the transfer of funds by the Bank, the failure to pay continues for a period of three Business Days, or the Bank is in default with respect to the payment of interest and such default continues for a period of ten days; or

(b)     *Cross Acceleration*

(A) any Indebtedness for Borrowed Money of the Bank or any Subsidiary of the Bank becomes due and payable prior to the due date for the payment thereof by reason of default of the Bank or the relevant Subsidiary (as the case may be), or is not paid when due subject to any originally applicable grace period; or (B) any Indebtedness Guarantee given by the Bank or any Subsidiary of the Bank in respect of Indebtedness for Borrowed Money of another Person is not honoured when due and called, *provided that* the amount of Indebtedness for Borrowed Money referred to in (A) above and/or the amount payable under any Indebtedness Guarantee referred to in (B) above individually or in the aggregate exceeds U.S.$7,000,000 (or its equivalent in any other currency or currencies (as determined by the Trustee)); or

(c)     *Bankruptcy*

any Person shall have instituted a proceeding or entered a decree or order for the appointment of a receiver, administrator or liquidator in any insolvency, rehabilitation, readjustment of debt, marshalling of assets and liabilities or similar arrangements in respect of the Bank or any Material Subsidiary, or all or substantially all of its properties and such proceeding, decree or order shall not have been vacated or shall have remained in force undischarged or unstayed for a period of 60 days or the Bank or any Material Subsidiary shall institute proceedings under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect to be adjudicated a bankrupt or shall consent to the filing of a bankruptcy, insolvency or similar proceeding against it or shall file a petition or answer or consent seeking reorganisation under any such law or shall consent to the filing of any such petition, or shall consent to the appointment of a receiver, administrator or liquidator or trustee or assignee in bankruptcy or liquidation of the Bank or any Material Subsidiary, or in respect of its property, or shall make an assignment for the benefit of its creditors or shall otherwise be unable or admit its inability to pay its debts generally as they become due or the Bank commences proceedings with a view to the general adjustment of its Indebtedness, save that on the occurrence and continuation of an event specified in Condition 11(a)(ii) (*Cross Acceleration*), *provided that* action has been taken (whether by the Trustee or the Discount Noteholders or the Par Noteholders) to accelerate the obligations of the Bank with respect to all outstanding Indebtedness for Borrowed Money which is unsubordinated, the Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, give notice to the Bank that the Notes are and they shall become due and repayable at their principal amount together with accrued interest.

12.     **Replacement of Notes**

If any Note is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Principal Paying and Transfer Agent and the Agent, subject to all applicable laws and stock exchange requirements, upon payment by the claimant of the expenses incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank may reasonably require.  Mutilated or defaced Notes must be surrendered before replacements will be issued.

13. **Meetings of Noteholders; Modification and Waiver**

(a) *Meetings of Noteholders*

The Trust Deed contains provisions for convening meetings of Noteholders to consider any matters relating to the Notes, including the modification of any provision of these Conditions or the Trust Deed. Any such modification may be made if sanctioned by an Extraordinary Resolution. Such a meeting may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than one tenth of the aggregate principal amount of the outstanding Notes. The quorum at any meeting convened to vote on an Extraordinary Resolution will be two or more persons holding or representing a clear majority of the aggregate principal amount of the Notes for the time being outstanding, or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented; *provided, however, that* certain proposals (including any proposal to change any date fixed for payment of principal or interest in respect of the Notes, to reduce the amount of principal or interest payable on any date in respect of the Notes, to alter the method of calculating the amount of any payment in respect of the Notes or the date for any such payment, to change the currency of payment under the Notes or to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution) may only be sanctioned by an Extraordinary Resolution passed at a meeting of Noteholders at which two or more persons holding or representing not less than three quarters or at any adjourned meeting, one quarter of the aggregate principal amount of the outstanding Notes form a quorum (a "**special quorum resolution**"). Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Noteholders, whether present or not.

The Trust Deed contains provisions for convening meetings of holders of the Notes with holders of notes of other series issued under the Trust Deed if the Trustee so decides.

(b) *Written Resolution*

A resolution in writing will take effect as if it were an Extraordinary Resolution if it is signed (i) by or on behalf of all of Noteholders who for the time being are entitled to receive notice of a meeting of Noteholders under the Trust Deed or (ii) if such Noteholders have been given at least 21 clear days' notice of such resolution, by or on behalf of persons holding three quarters of the aggregate principal amount of the outstanding Notes. Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders.

(c) *Modification Without Noteholders' Consent*

The Trustee may, without the consent of the Noteholders, agree (i) to any modification of the Notes (including these Conditions) or the Trust Deed (other than in respect of a matter requiring a special quorum resolution), which, in the opinion of the Trustee, will not be materially prejudicial to the interests of Noteholders and (ii) to any modification of the Notes (including these Conditions) or the Trust Deed, which is of a formal, minor or technical nature or to correct a manifest error. In addition, the Trustee may, without the consent of the Noteholders, authorise or waive any proposed breach or breach of the Notes or the Trust Deed (other than a proposed breach or breach relating to the subject of a matter requiring a special quorum resolution) if, in the opinion of the Trustee, the interests of the Noteholders will not be materially prejudiced thereby. Any such modification, waiver or authorisation shall be binding on the Noteholders and, unless the Trustee agrees otherwise, shall be

promptly notified to the Noteholders in accordance with Condition 14 (*Notices*).  Any such modification, authorisation or wavier shall be subject to the receipt of all applicable regulatory approvals.

14. **Notices**

(a) *To the Noteholders*

Notices to Noteholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register.  Any such notice shall be deemed to have been given on the fourth day (not being a Saturday or a Sunday) after the date of mailing.  In addition, so long as the Notes are listed on the Kazakhstan Stock Exchange, and the Kazakhstan Stock Exchange so requires, notices to the Noteholders shall be published in a leading newspaper having general circulation in Kazakhstan.  Any such notice shall be deemed to have been given on the date of first publication.

(b) *To the Bank*

Notices to the Bank will be deemed to be validly given if delivered to the Bank at 50, Furmanov Street, Almaty 050004, Republic of Kazakhstan and clearly marked on their exterior "Urgent — Attention:  International Relations Department" (or at such other addresses and for such other attentions as may have been notified to the Noteholders in accordance with Condition 14(a)) and will, be deemed to have been validly given at the opening of business on the next day on which the Bank's principal offices, as applicable, are open for business.

(c) *To the Trustee and Agents*

Notices to the Trustee or any Agent will be deemed to have been validly given if delivered to the registered office, for the time being, of the Trustee or the Specified Office, for the time being, of such Agent, as the case may be, and will be validly given on the next day on which such office is open for business.

15. **Trustee**

(a) *Indemnification*

Under the Trust Deed, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and to be paid its costs and expenses in priority to the claims of the Noteholders.  In addition, the Trustee is entitled to enter into business transactions with the Bank and any entity relating to the Bank without accounting for any profit.

The Trustee's responsibilities are solely those of trustee for the Noteholders on the terms of the Trust Deed.  Accordingly, the Trustee makes no representations and assumes no responsibility for the validity or enforceability of the Notes or for the performance by the Bank of its obligations under or in respect of the Notes or the Trust Deed, as applicable.

(b) *Exercise of Power and Discretion*

In connection with the exercise of any of its powers, trusts, authorities or discretions (including but not limited to those referred to in these Conditions and the Trust Deed), the Trustee shall have regard to the interests of the Noteholders as a class and, in particular, shall not have regard to the consequences of such exercise for individual Noteholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or

taxing jurisdiction. The Trustee shall not be entitled to require, and no Noteholder shall be entitled to claim, from the Bank (in the case of a Noteholder) the Trustee any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders.

(c)     *Enforcement; Reliance*

The Trustee may at any time, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Notes, but it shall not be bound to do unless:

(i)     it has been so requested in writing by the holders of a least one fifth in principal amount of the outstanding Notes or has been so directed by an Extraordinary Resolution; and

(ii)    it has been indemnified or provided with security or pre funded to its satisfaction.

The Trust Deed provides that the Trustee may, at any time, or, in making any determination under these Conditions or the Trust Deed, act on the opinion or advice of, or information obtained from, any expert, auditor, lawyer or professional entity, without further enquiry or evidence. In particular, the Trust Deed provides that the Trustee may rely on certificates or reports from auditors whether or not such certificate or report or any engagement letter or other document entered into by the Bank and the auditors contains any limit on liability (monetary or otherwise) of the auditors and provides further that nothing shall require the Trustee to enter into or to agree to be bound by the terms of any engagement letter or other document entered into by the Bank or any such auditor. If such evidence is relied upon, the Trustee's determination shall be conclusive and binding on all parties, and the Trustee will not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience which may result from it so acting.

Until the Trustee has actual or express knowledge to the contrary, the Trustee may assume that no Event of Default or event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default has occurred.

The Trust Deed provides that the Bank is required to deliver to the Trustee, pursuant to, and in the circumstances detailed in, the Trust Deed, a certificate signed by any two of its Directors that there has not been and is not continuing any Event of Default, an event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default, or other breach of the Trust Deed. The Trustee shall be entitled to rely without liability on such certificates. The Trustee shall not be responsible for monitoring any of the covenants and obligations of the Bank set out in these Conditions and shall be entitled to rely upon the information provided pursuant to these Conditions and the Trust Deed and to assume, unless it receives actual notice to the contrary, that the Bank is complying with all covenants and obligations imposed upon it, respectively, herein and therein.

(d)     *Failure to Act*

No Noteholder may proceed directly against the Bank unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

(e) *Retirement and Removal*

Any Trustee may retire at any time on giving at least three months' written notice to the Bank without giving any reason or being responsible for any costs occasioned by such retirement and the Noteholders may by Extraordinary Resolution remove any Trustee, *provided that* the retirement or removal of a sole trust corporation will not be effective until a trust corporation is appointed as successor Trustee. If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, it will use all reasonable endeavours to procure that another trust corporation be appointed as Trustee. In the event of any change of the Trustee, a notice shall be published in a leading newspaper which will have general circulation in the Republic of Kazakhstan.

(f) *Substitution*

The Trust Deed contains provisions to the effect that the Trustee may (without the consent of the Noteholders) agree on such terms as it may specify to the substitution of the Bank's successor in business in place of the Bank as issuer and principal obligor in respect of the Notes and as principal obligor under the Trust Deed, subject to all relevant conditions of the Trust Deed having been complied with (including an unconditional guarantee by the Bank of the obligations assumed by the substitute). Not later than 14 days after compliance with the aforementioned requirements, notice thereof shall be given by the Bank to the Noteholders in accordance with Condition 14 (*Notices*).

16. **Further Issues**

The Bank may from time to time, without the consent of the Noteholders and in accordance with the Trust Deed, create and issue further Notes having the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest).

17. **Currency Indemnity**

If any sum due from the Bank in respect of the Notes under the Trust Deed or any order or judgment given or made in relation thereto has to be converted from the currency (the "**first currency**") in which the same is payable under these Conditions, the Trust Deed or such order or judgment into another currency (the "**second currency**") for the purpose of making or filing a claim or proof against the Bank, obtaining an order or judgment in any court or other tribunal or enforcing any order or judgment given or made in respect of the Notes or in respect thereof under the Trust Deed, the Bank shall indemnify each Noteholder, on the written demand of such Noteholder addressed to the Bank and delivered to the Bank or to the Specified Office of the Principal Agent or the Agent having its Specified Office in London, against any loss suffered as a result of any discrepancy between the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and the rate or rates of exchange at which such Noteholder may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof. This indemnity constitutes a separate and independent obligation of the Bank and shall give rise to a separate and independent cause of action.

18. **Contracts (Rights of Third Parties) Act 1999**

No Person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999, but this does not affect the right or remedy of any Person which exists or is available apart from such Act.

19. **Governing Law; Arbitration and Jurisdiction**

(a) *Governing Law*

The Trust Deed, the Notes, the Agency Agreement and any non-contractual obligations arising out of or in connection therewith are governed by, and shall be construed in accordance with, English law.

(b) *Arbitration*

The Bank agrees that any claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non contractual obligations arising out of or in connection with the Trust Deed) (a "**Dispute**"), shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**") as at present in force and as modified by this Condition, which Rules shall be deemed incorporated into this Condition. The number of arbitrators shall be three, one of whom shall be nominated by the Bank, one by the Trustee and the third of whom, who shall act as Chairman, shall be nominated by the two party nominated arbitrators, *provided that* if the third arbitrator has not been nominated within 30 days of the nomination of the second party nominated arbitrator, such third arbitrator shall be appointed by the LCIA. The parties may nominate and the LCIA may appoint arbitrators from among the nationals of any country, whether or not a party is a national of that country. The seat of arbitration shall be London, England and the language of arbitration shall be English. Sections 45 and 69 of the Arbitration Act 1996 shall not apply.

(c) *Trustee's Option*

At any time before the Trustee has nominated an arbitrator to resolve any Dispute(s) pursuant to Condition 19(b) (*Arbitration*), the Trustee, at its sole option, may elect by notice in writing to the Bank that such Dispute(s) shall instead be heard by the courts of England, as more particularly described in Condition 19(d) (*Jurisdiction*). Following any such election, no arbitral tribunal shall have jurisdiction in respect of such Dispute(s).

(d) *Jurisdiction*

In the event that the Trustee serves a written notice of election in respect of any Dispute(s) pursuant to Condition 19(c) (*Trustee's Option*), the Bank agrees for the benefit of the Trustee and the Noteholders that the courts of England shall have jurisdiction to hear and determine any such Dispute(s) and, for such purposes, irrevocably submits to the jurisdiction of such courts. Subject to Condition 19(b) (*Arbitration*), nothing in this Condition shall (or shall be construed so as to) limit the right of the Trustee to bring proceedings ("**Proceedings**") for the determination of any Dispute(s) in any other court of competent jurisdiction, nor shall the bringing of such Proceedings in any one or more jurisdictions preclude the bringing of Proceedings by the Trustee in any other jurisdiction (whether concurrently or not) if and to the extent permitted by law.

(e) *Appropriate Forum*

The Bank has irrevocably waived any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and agrees not to claim in any Proceedings that any such court is not a convenient or appropriate forum.

(f) *Agent for Service of Process*

The Bank has agreed that the process by which any Proceedings in England are begun may be served on it by being delivered to Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX or, if different, its registered office for the time being. If for any reason the Bank does not have such an agent in England, it will promptly appoint a substitute process agent and notify in writing the Trustee of such appointment. If such person is not or ceases to be effectively appointed to accept service of process on behalf of the Bank, the Bank shall, on the written demand of the Trustee, appoint a further person in England to accept service of process on its behalf and, failing such appointment within 15 days, the Trustee shall be entitled to appoint such a person by written notice to the Bank. Nothing herein shall affect the right to serve process in any other manner permitted by law.

(g) *Consent to Enforcement, etc.*

The Bank has consented generally in respect of any Disputes (or Proceedings in accordance with Condition 19(d) (*Jurisdiction*)) to the giving of any relief or the issue of any process in connection with such Disputes or Proceedings, including (without limitation) the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment which may be given in such Proceedings or in connection with such Disputes.

(h) *Waiver of Immunity*

To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity to the full extent permitted by the laws of such jurisdiction.

**ANNEX 4**

**TERMS AND CONDITIONS OF THE SUBORDINATED TENGE B NOTES**

*The following is the text of the terms and conditions of the Subordinated Tenge B Notes which, subject to amendment and completion will be endorsed on each Note Certificate pertaining to the Subordinated Tenge B Notes and will be attached and (subject to the provisions thereof) apply to the relevant Global Note, and which supersedes in its entirety the corresponding section of Annex 5 of Schedule 6 to the Information Memorandum. The wording of the Terms and Conditions of the Subordinated Notes is subject to confirmation and/or further material amendments that may be required by the FMSA and/or the NBK.*

The KZT ____ 9.5 per cent. notes due ____ 2030 (the "**Notes**", which expression includes any further notes issued pursuant to Condition 16 (*Further Issues*) and forming a single series therewith) of JSC Alliance Bank (the "**Bank**") are (a) constituted by, and subject to, and have the benefit of a trust deed dated ____ 2010 (as amended or supplemented from time to time, the "**Trust Deed**") between the Bank and BNY Corporate Trustee Services Limited as trustee (the "**Trustee**", which expression includes all persons for the time being appointed as trustee for the holders of the Notes ("**Noteholders**") under the Trust Deed) and (b) the subject of a paying agency agreement dated ____ 2010 (as amended or supplemented from time to time, the "**Agency Agreement**") between the Bank, the Trustee, ____ as principal paying and transfer agent (the "**Principal Paying and Transfer Agent**"; which expression includes any successor or additional paying and transfer agents appointed from time to time in connection with the Notes) and ____ as registrar (the "**Registrar**", which expression shall include any successor registrar appointed from time to time in connection with the Notes).

Certain provisions of these Conditions are summaries of the Trust Deed and the Agency Agreement and subject to their detailed provisions. The Noteholders are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and the Agency Agreement applicable to them. Copies of the Trust Deed and the Agency Agreement are available for inspection during normal business hours at the Specified Offices (as defined in the Agency Agreement) of the Principal Paying and Transfer Agent. Copies are also available for inspection during normal business hours at the registered office for the time being of the Trustee, One Canada Square, London E14 5AL, United Kingdom. References herein to the "**Agents**" are to the Registrar and the Paying and Transfer Agents and any reference to an "**Agent**" is to any one of them.

Terms defined in the Trust Deed shall, unless otherwise defined herein or the context requires otherwise, bear the same meanings herein.

1.      **Status**

Subject to exceptions provided by mandatory applicable law, the payment obligations under the Notes constitute direct, unconditional, unsecured and subordinated obligations of the Bank and shall, in case of (i) the bankruptcy in the Republic of Kazakhstan (*bankrotsvo*) of the Bank; (ii) the Bank being granted (provisional) suspension of payments in the Republic of Kazakhstan (*moratoriy na udovletvoreniye zadolzhennosti*) (such situation hereinafter being referred to as a "**Moratorium**"); or (iii) dissolution of the Bank in the Republic of Kazakhstan (*likvidatsiya*)) rank:   (A) subordinate and junior only to present and future indebtedness of the Bank which by or under its terms ranks senior, or does not rank subordinate to, any indebtedness or other obligations of the Bank; (B) *pari passu* amongst themselves and with any other present and future indebtedness which ranks by or under its own terms or otherwise *pari passu* with subordinated indebtedness or other obligations of the Bank; and (C) senior to equity securities of the Bank and to any other present and future indebtedness which ranks by or under its own terms or otherwise, subordinate or junior to the Notes of the Bank.

By virtue of such subordination (i) payments to holders of Notes will, in the case of bankruptcy or dissolution of the Bank or in the event of a Moratorium with respect to the Bank, only be made after all payment obligations of the Bank ranking senior to such Notes have been satisfied; (ii) any right of set-off by a holder of Notes in respect of any amount owed to such holder by the Bank under or in connection with such Notes shall be excluded; and (iii) each holder of Notes shall, by virtue of being the holder of such Notes, be deemed to have waived all such rights of set-off.

2.  **Form, Denomination and Title**

    (a)    *Form and Denomination*

    The Notes are in registered form, without interest coupons attached, and shall be serially numbered. Notes shall be issued in denominations of KZT _____ and integral multiples of KZT _____ in excess thereof (each denomination an "**authorised denomination**").

    (b)    *Title*

    Title to the Notes will pass by transfer and registration as described in Conditions 3 (*Registration*) and 4 (*Transfers*). The holder (as defined below) of any Notes shall (except as otherwise required by law or as ordered by a court of competent jurisdiction) be treated as its absolute owner for all purposes (whether or not it is overdue and regardless of any notice of ownership, trust or any other interest therein, any writing thereon (other than a duly executed transfer thereof in the form endorsed thereon) or any notice of any previous loss or theft thereof) and no person shall be liable for so treating such holder.

    In these Conditions, "**holder**" means the person in whose name a Note is registered in the Register (as defined below) (or, in the case of joint holders, the first named thereof) and "**holders**" and "**Noteholders**" shall be construed accordingly.

3.  **Registration**

    The Bank shall procure that the Registrar will maintain a register (the "**Register**") at the Specified Office of the Registrar in respect of the Notes in accordance with the provisions of the Agency Agreement. A certificate (each, a "**Note Certificate**") will be issued to each Noteholder in respect of its registered holding. Each Note Certificate will be numbered serially with an identifying number which will be recorded in the Register.

4.  **Transfers**

    (a)    Subject to Conditions 4(d) and 4(e), a Note may be transferred in whole or in part upon surrender of the relevant Note Certificate, with the endorsed form of transfer (the "**Transfer Form**") duly completed, at the Specified Office of an Agent, together with such evidence as the Registrar or (as the case may be) such Agent may reasonably require to prove the title of the transferor and the authority of the individuals who have executed the form of transfer; *provided, however, that* a Note may not be transferred unless the principal amount of Notes transferred and (where not all of the Notes held by a holder are being transferred) the principal amount of the balance of Notes not transferred are authorised denominations. Transfer Forms are available from any Agent and the Bank upon the request of any holder.

    (b)    Within five business days of the surrender of a Note Certificate in accordance with Condition 4(a), the Registrar will register the transfer in question and deliver a new Note Certificate of a like principal amount to the Notes transferred to each relevant holder at its Specified Office or (as the case may be) the Specified Office of any Agent or (at the request and risk of any such relevant holder) by uninsured first class

mail (airmail if overseas) to the address specified for the purpose by such relevant holder. In this Condition 4(b), "**business day**" means a day other than a Saturday or a Sunday on which commercial banks are open for business (including dealings in foreign currencies) in the city where the Registrar or (as the case may be) the relevant Agent has its Specified Office.

(c)     The transfer of a Note will be effected without charge by the Registrar or any Agent but against such indemnity as the Registrar or (as the case may be) such Agent may require in respect of any tax or other duty of whatsoever nature which may be levied or imposed in connection with such transfer.

(d)     Noteholders may not require transfers to be registered during the period of 15 days ending on the due date for any payment of principal or interest in respect of the Notes.

(e)     All transfers of Notes and entries on the Register are subject to the detailed regulations concerning the transfer of the Notes scheduled to the Agency Agreement, a copy of which will be made available as specified in the preamble to these Conditions. The regulations may be changed by the Bank with the prior written approval of the Trustee and the Registrar. A copy of the current regulations will be mailed (free of charge) by the Registrar to any Noteholder who requests in writing a copy of such regulations.

5.     **Covenants**

The Noteholders will have the benefit of certain covenants contained in the Trust Deed relating to, amongst other things, restrictions on the incurrence of indebtedness, disposal of assets and payment of dividends.

6.     **Interest**

(a)     *Interest Accrual*

The Notes shall bear interest or, as the case may be, be deemed to bear interest on their outstanding principal amount from the earlier of ____ 2010 (the "**Issue Date**") and 1 March 2010 up to but excluding ____ 2020 (the "**Amortisation Date**") at the rate of 9.5 per cent. per annum (the "**Initial Rate of Interest**") and thereafter until ____ 2030 at the rate of 12 per cent. per annum (the "**Step Up Rate of Interest**") payable in arrear on ____ and ____ in each year (each, an "**Interest Payment Date**"), subject as provided in Condition 7 (*Payments*), save that at the end of each Interest Period during the period beginning on the Issue Date (or 1 March 2010, as the case may be) and ending on (but excluding) the Amortisation Date, that portion of the interest payable equal to the Capitalisation Amount for that Interest Period accrued on the Notes from time to time during that Interest Period shall, unless the Bank elects to pay such accrued interest in cash (an "**Elective Cash Payment**") on the corresponding Interest Payment Date by giving the Principal Paying and Transfer Agent not less than three Business Days' notice of such election (which notice shall be irrevocable for such Interest Payment Date), be automatically capitalised and added to the amount of the principal in respect of the Notes, for which purpose, the "**Capitalisation Amount**" for any Interest Period shall be an amount equal to the interest that would have accrued for that Interest Period had the Initial Interest Rate been 5 per cent. per annum. Any such accrued interest shall, after being so capitalised, be (and be treated as) part of the principal in respect of the Notes and shall bear interest in accordance with this Condition 6 (*Interest*) and, except to the extent repaid or prepaid at an earlier time in accordance with these Conditions, shall be payable in accordance with the provisions of these Conditions and the Trust Deed. If all or part of the principal of the Notes is prepaid prior to the end of an Interest

Period, any accrued and unpaid interest on such principal of the Notes that has not been so capitalised will be payable in cash on the date of such prepayment. No Elective Cash Payment shall be made unless a corresponding payment is made in respect of the Par Notes, the Subordinated Tenge A Notes and the Subordinated Dollar Notes.

Each period beginning on (and including) the Issue Date (or 1 March 2010, as the case may be) or any Interest Payment Date and ending on (but excluding) the next Interest Payment Date is herein called an "**Interest Period**".

(b)     *Cessation of Interest*

Each Note will cease to bear interest from the due date for final redemption unless, upon due presentation, payment of principal is improperly withheld or refused, in which case it will continue to bear interest at such rate (as well after as before judgment) until whichever is the earlier of (i) the day on which all sums due in respect of such Notes up to that day are received by or on behalf of the relevant Noteholder and (ii) the day which is seven days after the Principal Paying and Transfer Agent or the Trustee has notified the Noteholders that it has received all sums due in respect of the Notes up to such seventh day (except to the extent that there is any subsequent default in payment).

(c)     *Calculation of Interest for an Interest Period*

The amount of interest payable in respect of each Note for any Interest Period shall be calculated by applying the Rate of Interest to the principal amount of such Note, dividing the product by two and rounding the resulting figure to the nearest tiyn (half a tiyn being rounded upwards) *provided that* if the Issue Date is later than 1 March 2010, the amount of interest payable for the first Interest Period shall be KZT ____ for each KZT ____ in principal amount of Notes (subject always to automatic capitalisation of interest pursuant to Condition 6(a) (*Interest Accrual*)).

(d)     *Calculation of Interest for any Other Period*

If interest is required to be calculated for any period other than an Interest Period, it will be calculated on the basis of a year of 360 days consisting of 12 months of 30 days each and, in the case of an incomplete month, the actual number of days elapsed.

The determination of the amount of interest payable under Condition 6(c) (*Calculation of Interest for an Interest Period*) by the Principal Paying and Transfer Agent shall, in the absence of manifest error, be binding on all parties.

7.     **Payments**

(a)     *Principal*

Payments of principal in respect of the Notes will be made to the Persons shown in the Register at the close of business on the relevant Record Date (as defined below) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note Certificates at the Specified Office of the Registrar or of any Agent.

(b)     *Interest*

Payments of interest due on an Interest Payment Date will be made to the Persons shown in the Register at the close of business on the Record Date for such Interest Payment Date, subject to (in the case of interest payable on redemption) upon surrender (or, in the case of part payment only, endorsement) of the relevant Note

Certificates at the Specified Office of the Registrar or any Agent. Payments of all amounts other than as provided in Conditions 7(a) (*Principal*) and this Condition 7(b) (*Interest*) will be made as provided in these Conditions.

(c)     *Record Date*

Each payment in respect of a Note will be made to the Person shown as the holder in the Register at the opening of business (in the place of the Registrar's specified office) on the fifteenth day before the due date for such payment (the "**Record Date**").

(d)     *Payments*

Each payment in respect of the Notes pursuant to Conditions 7(a) (*Principal*) and 7(b) (*Interest*) will be made by transfer to a Kazakhstan Tenge account maintained by the payee with a bank in Kazakhstan.

(e)     *Payments Subject to Fiscal Laws*

All payments in respect of the Notes are subject in all cases to any applicable or other laws and regulations in the place of payment, but without prejudice to the provisions of Condition 9 (*Taxation*). No commissions or expenses shall be charged to the Noteholders in respect of such payments.

(f)     *Payment on a Business Day*

If the due date for payment of any amount in respect of any Note is not a business day in the place of presentation, the holder thereof shall not be entitled to payment in such place of the amount due until the next succeeding business day in such place. A holder of a Note shall not be entitled to any interest or other payment in respect of any delay in payment resulting from the due date for a payment not being a business day. In this Condition 7(f) (*Payment on a Business Day*), "**business day**" means any day on which banks are open for business (including dealings in foreign currencies) in New York City, London and Almaty and, in the case of surrender (or, in the case of partial payment only, endorsement) of a Note Certificate, in the place in which the Note Certificate is surrendered (or, as the case may be, endorsed).

(g)     *Agents*

In acting under the Agency Agreement and in connection with the Notes, the Agents act solely as agents of the Bank and (to the extent provided therein) the Trustee and do not assume any obligations towards or relationship of agency or trust for or with any of the Noteholders. The Bank reserves the right (with prior written approval of the Trustee) at any time to vary or terminate the appointment of any Agent and to appoint a successor principal paying and transfer agent or registrar and additional or successor agent or agents; *provided*, *however*, *that* the Bank shall at all times maintain a principal paying and transfer agent with a specified office in a European member state, that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any other European Directive implementing the conclusions of the ECOFIN Council meeting of June 3, 2003 on the taxation of savings income or any law implementing or complying with, or introduced to conform to, such Directive, and a registrar. Notice of any change in any of the Agents or in their Specified Offices shall promptly be given to the Noteholders in accordance with Condition 14 (*Notices*).

8.   **Redemption and Purchase**

(a)   *Scheduled Redemption*

Unless previously redeemed or purchased and cancelled as provided below, subject as provided in Condition 7 (*Payments*), the Notes will be partially redeemed in twenty equal semi-annual instalments on ____ and ____ of each year, with the first such instalment being payable on ____ 2020 and the last such instalment being payable on ____ 2030. The outstanding principal amount of each Note shall be reduced by any instalment amount, with effect from the related instalment payment date, unless payment of the instalment is improperly withheld or refused on presentation of the Note, in which case such amount shall remain outstanding until the date of payment of such instalment amount. Each Note shall be finally redeemed in its final instalment amount payment.

(b)   *Redemption for Tax Reasons*

The Notes may be redeemed at the option of the Bank in whole, but not in part, at any time, on giving not less than 30 nor more than 60 days' notice to the Noteholders (which notice shall be irrevocable) at their principal amount, together with interest accrued but unpaid to the date fixed for redemption, if, immediately before giving such notice, the Bank satisfies the Trustee that (i) the Bank will become obliged to pay, on the next date on which any amount would be payable with respect to the Notes, additional amounts, as provided or referred to in Condition 9 (*Taxation*), to any greater extent than would have been required had such a payment been required to be made on the [date of the Claimants' Meeting,] as a result of any change in, or amendment to, the laws or regulations of the Republic of Kazakhstan or any political subdivision or any authority thereof having power to tax therein, or any change in the application or official interpretation of such laws or regulations (including a ruling by a court of competent jurisdiction, but excluding any such change or amendment which obliges the Bank to pay additional amounts in respect of Notes held by or on behalf of a person resident, domiciled or organised in the Republic of Kazakhstan), which change or amendment becomes effective on or after the [date of the Claimants' Meeting] and (ii) such obligation cannot be avoided by the Bank taking reasonable measures available to it: *provided*, *however*, *that* no such notice of redemption shall be given earlier than 90 days prior to the earliest date on which the Bank would be obliged to pay such additional amounts if a payment in respect of the Notes were then due. Prior to the publication of any notice of redemption pursuant to this Condition 8(b) (*Redemption for Tax Reasons*), the Bank shall deliver or procure that there is delivered to the Trustee a certificate signed by two directors of the Bank stating that the Bank is entitled to effect such redemption and setting forth a statement of facts showing that the conditions precedent to the right of the Bank so to redeem have occurred and an opinion in form and substance satisfactory to the Trustee of independent legal advisers of recognised standing to the effect that the Bank has or will become obliged to pay such additional amounts as a result of such change or amendment. The Trustee shall be entitled to accept, without further enquiry, such certificate and opinion as sufficient evidence of the satisfaction of the circumstances set out in (i) and (ii) above, in which event these shall be conclusive and binding on the Noteholders. Upon the expiry of any such notice as is referred to in this Condition 8(b) (*Redemption for Tax Reasons*), the Bank shall be bound to redeem the Notes in accordance with this Condition 8(b) (*Redemption for Tax Reasons*).

(c)   *Purchase*

The Bank may at any time purchase or procure others to purchase for its account the Notes in the open market or otherwise and at any price. Notes so purchased may be

held or resold (*provided that* such resale is in compliance with all applicable laws) or surrendered for cancellation at the option of the Bank, in compliance with Condition 8(d) (*Cancellation of Notes*).  Any Notes so purchased, while held by or on behalf of the Bank, shall not entitle the holder to vote at any meeting of Noteholders and shall not be deemed to be outstanding for the purposes of calculating quorum at such meetings.

(d)     *Cancellation of Notes*

All Notes which are redeemed or surrendered for cancellation pursuant to this Condition 8 (*Redemption and Purchase*) shall be cancelled and may not be reissued or resold.

9.     **Taxation**

(a)     *Taxation*

All payments of principal and interest in respect of the Notes shall be made free and clear of, and without withholding or deduction for, any taxes, duties, assessments or governmental charges of whatsoever nature imposed, levied, collected, withheld or assessed by or within the Republic of Kazakhstan or any other jurisdiction from or through which payment is made, or in any case, any political subdivision or any authority thereof or therein having power to tax (each, a "**Taxing Jurisdiction**"), unless such withholding or deduction is required by law.  In that event, the Bank shall pay such additional amounts as will result in the receipt by the Noteholders of such amounts as would have been received by them if no such withholding or deduction had been required, except that no such additional amounts shall be payable in respect of any Note:

(i)     presented for payment by or on behalf of a holder who is liable to such taxes, duties, assessments or governmental charges in respect of such Note by reason of the existence of any present or former connection between such holder (or between a fiduciary, settlor, beneficiary, member or shareholder of such holder, if such holder is an estate, a trust, a partnership or a corporation) and the relevant Taxing Jurisdiction, including, without limitation, such holder (or such fiduciary, settlor, beneficiary, member or shareholder) being or having been a citizen or resident thereof or being or having been engaged in a trade or business or present therein or having, or having had, a permanent establishment therein other than the mere holding of such Note; or

(ii)    presented (in the case of a payment of principal or interest on redemption) for payment more than 30 days after the Relevant Date except to the extent that the relevant holder would have been entitled to such additional amounts if it had presented such Note on the last day of such period of 30 days; or

(iii)   to a holder who is a fiduciary or partnership or other than the sole beneficial owner of such payment to the extent such payment would be required to be included in the income for tax purposes of a beneficiary or settlor with respect to such fiduciary or a member of such partnership or a beneficial owner who would not have been entitled to the additional amounts had such beneficiary, settlor, member or beneficial owner been the holder of the Note.

In the event that the foregoing obligation to pay additional amounts is for any reason unenforceable against the Bank, the Bank shall pay to any holder of a Note (subject to the exclusions set out in (i), (ii) and (iii) above) which has received a payment subject to deduction or withholding as aforesaid, upon written request of such holder (subject to the exclusions set out in (i), (ii) and (iii) above), and *provided that* reasonable

supporting documentation is provided, an amount equal to the amount withheld or deducted, so that the net amount received by such holder after such payment would not be less than the net amount the holder would have received had such deduction or withholding not taken place. Any payment made pursuant to this paragraph shall be considered an additional amount.

If, at any time, the Bank is required by law to make any deduction or withholding from any sum payable by it hereunder (or if thereafter there is any change in the rates at which or the manner in which such deductions or withholdings are calculated), the Bank shall promptly notify the Trustee in writing, and shall deliver to the Trustee, within 30 days after it has made such payment to the applicable authority, a written certificate to the effect that it has made such payment to such authority of all amounts so required to be deducted or withheld in respect of each Note.

(b)     *Relevant Date*

As used in these Conditions, "**Relevant Date**" in respect of any Note means the date on which payment in respect of such Note first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which notice is duly given to the Noteholders that, upon further presentation of the Note being made in accordance with the Conditions, such payment will be made, *provided that* payment is in fact made upon such presentation.

(c)     *Additional Amounts*

Any reference in these Conditions to principal or interest shall be deemed to include instalments of principal as well as any additional amounts in respect of principal or interest (as the case may be) which may be payable under this Condition 9 (*Taxation*) or any undertaking given in addition to or in substitution of this Condition 9 (*Taxation*) pursuant to the Trust Deed.

(d)     *Taxing Jurisdiction*

If the Bank becomes subject at any time to any taxing jurisdiction other than the Republic of Kazakhstan references in this Condition 9 (*Taxation*) to the Republic of Kazakhstan shall be construed as references to the Republic of Kazakhstan and/or such other jurisdiction.

10.     **Prescription**

Claims for principal and interest on redemption shall become void unless the relevant Note Certificates are surrendered for payment within ten years, and claims for interest due other than on redemption shall become void unless made within five years, of the appropriate Relevant Date.

11.     **Events of Default**

The Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, file a petition for the winding up of the Bank if any of the following events (each, an "**Event of Default**") occurs and is continuing and, in the case of (b) or (c) below the Notes have become due and payable as hereinafter provided:

(a)     *Non Payment*

the Bank fails to pay the principal of the Notes when the same becomes due and payable and, where such failure to pay is caused by technical or administrative errors

affecting the transfer of funds by the Bank, the failure to pay continues for a period of three Business Days, or the Bank is in default with respect to the payment of interest and such default continues for a period of ten days; or

(b)     *Cross Acceleration*

(A) any Indebtedness for Borrowed Money of the Bank or any Subsidiary of the Bank becomes due and payable prior to the due date for the payment thereof by reason of default of the Bank or the relevant Subsidiary (as the case may be), or is not paid when due subject to any originally applicable grace period; or (B) any Indebtedness Guarantee given by the Bank or any Subsidiary of the Bank in respect of Indebtedness for Borrowed Money of another Person is not honoured when due and called, *provided that* the amount of Indebtedness for Borrowed Money referred to in (A) above and/or the amount payable under any Indebtedness Guarantee referred to in (B) above individually or in the aggregate exceeds U.S.$7,000,000 (or its equivalent in any other currency or currencies (as determined by the Trustee)); or

(c)     *Bankruptcy*

any Person shall have instituted a proceeding or entered a decree or order for the appointment of a receiver, administrator or liquidator in any insolvency, rehabilitation, readjustment of debt, marshalling of assets and liabilities or similar arrangements in respect of the Bank or any Material Subsidiary, or all or substantially all of its properties and such proceeding, decree or order shall not have been vacated or shall have remained in force undischarged or unstayed for a period of 60 days or the Bank or any Material Subsidiary shall institute proceedings under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect to be adjudicated a bankrupt or shall consent to the filing of a bankruptcy, insolvency or similar proceeding against it or shall file a petition or answer or consent seeking reorganisation under any such law or shall consent to the filing of any such petition, or shall consent to the appointment of a receiver, administrator or liquidator or trustee or assignee in bankruptcy or liquidation of the Bank or any Material Subsidiary, or in respect of its property, or shall make an assignment for the benefit of its creditors or shall otherwise be unable or admit its inability to pay its debts generally as they become due or the Bank commences proceedings with a view to the general adjustment of its Indebtedness, save that on the occurrence and continuation of an event specified in Condition 11(a)(ii) (*Cross Acceleration*), *provided that* action has been taken (whether by the Trustee or the Discount Noteholders or the Par Noteholders) to accelerate the obligations of the Bank with respect to all outstanding Indebtedness for Borrowed Money which is unsubordinated, the Trustee at its discretion may, and if so requested in writing by the holders of not less than one fifth in principal amount of the Notes then outstanding or if so directed by an Extraordinary Resolution (subject in each case to being indemnified or provided with security or pre-funded to its satisfaction) shall, give notice to the Bank that the Notes are and they shall become due and repayable at their principal amount together with accrued interest.

12.     **Replacement of Notes**

If any Note is lost, stolen, mutilated, defaced or destroyed, it may be replaced at the Specified Office of the Principal Paying and Transfer Agent and the Agent, subject to all applicable laws and stock exchange requirements, upon payment by the claimant of the expenses incurred in connection with such replacement and on such terms as to evidence, security, indemnity and otherwise as the Bank may reasonably require.  Mutilated or defaced Notes must be surrendered before replacements will be issued.

13. **Meetings of Noteholders; Modification and Waiver**

(a) *Meetings of Noteholders*

The Trust Deed contains provisions for convening meetings of Noteholders to consider any matters relating to the Notes, including the modification of any provision of these Conditions or the Trust Deed. Any such modification may be made if sanctioned by an Extraordinary Resolution. Such a meeting may be convened by the Trustee or the Bank, or by the Trustee upon the request in writing of Noteholders holding not less than one tenth of the aggregate principal amount of the outstanding Notes. The quorum at any meeting convened to vote on an Extraordinary Resolution will be two or more persons holding or representing a clear majority of the aggregate principal amount of the Notes for the time being outstanding, or, at any adjourned meeting, two or more persons being or representing Noteholders whatever the principal amount of the Notes for the time being outstanding so held or represented; *provided*, *however*, *that* certain proposals (including any proposal to change any date fixed for payment of principal or interest in respect of the Notes, to reduce the amount of principal or interest payable on any date in respect of the Notes, to alter the method of calculating the amount of any payment in respect of the Notes or the date for any such payment, to change the currency of payment under the Notes or to change the quorum requirements relating to meetings or the majority required to pass an Extraordinary Resolution) may only be sanctioned by an Extraordinary Resolution passed at a meeting of Noteholders at which two or more persons holding or representing not less than three quarters or at any adjourned meeting, one quarter of the aggregate principal amount of the outstanding Notes form a quorum (a "**special quorum resolution**"). Any Extraordinary Resolution duly passed at any such meeting shall be binding on all the Noteholders, whether present or not.

The Trust Deed contains provisions for convening meetings of holders of the Notes with holders of notes of other series issued under the Trust Deed if the Trustee so decides.

(b) *Written Resolution*

A resolution in writing will take effect as if it were an Extraordinary Resolution if it is signed (i) by or on behalf of all of Noteholders who for the time being are entitled to receive notice of a meeting of Noteholders under the Trust Deed or (ii) if such Noteholders have been given at least 21 clear days' notice of such resolution, by or on behalf of persons holding three quarters of the aggregate principal amount of the outstanding Notes. Such a resolution in writing may be contained in one document or several documents in the same form, each signed by or on behalf of one or more Noteholders.

(c) *Modification Without Noteholders' Consent*

The Trustee may, without the consent of the Noteholders, agree (i) to any modification of the Notes (including these Conditions) or the Trust Deed (other than in respect of a matter requiring a special quorum resolution), which, in the opinion of the Trustee, will not be materially prejudicial to the interests of Noteholders and (ii) to any modification of the Notes (including these Conditions) or the Trust Deed, which is of a formal, minor or technical nature or to correct a manifest error. In addition, the Trustee may, without the consent of the Noteholders, authorise or waive any proposed breach or breach of the Notes or the Trust Deed (other than a proposed breach or breach relating to the subject of a matter requiring a special quorum resolution) if, in the opinion of the Trustee, the interests of the Noteholders will not be materially prejudiced thereby. Any such modification, waiver or authorisation shall be binding on the Noteholders and, unless the Trustee agrees otherwise, shall be

promptly notified to the Noteholders in accordance with Condition 14 (*Notices*). Any such modification, authorisation or wavier shall be subject to the receipt of all applicable regulatory approvals.

14. **Notices**

    (a) *To the Noteholders*

    Notices to Noteholders will be sent to them by first class mail (or its equivalent) or (if posted to an overseas address) by airmail at their respective addresses on the Register. Any such notice shall be deemed to have been given on the fourth day (not being a Saturday or a Sunday) after the date of mailing. In addition, so long as the Notes are listed on the Kazakhstan Stock Exchange, and the relevant Stock Exchange so requires, notices to the Noteholders shall be published in a leading newspaper having general circulation in Kazakhstan. Any such notice shall be deemed to have been given on the date of first publication.

    (b) *To the Bank*

    Notices to the Bank will be deemed to be validly given if delivered to the Bank at 50, Furmanov Street, Almaty 050004, Republic of Kazakhstan and clearly marked on their exterior "Urgent — Attention: International Relations Department" (or at such other addresses and for such other attentions as may have been notified to the Noteholders in accordance with Condition 14(a)) and will, be deemed to have been validly given at the opening of business on the next day on which the Bank's principal offices, as applicable, are open for business.

    (c) *To the Trustee and Agents*

    Notices to the Trustee or any Agent will be deemed to have been validly given if delivered to the registered office, for the time being, of the Trustee or the Specified Office, for the time being, of such Agent, as the case may be, and will be validly given on the next day on which such office is open for business.

15. **Trustee**

    (a) *Indemnification*

    Under the Trust Deed, the Trustee is entitled to be indemnified and relieved from responsibility in certain circumstances and to be paid its costs and expenses in priority to the claims of the Noteholders. In addition, the Trustee is entitled to enter into business transactions with the Bank and any entity relating to the Bank without accounting for any profit.

    The Trustee's responsibilities are solely those of trustee for the Noteholders on the terms of the Trust Deed. Accordingly, the Trustee makes no representations and assumes no responsibility for the validity or enforceability of the Notes or for the performance by the Bank of its obligations under or in respect of the Notes or the Trust Deed, as applicable.

    (b) *Exercise of Power and Discretion*

    In connection with the exercise of any of its powers, trusts, authorities or discretions (including but not limited to those referred to in these Conditions and the Trust Deed), the Trustee shall have regard to the interests of the Noteholders as a class and, in particular, shall not have regard to the consequences of such exercise for individual Noteholders resulting from their being for any purpose domiciled or resident in, or otherwise connected with, or subject to the jurisdiction of, any particular territory or

taxing jurisdiction. The Trustee shall not be entitled to require, and no Noteholder shall be entitled to claim, from the Bank (in the case of a Noteholder) the Trustee any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders.

(c)     *Enforcement; Reliance*

The Trustee may at any time, at its discretion and without notice, institute such proceedings as it thinks fit to enforce its rights under the Trust Deed in respect of the Notes, but it shall not be bound to do unless:

(i)      it has been so requested in writing by the holders of a least one fifth in principal amount of the outstanding Notes or has been so directed by an Extraordinary Resolution; and

(ii)     it has been indemnified or provided with security or pre funded to its satisfaction.

The Trust Deed provides that the Trustee may, at any time, or, in making any determination under these Conditions or the Trust Deed, act on the opinion or advice of, or information obtained from, any expert, auditor, lawyer or professional entity, without further enquiry or evidence. In particular, the Trust Deed provides that the Trustee may rely on certificates or reports from auditors whether or not such certificate or report or any engagement letter or other document entered into by the Bank and the auditors contains any limit on liability (monetary or otherwise) of the auditors and provides further that nothing shall require the Trustee to enter into or to agree to be bound by the terms of any engagement letter or other document entered into by the Bank or any such auditor. If such evidence is relied upon, the Trustee's determination shall be conclusive and binding on all parties, and the Trustee will not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience which may result from it so acting.

Until the Trustee has actual or express knowledge to the contrary, the Trustee may assume that no Event of Default or event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default has occurred.

The Trust Deed provides that the Bank is required to deliver to the Trustee, pursuant to, and in the circumstances detailed in, the Trust Deed, a certificate signed by any two of its Directors that there has not been and is not continuing any Event of Default, an event or circumstance which could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 11 (*Events of Default*) become an Event of Default, or other breach of the Trust Deed. The Trustee shall be entitled to rely without liability on such certificates. The Trustee shall not be responsible for monitoring any of the covenants and obligations of the Bank set out in these Conditions and shall be entitled to rely upon the information provided pursuant to these Conditions and the Trust Deed and to assume, unless it receives actual notice to the contrary, that the Bank is complying with all covenants and obligations imposed upon it, respectively, herein and therein.

(d)     *Failure to Act*

No Noteholder may proceed directly against the Bank unless the Trustee, having become bound to do so, fails to do so within a reasonable time and such failure is continuing.

(e)     *Retirement and Removal*

Any Trustee may retire at any time on giving at least three months' written notice to the Noteholders without giving any reason or being responsible for any costs occasioned by such retirement and the Noteholders may by Extraordinary Resolution remove any Trustee, *provided that* the retirement or removal of a sole trust corporation will not be effective until a trust corporation is appointed as successor Trustee.  If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, it will use all reasonable endeavours to procure that another trust corporation be appointed as Trustee.  In the event of any change of the Trustee, a notice shall be published in a leading newspaper having general circulation in the Republic of Kazakhstan.

(f)     *Substitution*

The Trust Deed contains provisions to the effect that the Trustee may (without the consent of the Noteholders) agree on such terms as it may specify to the substitution of the Bank's successor in business in place of the Bank as issuer and principal obligor in respect of the Notes and as principal obligor under the Trust Deed, subject to all relevant conditions of the Trust Deed having been complied with (including an unconditional guarantee by the Bank of the obligations assumed by the substitute).  Not later than 14 days after compliance with the aforementioned requirements, notice thereof shall be given by the Bank to the Noteholders in accordance with Condition 14 (*Notices*).

16.  **Further Issues**

The Bank may from time to time, without the consent of the Noteholders and in accordance with the Trust Deed, create and issue further Notes having the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest).

17.  **Currency Indemnity**

If any sum due from the Bank in respect of the Notes under the Trust Deed or any order or judgment given or made in relation thereto has to be converted from the currency (the "**first currency**") in which the same is payable under these Conditions, the Trust Deed or such order or judgment into another currency (the "**second currency**") for the purpose of making or filing a claim or proof against the Bank, obtaining an order or judgment in any court or other tribunal or enforcing any order or judgment given or made in respect of the Notes or in respect thereof under the Trust Deed, the Bank shall indemnify each Noteholder, on the written demand of such Noteholder addressed to the Bank and delivered to the Bank or to the Specified Office of the Principal Agent or the Agent having its Specified Office in London, against any loss suffered as a result of any discrepancy between the rate of exchange used for such purpose to convert the sum in question from the first currency into the second currency and the rate or rates of exchange at which such Noteholder may in the ordinary course of business purchase the first currency with the second currency upon receipt of a sum paid to it in satisfaction, in whole or in part, of any such order, judgment, claim or proof.   This indemnity constitutes a separate and independent obligation of the Bank and shall give rise to a separate and independent cause of action.

18.  **Contracts (Rights of Third Parties) Act 1999**

No Person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999, but this does not affect the right or remedy of any Person which exists or is available apart from such Act.

19. **Governing Law; Arbitration and Jurisdiction**

(a) *Governing Law*

The Trust Deed, the Notes, the Agency Agreement and any non-contractual obligations arising out of or in connection therewith are governed by, and shall be construed in accordance with, English law.

(b) *Arbitration*

The Bank agrees that any claim, dispute or difference of whatever nature arising under, out of or in connection with the Notes or the Trust Deed (including a claim, dispute or difference regarding its existence, termination or validity or any non contractual obligations arising out of or in connection with the Trust Deed) (a "**Dispute**"), shall be referred to and finally settled by arbitration in accordance with the rules of the London Court of International Arbitration ("**LCIA**") (the "**Rules**") as at present in force and as modified by this Condition, which Rules shall be deemed incorporated into this Condition.  The number of arbitrators shall be three, one of whom shall be nominated by the Bank, one by the Trustee and the third of whom, who shall act as Chairman, shall be nominated by the two party nominated arbitrators, *provided that* if the third arbitrator has not been nominated within 30 days of the nomination of the second party nominated arbitrator, such third arbitrator shall be appointed by the LCIA.  The parties may nominate and the LCIA may appoint arbitrators from among the nationals of any country, whether or not a party is a national of that country.  The seat of arbitration shall be London, England and the language of arbitration shall be English.  Sections 45 and 69 of the Arbitration Act 1996 shall not apply.

(c) *Trustee's Option*

At any time before the Trustee has nominated an arbitrator to resolve any Dispute(s) pursuant to Condition 19(b) (*Arbitration*), the Trustee, at its sole option, may elect by notice in writing to the Bank that such Dispute(s) shall instead be heard by the courts of England, as more particularly described in Condition 19(d) (*Jurisdiction*). Following any such election, no arbitral tribunal shall have jurisdiction in respect of such Dispute(s).

(d) *Jurisdiction*

In the event that the Trustee serves a written notice of election in respect of any Dispute(s) pursuant to Condition 19(c) (*Trustee's Option*), the Bank agrees for the benefit of the Trustee and the Noteholders that the courts of England shall have jurisdiction to hear and determine any such Dispute(s) and, for such purposes, irrevocably submits to the jurisdiction of such courts.  Subject to Condition 19(b) (*Arbitration*), nothing in this Condition shall (or shall be construed so as to) limit the right of the Trustee to bring proceedings ("**Proceedings**") for the determination of any Dispute(s) in any other court of competent jurisdiction, nor shall the bringing of such Proceedings in any one or more jurisdictions preclude the bringing of Proceedings by the Trustee in any other jurisdiction (whether concurrently or not) if and to the extent permitted by law.

(e) *Appropriate Forum*

The Bank has irrevocably waived any objection which it might now or hereafter have to the courts of England being nominated as the forum to hear and determine any Proceedings and agrees not to claim in any Proceedings that any such court is not a convenient or appropriate forum.

(f)     *Agent for Service of Process*

The Bank has agreed that the process by which any Proceedings in England are begun may be served on it by being delivered to Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX or, if different, its registered office for the time being.  If for any reason the Bank does not have such an agent in England, it will promptly appoint a substitute process agent and notify in writing the Trustee of such appointment.   If such person is not or ceases to be effectively appointed to accept service of process on behalf of the Bank, the Bank shall, on the written demand of the Trustee, appoint a further person in England to accept service of process on its behalf and, failing such appointment within 15 days, the Trustee shall be entitled to appoint such a person by written notice to the Bank.  Nothing herein shall affect the right to serve process in any other manner permitted by law.

(g)     *Consent to Enforcement, etc.*

The Bank has consented generally in respect of any Disputes (or Proceedings in accordance with Condition 19(d) (*Jurisdiction*)) to the giving of any relief or the issue of any process in connection with such Disputes or Proceedings, including (without limitation) the making, enforcement or execution against any property whatsoever (irrespective of its use or intended use) of any order or judgment which may be given in such Proceedings or in connection with such Disputes.

(h)     *Waiver of Immunity*

To the extent that the Bank may in any jurisdiction claim for itself or its respective assets or revenues immunity from suit, execution, attachment (whether in aid of execution, before judgment or otherwise) or other legal process and to the extent that such immunity (whether or not claimed) may be attributed in any such jurisdiction to the Bank, or its assets or revenues, the Bank has agreed, in connection with any Disputes or Proceedings, not to claim and have irrevocably waived such immunity to the full extent permitted by the laws of such jurisdiction.